**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARTHUR BARRY SOTLOFF, *et al*., ) | |
| ) | |
| Plaintiffs, ) | CA NO.: 16-cv-725 (TJK) |
| ) | consolidated with CA 18-cv-1625 (TJK) |
| v. ) | |
| ) | |
| SYRIAN ARAB REPUBLIC, *et al.* ) | |
| ) | |
| Defendant ) | |

**PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT ON LIABILITTY
AND MEMORANDUM IN SUPPORT THEREOF**

1

# TABLE OF CONTENTS

I.  MOTION.................................................................................................................. 1

II.  INTRODUCTION ................................................................................................. 1

A.  Statement of the Case................................................................................................ 1

B.  The Parties ................................................................................................................ 3

   i.  Plaintiffs .............................................................................................................. 3

   ii.  Defendant ........................................................................................................... 4

III.  Statement of Facts .................................................................................................. 4

A.  The Assad Regime's Years of Support for ISIS Precursor Organizations .......................... 4

B.  The Assad Regime's Key Role in the Creation of ISIS in Response to the Arab Spring.. 11

   i.  Syria Deliberately Networked and then Released Trained and Experienced Jihadist Prisoners from the ISIS Precursor Groups Who Became the Core of ISIS............................ 14

   ii.  Syria was ISIS' Main Purchaser of Oil and Natural Gas. ................................................ 18

   iii.  Military Cooperation Between Syria and ISIS.................................................................. 20

   iv.  Syria Permitted its Banks to Provide Financial Services to ISIS..................................... 20

C.  ISIS's Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff................................................................................................................................ 21

D.  Procedural History ................................................................................................... 26

IV.  Argument............................................................................................................. 26

A.  Jurisdiction and Standing Exist in this Matter ................................................................. 29

   i.  Federal Subject Matter Jurisdiction Exists, as Syria Is Not Entitled to Immunity for Its Material Support of ISIS and the Resultant Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff. ................................................................................. 29

   ii.  Syria Is Subject to the Personal Jurisdiction of this Court Since Subject Matter Jurisdiction Exists and Syria Has Been Properly Served ...................................................... 30

   iii.  Plaintiffs Have Standing to Bring Their 28 U.S.C. § 1605A Claims Against Syria...... 31

B.  Syria Is Liable for the Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff Under 28 U.S.C. § 1605A ......................................................................... 31

   i.  The Abduction, Torture, and Murder of James Foley and Steven Sotloff constitute Hostage Taking, Torture, and Extrajudicial Killing under 28 U.S.C. § 1605A ................... 31

   ii.  Syria Provided Material Support to ISIS, Without Which that Terrorist Organization Would Have Been Unable to Carry Out the Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff........................................................................... 33

V.    Conclusion.................................................................................................................... 36

## EXHIBIT LIST

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Expert Report of Daveed Gartenstein-Ross |
| 2 | Expert Report of Matt Levitt, Ph. D. |
| 3 | 2014 State Department Country Reports on Terrorism |
| 4 | 2015 State Department Country Reports on Terrorism |
| 5 | 2016 State Department Country Reports on Terrorism |
| 6 | 2017 State Department Country Reports on Terrorism |
| 7 | Treasury Press Release of Nov. 25, 2015 (Haswani designation) |
| 8 | FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL) |
| 9 | Presidential Memorandum Plan to Defeat ISIS |
| 10 | State Department Update on the D-ISIS Campaign |
| 11 | Declaration of Nicholas Henin |
| 12 | Declaration of Arthur Sotloff |
| 13 | Declaration of Diane Foley |
| 14 | Affidavit of Emily Amick |
| 15 | 2000 State Department Overview of State-Sponsored Terrorism |
| 16 | Treasury Press Release of Jan. 25, 2005 (Darwish designation) |
| 17 | Treasury Press Release of Feb. 28, 2008 (Abu Ghadiyah network designation) |
| 18 | Treasury Press Release of Jan. 18, 2006 (Shawkat designation) |
| 19 | Remarks by the President on the Death of Muammar Qaddafi |
| 20 | Treasury Press Release of Sep. 29, 2015 (Treasury Sanctions Major ISIL Leaders) |
| 21 | U.S. Embassy Syria on Twitter part 1 |
| 22 | U.S. Embassy Syria on Twitter part 2 |
| 23 | State Department Press Release of Jan. 10, 2017 (Kotey designation) |
| 24 | E.D. Va. Umm Sayyaf Criminal Complaint |
| 25 | (warning graphic video) ISIS beheading of Steven Sotloff http://web.archive.org/web/20140907203950/http://leaksource.info/2014/09/02/graphic-video-islamic-state-beheads-american-journalist-steven-sotloff/ |
| 26 | (warning graphic video) ISIS beheading of James Foley http://web.archive.org/web/20160914195127/https://leaksource.wordpress.com/2014/08/19/graphic-video-islamic-state-beheads-american-journalist-james-foley/ |
| 27 | Treasury Press Release of Sep. 6, 2018 (Qatirji designation) |

I.    **MOTION**

Plaintiffs in the above-captioned matter respectfully submit this Motion for Entry of Default Judgment on Liability pursuant to Federal Rule of Civil Procedure 55 and 28 U.S.C. § 1608(e) against Defendant Syrian Arab Republic ("Syria") for its material support of ISIS and that terrorist organization's hostage taking, torture, and extrajudicial killings of James Foley and Steven Sotloff. In support of their Motion, Plaintiffs submit the following memorandum and exhibits appended thereto.

Plaintiffs are confident that the memorandum and exhibits provide ample basis for the entry of a default judgment, but respectfully request that if the Court wishes to hear further evidence in support of this motion that it (a) deny the motion without prejudice or defer ruling on the motion, and (b) request additional briefing by Plaintiffs or schedule an evidentiary hearing later in 2019.

Should the Court enter a default judgment against Syria as to liability, Plaintiffs respectfully suggest that the Court hear damages evidence on the papers or appoint a special master to submit a recommendation to the Court. Plaintiffs will expound on the course of action proposed above in the upcoming status conference scheduled for July 16, 2019.

II.    **INTRODUCTION**

A.  **Statement of the Case**

Beginning in March 2011, a wave of protests known as the "Arab Spring" swept through the Middle East and North Africa. Syria responded by arresting, torturing, and killing protestors and other dissidents. Fearing NATO intervention such as the one that toppled Muammar al-Qaddafi's regime in Libya, the Assad regime decided to manufacture an Islamist threat and to position itself as a relatively more palatable alternative. Starting in 2011, at the same time it was jailing and killing Arab Spring protestors, Syria systematically released hundreds of battle-

1

hardened Islamist militants. These former Al-Qaeda in Iraq (AQI)/Islamic State in Iraq (ISI) militants worked together to morph establish ISIS and produced its depraved successes.

Over the following years Syria would carry out a massive petrochemical trade with ISIS, and supply ISIS with logistical and military support in ISIS's fight against the more moderate rebel groups opposing the Assad regime. Syria's creation and support of ISIS result not only in the metamorphosis of a former group of regional actors into a highly effective, transnational terrorist organization, but a gave rise to a humanitarian disaster in Syria itself. James Foley and Steven Sotloff felt obliged to reveal this human suffering to the world, and their humanity brought them to Syria.

ISIS, seeing an opportunity to put pressure on the United States to cease its airstrikes against ISIS and support for ISIS opponents, abducted Foley and Sotloff in November 2012 and August 2013, respectively. These two journalists were held in darkness for months, brutally tortured, starved, and eventually beheaded in recorded broadcasts in August and September 2014 as part of ISIS' horrific but successful public relations-brutality campaign. Several of the ISIS leaders who Syria released in response to the Arab Spring oversaw the captivity, torture, and execution of Foley and Sotloff, as well as the world-wide distribution of the execution videos via the internet.

Plaintiffs' evidence establishes that ISIS carried out the hostage taking, torture, and extrajudicial killings of Foley and Sotloff, that Defendant Syrian Arab Republic ("Syria") provided material support to ISIS, and that ISIS could not have carried out these brutal crimes without Syria's material support. Under section 1605A of the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs are entitled to an award of compensatory and punitive damages. *See* 28 U.S.C. § 1605A.

## B. The Parties

### i. Plaintiffs

Plaintiff Arthur Barry Sotloff is the father of Steven Joel Sotloff and a citizen of the United States of America. Exhibit 12. He brings this action in his own capacity and in his capacity as Personal Representative of the Estate of Steven Joel Sotloff,[1] who was also a U.S. national. *Id.* Plaintiff Shirley Goldie Pulwer is the mother of Steven Joel Sotloff a citizen of the United States of America. *Id.* Plaintiff Lauren Sotloff is the sister of Steven Joel Sotloff a citizen of the United States of America. *Id.*

Should the Court find Syria liable for Steven's murder, his family members have recourse to damages under the federal cause of action found at 28 U.S.C. § 1605A(c).

Plaintiff Diane Maria Foley is the mother of James Wright Foley and a citizen of the United States of America who resides in the state of New Hampshire. Exhibit 13. She brings this suit in her own capacity and in her capacity as Personal Representative of the Estate of James Wright Foley,[2] who was also a U.S. citizen. *Id.* Plaintiff John William Foley is the father of James Wright Foley and a citizen of the United States of America. *Id.* Plaintiff Lt. Col. John Elliot is the brother of James Wright Foley and a citizen of the United States. Plaintiff Mark Vincent Foley is the

---

[1] The State court documents appointing Arthur Barry Sotloff as personal representative of the estate of Steven Joel Sotloff are on file with counsel for Plaintiffs. If requested by the Court Plaintiffs will file those documents under seal, but in light of this Court's Minute Order of April 26, 2016 permitting Plaintiffs to proceed with certain information under seal, counsel for Plaintiffs have not attached them as an exhibit hereto.

[2] The State court documents appointing Diane Maria Foley as personal representative of the estate of Steven Joel Sotloff are on file with counsel for Plaintiffs. If requested by the Court Plaintiffs will file those documents under seal, but in light of this Court's Minute Order on the *Foley* docket of July 24, 2018 permitting Plaintiffs to proceed with certain information under seal, counsel for Plaintiffs have not attached them as an exhibit hereto.

brother of James Wright Foley and a citizen of the United States of America. *Id.* Plaintiff Kathryn Foley Simpson is the sister of James Wright Foley and a citizen of the United States of America. *Id.*

Should the Court find Syria liable for James' murder, his family members have recourse to damages under the federal cause of action found at 28 U.S.C. § 1605A(c).

### ii. Defendant

Defendant Syria is a dictatorship under the control of President Bashar al-Assad. Exhibit 2 at 7. The United States has designated Syria a state sponsor of terrorism since December 29, 1979. *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980).

## III.   STATEMENT OF FACTS

### A.  The Assad Regime's Years of Support for ISIS Precursor Organizations

Syria supported terrorist groups as a matter of government policy decades before the United States invaded Iraq, *see e.g.*, 45 Fed. Reg. 33956 (May 21, 1980), during the invasion, and in the decades of its aftermath. As early as 2000, the U.S. Department of State reported that:

> *Syria continued to provide safe haven and support to several terrorist groups, some of which maintained training camps or other facilities on Syrian territory.* Ahmad Jibril's Popular Front for the Liberation of Palestine-General Command, PFLP-GC, the Palestine Islamic Jihad, PIJ, Abu Musa's Fatah-the-Intifada and George Habash's Popular Front for the Liberation of Palestine, PFLP, maintained their headquarters in Damascus. The Syrian government allowed HAMAS to open a new main office to Damascus in March, although the arrangement may be temporary while HAMAS continues to seek permission to reestablish its headquarters in Jordan. In addition, Syria granted a variety of terrorist groups, including HAMAS, the PFLP-GC, and the PIJ-basing privileges or refuge in areas of Lebanon's Bekaa Valley under Syrian control.

Exhibit 15.

On several occasions this Court has found Syria liable under 28 U.S.C. § 1605A for its material support of the terrorist organizations that operated from its territory against U.S. citizens in Iraq, groups which would later metastasize into ISIS. For example, in *Foley v. Syrian Arab Republic*, this Court found that Syria had sponsored, from 2002-2006, the various incarnations of ISIS/ISIL/Daesh[3] precursor groups, which the Court collectively referred to as the "Zarqawi Terrorist Organization", including: Jamaat al-Tawhid wal-Jihad ("JTJ"), al-Qaeda in Iraq ("AQI") and Mujahidin Shura Council ("MSC"). 249 F. Supp. 186, 193-95 (D.D.C. 2017) (finding Syria liable for the 2002 assassination of a U.S. diplomat in Amman, Jordan, and the 2004 and 2006 abduction, torture and execution of two U.S. service members in separate incidents near Baghdad, Iraq—all acts carried out by the Zarqawi Terrorist Organization); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016) ("[P]laintiffs have established that these suicide bombers were trained, funded, and sent by Zarqawi and his organization AQI, which received material support and resources from the [Syria]."); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 59-63 (D.D.C. 2008) ("Syria was the critical geographic entry point for Zarqawi's fighters into Iraq, Levitt T-1-127, and served as a 'logistical hub' for Zarqawi. *Id.* at 119, 127. Syria supported Zarqawi and his organization by: (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to

---

[3] The terrorist group Daesh is also commonly referred to as the Islamic State of Iraq (ISIS) and the Levant (ISIL). "Daesh" is the Romanization of the Arabic acronym for *ad-Dawlah al-Islāmiyah fīl-ʿIrāq wash-Shām*. Though its literal meaning is the same as the English acronym "ISIL," many world leaders prefer to use the terms "Daesh" as it is somewhat pejorative. "Daesh" is a homophone with the Arabic words Daesh ("one who crushes something underfoot") and Dahes ("one who sows discord"). The various experts and government officers and agents whose statements are quoted below have variously referred to the group as ISIS, ISIL, and Daesh—all of which refer to the same group of terrorists in the same time period.

terrorists and their operational and logistical supply network; and (3) financing Zarqawi and his

terrorist network in Iraq.").

In *Foley*, the Court relied upon the expert testimony and report of Daveed Gartenstein-

Ross in finding that:

> The Zarqawi Terrorist Organization, led by Jordanian born Abu Mus'ab Al-
> Zarqawi, was a group dedicated to what it viewed as the earliest principles of Islam
> and <u>committed to a strategy of fomenting unrest in Middle Eastern countries</u>
> <u>through terrorist acts with the goal of eventually establishing religious</u>
> <u>governance,</u>" Gartenstein-Ross T2-59-62.4 Although <u>effectively the same</u>
> <u>organization throughout</u>, the Zarqawi Terrorist Organization operated under
> various names during the time period relevant to this case, including, among others,
> "Jamaat al-Tawhid wal-Jihad" ("JTJ"), "al-Qaeda in Iraq" ("AQI") and "Mujahidin
> Shura Council" ("MSC"). Despite these name changes, Plaintiffs presented
> undisputed expert testimony that the Zarqawi Terrorist Organization's ideology,
> strategy and leadership remained consistent throughout this period.

*Foley*, 249 F. Supp. 3d at 193 (emphasis added). Syria's support also remained consistent, despite

the name changes for the group. *Id.* at 192-95.

In this case, Daveed Gartenstein-Ross's expert opinion[4] is that "[t]he Islamic State (ISIS)

is the most recent iteration of 'the Zarqawi organization,' a militant group that has undergone

several name changes since its emergence in the early 1990s" including "Jamaat al-Tawhid wal-

Jihad" in 2004, "al-Qaeda in Iraq" from 2004-2006, and the "Mujahedin Shura Council" in 2006.

Exhibit 1 at 12 (Gartenstein-Ross Report). Again, this Court has already found Syria liable for its

---

[4] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education
may testify in the form of an opinion or otherwise . . . ." Fed. R. Evid. 702. Daveed Gartenstein-
Ross has been accepted as an expert witness by two different judges in this Court, defeated a
Daubert challenge in the context of a criminal prosecution of an U.S. citizen-ISIS supporter,
Exhibit 1 at 4-5 (in addition to serving in many other court matters as an expert), and undoubtedly
qualifies as an expert on the evolution of the Islamic State (popularly known as ISIS) from 2012–
2016; on ISIS's responsibility for the deaths of Steven Sotloff and James Foley; on the conditions
that Sotloff and Foley faced while held captive by the militant group; and on the Syrian Arab
Republic's relationship with ISIS both before and during this period. *See* Exhibit 1 at 1-11.
Plaintiffs hereby move the Court to accept him as an expert in the above-described fields.

support of these three iterations of the same group for the injuries which addressed in those cases. *Foley*, 249 F. Supp. 3d at 193, *Thuneibat*, 167 F. Supp. 3d at 36 *Gates*, 580 F. Supp. 2d at 67. Since that time this group has been referred to as the "Islamic State of Iraq (ISI)" from 2006 to 2013, the "Islamic States of Iraq and al-Sham (ISIS)" from 2013 to 2014, and the "Islamic State" from 2014 to the present. Exhibit 1 at 12. Plaintiffs' second expert witness, Matthew Levitt, Ph. D.,[5] former Deputy Assistant Secretary for Intelligence and Analysis in the United States Department of the Treasury and former advisor on counterterrorism and intelligence for the U.S. State Department's Special Envoy Middle East Regional Security, also concluded:

> Syrian government support for the terrorist network that morphed into ISIS goes back many years, to include support for foreign fighters traveling through Syria to join al Qaeda in Iraq (AQI, and specifically the terrorist network led by Abu Musab al Zarqawi) which later became ISIS.

Exhibit 2 at 1.

As the evidence will demonstrate, Syria continued its material support of this terrorist organization through each of these incarnations and at all times relevant to this complaint. Importantly, Syria's long-time support achieved a cumulative effect; ISIS and its key operatives achieved success in their goals because of Syria's prior decade of material support.

---

[5] The Court previously admitted Dr. Levitt as an expert on Syrian support for AQI in *Gates*, 580 F. Supp. 2d 59 n.5, and his education, experience, and training have only increased since that time. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise . . . ." Fed. R. Evid. 702. Dr. Levitt's methodology has been described as "the gold standard in the field of international terrorism" by a U.S. federal district court. *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005). Additionally, the Supreme Court has cited his book on Hamas and its Iranian state-sponsorship in a decision regarding the constitutionality of 18 U.S.C. § 2339B and its prohibition on the provision of material support or resources to designated foreign terrorist organizations. *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010). Dr. Levitt undoubtedly qualifies as an expert on the the Syrian Arab Republic's relationship with ISIS both before and during this period. *See* Exhibit 2 at 1-6. Plaintiffs hereby move the Court to accept him as an expert in the above-described field.

Syria supported the various iterations of the Zarqawi Terrorist Organization because:

> Syria's considerable support for AQI was intended to undermine coalition efforts in Iraq. This desire to see the United States defeated in Iraq was articulated explicitly by Syrian officials, from the very earliest days of the U.S. invasion. Addressing the country's parliament in March 2003—the month of the U.S. invasion—Syria's then-foreign minister Farouq al-Sharra said that "Syria has a national interest in the expulsion of the invaders from Iraq."

Exhibit 1 at 43, 49-50. Dr. Levitt also concludes:

> The Islamic State organization, in its early incarnation as the Zarqawi organization, benefited from Syrian safe haven and support; it maintained a logistical facilitation network in Syria which helped plan operations and funded and trained operatives who carried out attacks in Jordan; and its network in Syria provided financial and operational support to its compatriots fighting in Iraq.

Exhibit 2 at 1.

Syria's support took many forms, including its well-documented and critical role in providing safe haven as the transit point for militants to travel to Iraq to fight U.S. and Western forces. Exhibit 1 at 43. As Gartenstein-Ross states, "Syria's role as the primary transit point for militants heading to Iraq, as well as a permissive operating environment for Zarqawi network operatives stationed there, has been outlined and verified by insider accounts, official U.S. government statements, captured documents and data, and contemporaneous open-source reporting." *Id.* at 43.

In 2003 Congress condemned Syrian government support for the foreign fighter pipelines into Iraq:

> (2) the Government of Syria should—
> (A) immediately and unconditionally stop facilitating transit from Syria to Iraq of individuals, military equipment, and all lethal items, except as authorized by the Coalition Provisional Authority or a representative, internationally recognized Iraqi government;
> (B) cease its support for ''volunteers'' and terrorists who are traveling from and through Syria into Iraq to launch attacks; and

8

(C) undertake concrete, verifiable steps to deter such behavior and control the use of territory under Syrian control;[6]

A March 2007 Department of Defense Report concluded that "Syria continues to provide safe haven, border transit, and limited logistical support to some Iraqi insurgents" and a series of U.S. State Department Country Reports from 2008-10 "all identified Syria as the main conduit for foreign fighters entering Iraq." Exhibit 1 at 46-47.

Syria also knowingly provided safe haven for key terrorist operatives who ran the recruiting and logistics support hubs inside Syria which provided so much critical support to the terrorists transiting into Iraq and the terrorists inside Iraq. *Id.* at 48-50; Exhibit 2 at 20-23. The U.S. Treasury Department designated one such AQI leader, Abu al-Ghadiyah (born Sulayman Khalid Darwish) based in Syria in 2005 for his role in the Zarqawi network. The designation detailed some of his activities and illustrated the essential role that a Syria-based-operative could play in the events in Iraq and how the flow of fighters from Syria into Iraq enabled him to finance and recruit for AQI:

> Darwish handles mostly financial issues for Zarqawi, collecting, and distributing funds for him. Specifically, Darwish sent donations of $10,000-$12,000 to Zarqawi in Iraq every 20-25 days. Darwish sent the money into Iraq through suicide attack volunteers who were entering the country. Darwish also was essential to recruiting and dispatching terrorist operatives, both for the planned attacks in Jordan and for operations elsewhere, particularly Iraq. For example, Darwish contacted jihadists who had been in Afghanistan and who were, by 2004, scattered in different countries; he recruited among these jihadists for fighters to join Zarqawi in Iraq.

Exhibit 16.

This Abu al-Ghadiya died and was quickly replaced by Badran Turki Hishan al-Mazidih, who proceeded to operate under the same *nom de guerre*. Exhibit 1 at 48. The U.S. Treasury Department designated this individual as well, whose scope of activities are described therein:

---

[6] Syria Accountability and Lebanese Sovereignty Restoration Act of 2003, Pub. L. No. 180-175, 117 Stat. 2482 (2003).

obtained false passports for foreign terrorists, provided passports, weapons, guides, safe houses, and allowances to foreign terrorists in Syria and those preparing to cross the border into Iraq. [Mazidih] received several hundred thousand dollars from his cousin Saddah—also designated today—and used these funds to support anti-U.S. military elements and the travel of AQI foreign fighters… As of the spring of 2007, [Mazidih] facilitated the movement of AQI operatives into Iraq via the Syrian border.

Exhibit 17. As Gartenstein-Ross concludes: "[e]ven after the elimination of the first Abu al-Ghadiya, another capable AQI member filled his position, and ensured that fighters, money, and weapons continued to flow across the border." Exhibit 1 at 48.

Control of Syrian government support and supervision of terrorist networks inside Syria has always resided at the very top of the power structure of the Syrian dictatorship. In 2006, the U.S. Treasury Department designated Assef Shawkat "for directly furthering the Government of Syria's support for terrorism" and its detailed explanation of the designation illuminates his role in the government and shines a light on the small group that controls Syria:

Major General Assef Shawkat is the Director of Syrian Military Intelligence (SMI), the strongest and most influential security service in Syria. Its broad internal and external responsibilities include working with terrorist organizations resident in Syria and overseeing the Syrian security presence in Lebanon. In addition to the power he derives from his position, Shawkat also has access to the highest levels of the Syrian power structure by virtue of his marriage to Bushra al-Asad, the sister to Syrian President Bashar al-Assad. Shawkat is a close confidant of President Assad and an important member of his inner circle of advisors.

Exhibit 18 (emphasis added); Exhibit 1 at 51-52 (further detailing Shawkat's role in Syrian government support of various terrorist groups on Syrian soil).

Unsurprisingly, Shawkat later played a key role in the Central Crisis Management Cell (CCMC), "reporting directly to President Assad himself", which effectively ruled Syria after the ignition of the Arab Spring protests. Exhibit 2 at 6. As Dr. Levitt reports:

The CCMC was the highest national-security body in the Syrian government, subordinate only the President Assad himself.  The CMCC formulated strategic and

tactical instructions, which were submitted to President Assad for approval and then disseminated through parallel, and sometimes overlapping, chains of command, that included at their core the National Security Bureau of the Baath Party (the "NSB"), the Security Committees of each of Syria's 14 governates, the Ministry of Defense, and the Ministry of Interior.

Exhibit 2 at 6 (quoting a former member of the CCMC who defected and then testified in a civil proceeding in this Court).[7]

**B.   The Assad Regime's Key Role in the Creation of ISIS in Response to the Arab Spring**

The Syrian government had similarly pragmatic reasons for supporting the latest iteration of the AQI-MSC-ISI strain, which came to be called ISIS—the survival of the regime itself. As Gartenstein-Ross concludes:

a core factor was the regime's desire to make anti-Assad elements appear as extreme, and hence unpalatable, as possible to the outside world. Assad seemingly feared foreign military intervention—a fear that drove his support for AQI during the Iraq war, and one that intensified after the NATO intervention that brought down Muammar al-Qaddafi's regime in Libya. Faced with this perceived existential threat, Assad could justify his support for Sunni extremists as shifting the composition of the insurgency he faced in a jihadist direction, which in turn made foreign intervention far more unattractive.

Exhibit 1 at 53. In 2015 then-Secretary of State John Kerry stated that Assad created ISIS to create a "binary choice between Assad and the terrorists." *Id.* at 55. Syrian government defectors concur in this assessment. Exhibit 1 at 54-55; Exhibit 2 at 9. Dr. Levitt also concludes: "[t]he Syrian regime of Bashar al-Assad took the strategic decision to enable and facilitate the continued survival of the Islamic State terrorist group (aka ISIS, ISIL, Daesh) in Syria in an effort to paint all of the Syrian opposition as 'terrorists'". *Id.* at 1.

---

[7]*Colvin v. Syrian Arab Republic*, Ca. No. 16-cv-1423 (ABJ), Declaration of Abdel Majid Mohammed Abdel Majid Barakat, ECF No. 42-3 at 3-4 (D.D.C. filed December 22, 2017).

Tellingly, Syria's overt support of the group called ISIS began as the Arab Spring erupted in Syria. Exhibit 1 at 53; Exhibit 2 at 9. "Beginning in March 2011, Syria began to experience the effects of the 'Arab Spring' – a wave of protests sweeping through the Middle East and North Africa against authoritarian governments. The Arab Spring prompted both a non-violent movement as well as an armed insurrection, calling for government change and an end to corruption . . . ." *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 147 (D.D.C. 2019) (citations omitted). Syria "responded with a strategy to quash the dissent using military and intelligence forces, coordinated by a group established by President Bashar al-Assad called the Central Crisis Management Cell ('CCMC')". *Id.*

As noted in the expert report of Dr. Levitt, "[i]n coordination with the CCMC, Syria intelligence services coordinated the regime's efforts to allow ISIS to grow and actualize President Assad's threat that, as then-Secretary of State John Kerry put it, 'it's me or the terrorists.'" *Id.* at 8. "From the outset, he [Assad] had portrayed his opponents, even those who were only calling for modest economic reforms, as al Qaeda terrorists . . . .  [Assad] sought to ensure his political longevity through self-fulfilling prophecy. His regime undertook several measures to bring violent Islamism home to Syria.  It was no coincidence that one of the favored slogans of his loyalists was 'Assad or we burn the country.'" *Id.* (quoting Michael Weiss and Hassan Hassan, ISIS: Inside the Army of Terror (New York: Regan Arts, 2015) at 134). As Dr. Levitt, explains, it is the official position of the United States government that "[t]he Assad regime played a key role in ISIL's rise," quoting then-U.S. State Department spokeswoman Marie Harf. *Id.* at 7.

The decade of support for the previous iterations of ISIS bore new fruit when Syria found it provident to play a major role in the creation of a new group to save the Assad regime. From the time the U.S. State Department began identifying ISIL or ISIS in its annual Country Reports on

Terrorism ("CRT"), 2014, until its most recent CRT, 2017, it has consistently found Syria

responsible for the rise of this terrorist group, specifically noting Syria's use of the group as a

political prop, as well as its oil purchases from ISIS:

> The Syrian government had an important role in the growth of terrorist networks in Syria through the permissive attitude the Assad regime took towards al-Qa'ida's foreign fighter facilitation efforts during the Iraq conflict.… <u>Those very networks were the seedbed for the violent extremist elements, including ISIL</u>, which terrorized the Syrian and Iraqi population in 2014 and—in addition to other terrorist organizations within Syria—continued to attract thousands of foreign terrorist fighters to Syria in 2014.

Exhibit 3 at 287-88 (2014 CRT) (emphasis added); Exhibit 4 at 301-302 (2015 CRT) (same as

2014, also noting that "[a]s part of a broader strategy during the year, the regime portrayed Syria

itself as a victim of terrorism, characterizing all of the internal armed opponents as 'terrorists.'")

Exhibit 5 at 305-306 (2016 CRT) (same as 2015, also noting that "the Syrian regime has purchased

oil from ISIS through various middlemen, adding to the terrorist group's revenue."); Exhibit 6 at

219-220 (2017 CRT) (same as 2016). Young fighters for Zarqawi who survived became senior

leaders for ISIS, Exhibit 1 at 58 ("Sources reported that al-Hiju had fought against the American

forces in Iraq sometime before 2008."), and old facilitation and support networks sprung back to

life, *Id.* at 56 (a jihadist released from prison by Syria "brought his regime smuggling contacts

with him when he shifted from Nusra to ISIS in 2013"); Exhibit 2 at 7 ("In fact, Syrian intelligence

agencies were deeply involved in the Assad regime's efforts facilitating and providing cover for

the terrorist pipeline that ran through Syria into Iraq and helped build up al Qaeda in Iraq, which

later became ISIS."), to allow Syria to prop up a group it now needed to appear to have a deadly

Islamic threat in its own territory, to stave off Western support for the moderate Syrian opposition

forces.

As alluded to above, and described by Plaintiffs in detail below, Syrian support for ISIS took many forms and was both direct and indirect.

> ### i.  Syria Deliberately Networked and then Released Trained and Experienced Jihadist Prisoners from the ISIS Precursor Groups Who Became the Core of ISIS

In May 2011, in the wake of some of the early Arab Spring protests in Syria, the Syrian government began to release battle-hardened, experienced Islamist terrorists, who later became leaders in ISIS, from Syrian prisons in a series of official government amnesties. Exhibit 1 at 53-55; Exhibit 2 at 9. At the same time, the regime was arresting large number of peaceful protestors, students, and human rights activists and throwing them into jail and torturing them to death. Exhibit 1 at 54; Exhibit 2 at 9. The striking divergence in the Syrian government official policy toward the different groups reveals its strategy for surviving the Arab Spring movement and any attempted Western intervention, such as the earlier intervention in Libya which resulted in former Libyan dictator Gaddafi's slaughter by a crowd of opposition fighters. Exhibit 1 at 53; *see also* Exhibit 19.

The Assad regime released many jihadist terrorists, among them not just foot soldiers but also critically important future senior Islamic State leaders, who had a dramatic impact on the course of ISIS' success, history, and evolution. These released leaders included Abu Luqman, the future director of the Islamic State's security and intelligence service and governor of Raqqa, who oversaw ISIS's detention and execution of foreign hostages, recruited hundreds of fighters, considered "the most feared jihadist in Raqqa", and who by 2013 oversaw the oil trade between the Assad regime and ISIS. Exhibit 1 at 55-56; Exhibit 2 at 9. "Abu Luqman is considered one of the most notorious members of ISIS's leadership" whose "significance in ISIS cannot be overstated." Exhibit 1 at 55 and 57. He brought "hundreds of Nusra fighters" to ISIS when he

defected from Nusra to ISIS in the Spring of 2013 and became an "integral part of the group's leadership in Raqqa." *Id.* at 56.

Part of Luqman's duties included overseeing and conducting public executions of foreign nationals, *id.* at 56-57, which would have included Sotloff and Foley. The Department of Treasury designated him as a "Major Islamic State of Iraq and the Levant Leaders, Financial Figures, Facilitators, and Supporters":

> As of mid-2015, Syrian national al-Shawakh [Abu Luqman] served as ISIL's governor for Raqqah, Syria, after previously serving as ISIL's senior security official for Syria and as governor in Aleppo, roles in which he directed combat assignments for foreign fighters. Al-Shawakh was in charge of ISIL's detention of foreign hostages, and oversaw the appointment of other ISIL leaders. Al-Shawakh supervised security matters, including executions, interrogations, and transfers of ISIL prisoners, at an al-Raqqah detention facility used to hold foreign hostages and ISIL foreign recruits who had refused to fight. In mid-2014, al-Shawakh ordered the beheadings of two ISIL hostages. Al-Shawakh also served on a governance council chaired by ISIL leader and U.S. and UN-designated SDGT Abu Bakr al-Baghdadi (AKA Dr. Ibrahim al-Badri).

Exhibit 20 (emphasis added). That is, Syria intentionally released a man who would became the governor of the city where Sotloff and Foley were held, tortured, and murdered. While he did not become governor until after their murders, it is clear that he oversaw the execution of hostages at the time they were murdered, "[i]n mid-2014, al-Shawakh ordered the beheadings of two ISIL hostages." *Id.*

Also released were Fiwaz Muhammad al-Kurdi al-Hiju¸ an Abu Luqman associate and ISIS's first judge, Amr al-Absi (Abu al-Atheer), a major recruiter of foreign fighters for ISIS, early advocate for the caliphate system, and Islamic governor, or *Wali*, of Aleppo and Homs. Exhibit 1 at 58-61. Hiju's story symbolizes the entire story of Syrian support for early groups such as AQI, and its metastasis into support for ISIS. A former terrorist who fought against U.S. forces in Iraq, he found himself in Sednaya prison prior to the Arab Spring. *Id.* at 58. Hiju was appointed as ISIS'

"first judge" in mid-2013 and thereafter played a leading role in the execution of prisoners in Raqqa. *Id.* at 58.

Amr al-Absi was another imprisoned jihadist, arrested by Syria as a member of ISI, but then released by the Syrian government to cope with the Arab Spring movement. "Amr al-Absi was among the earliest and most influential members of ISIS." *Id.* at 58. After his release, Absi also left joined ISIS in mid-2013, quickly becoming an important recruiter of foreign fighters. *Id.* at 59. Later elevated to *Wali* of Aleppo, Absi "became notorious for his zealous use of torture and imprisonment", and would have directly overseen at least Foley's imprisonment, as he ran the prison which held Foley. *Id.* at 60. In mid-2014, Absi left the prisons in Aleppo and moved Foley and other prisoners to Raqqa before their execution. Exhibit 1 at 60. Ahmed Primo and Jejoen Bontinck, two former hostages who survived, were able to identify Absi, testified that he played a direct role in their torture. Exhibit 1 at 60. Thus, it is highly likely that Absi played a role in the torture the victims in this case. *Id.* at 60-61.

Additionally, Absi played another critically important role in the success of ISIS. As its leader of ISIS's media wing, he was responsible for the distribution of its infamous beheading videos. Exhibit 1 at 61. As Gartenstein-Ross concludes, "[t]he media wing was one of ISIS's core strengths that was instrumental to drawing foreign fighters to the Syria-Iraq theater to join the group." *Id.* at 61. The ISIS media wing published an English language propaganda magazine called *Dabiq* published between July 5, 2014 and July 31, 2016 through "the Al-Hayat Media Center, one of several media centers that ISIS employed to reach its global followers." *Id.* at 33. Absi was likely responsible for the release of Foley's August 2014 beheading video in which Sotloff appears, and, which was followed in less than two weeks by Sotloff's beheading video. *Id.* at 60-61. In view

of the fact that he ran the media wing and brought Foley to Raqqa from his prison in Aleppo, it is highly likely that he played a direct role in their torture and execution.

Syria's pre-release detention policies for jihadists played a decisive role in the future success of ISIS. During their incarceration, these "graduates" of the notorious Sednaya prison were effectively networked by the Assad regime with other formerly disparate and unconnected jihadists:

> The Assad regime not only let jihadists out of jail to create chaos in society, but it used Sednaya as a laboratory where they could learn knew who was who and could then release certain people to undermine moderate rebel cooperation within the Free Syrian Army (FSA) and create what became ISIS. This was not just a general prisoner release, but rather the release of specific violent extremists for the purpose of countering and undermining the FSA.

Exhibit 2 at 10. Dr. Levitt notes the testimony of one released Sednaya jihadist, "when I was detained, I knew four or five or six, but when I was released I knew a hundred, or two or three hundred. I now had brothers in Hama and Homs and Daraa and many other places, and they knew me. It took only a few short weeks—weeks, not a month—for us, in groups of two or three, in complete secrecy, to start." *Id.* at 10. Various Syrian government figures have described the prison as an "incubator of jihadism" and "a mine for jihadist movements." Exhibit 1 at 54. It is clear that housing former AQI/ISI jihadist together in prison allowed them to build the networks that sprang into life after the Syrian general amnesty and became ISIS.

The orders to release the prisoners came from the "highest authorities." Exhibit 2 at 10. Former members of the Syrian government have confirmed that the regime was "certain" the released prisoners would join the fight against the regime and that the prisoner releases were ordered by Military Intelligence Headquarters in Damascus. Exhibit 1 at 54-55. After Syria released the prisoners, its security services were instructed to work with them. *Id.* at 62. In 2014 Secretary of State John Kerry publicly described the "symbiotic" relationship between ISIS and

Syria, characterized by Assad's refusal to bomb ISIS' headquarters despite knowing its position and using it as a tool to weaken the opposition, a relationship which had made both entities stronger. *Id.* at 63.

### ii. Syria was ISIS' Main Purchaser of Oil and Natural Gas.

Oil sales played a major role in ISIS finances and ISIS' relationship with Syria played a critical role in this success, which the Department of Treasury noted in public comments as early as October 2014: "the Syrian government has made an arrangement to purchase oil from ISIL." *Id.* at 66 (quoting U.S. Treasury Department's Under Secretary for Terrorism and Financial Intelligence David S. Cohen); Exhibit 2 at 12-14. In an on-the-record interview with Plaintiffs' expert Daveed Gartenstein-Ross, Gen. (ret.) Terry Wolff, who served as the Deputy Special Presidential Envoy for the Global Coalition to Defeat ISIS, confirmed ISIS was the Assad regime's "main provider of oil and natural gas," and that the regime purchased that oil not only through the black market, but *directly* from ISIS and that it was delivered *directly* through pipelines from ISIS-controlled facilities. Exhibit 1 at 67-68.

ISIS and its predecessors have been trading oil extracted from Iraq and Syria since at least 2006, and by 2008 39% of its revenue was derived from oil-related activities. *Id.* at 64. In 2014, the year ISIS executed James Foley and Steven Sotloff, it made between $150 million and $450 million from oil sales. *Id.* at 65. Internal ISIS documents seized by U.S. Special Forces in a raid on ISIS "oil tycoon" Abu Sayyaf[8] reveal that from August 2014 to February 2015, Abby Sayyaf's oil division, which traded extensively with the Assad Regime, contributed 72% of the $289.5 million total Islamic State natural resource-related revenues. *Id.* at 69-70. As Gartenstein-Ross

---

[8] During his tenure as "ISIL's minister for oil and gas," Abbu Sayyaf and his wife Umm Sayyaf obtained Kayla Mueller, fellow hostage of James Foley and Steven Sotloff, as a slave. Exhibit 26.

concludes: "[i]n addition to further verifying the existence of ongoing oil trade relations between the regime and ISIS's oil ministry, this memo suggests that the regime was considered a *significant*, and perhaps vital, trading partner." *Id.* at 70.

The significance of the Syrian-ISIS oil trade is demonstrated by the numerous Treasury designations of individuals and entities who played a role in it. *Id.* at 71. In 2015, Treasury filed a designation which sanctioned "Networks Providing Support to the Government of Syria, Including For Facilitating Government Oil Purchases from ISIL." Exhibit 7. According to the Treasury designation, "[George] Haswani is a Syrian businessman who serves as a middleman for oil purchases by the Syrian regime from ISIL" and his company "HESCO is a Syrian engineering and construction company that operates energy production facilities in Syria, reportedly in areas controlled by ISIL." *Id.* Additionally, the State Department found that "the Syrian regime has purchased oil from ISIS through various intermediaries, adding to the terrorist group's revenue." Exhibit 5 at 305-306; Exhibit 6 at 219.

A later Treasury designation of Muhammad al-Qatirji and his company Qatirji Company as an "Assad-ISIS Intermediary" demonstrates Syria's longstanding use of yet another middleman in its important commercial relationship with ISIS. Exhibit 27. Treasury finds that "in a 2016 trade deal between the Government of Syria and ISIS, the Qatirji Company was identified as the exclusive agent for providing supplies to ISIS-controlled areas, including oil and other commodities." *Id.* This finding attests to the highly developed relationship, where Syria appoint specific businessman and companies to carry out its trade with ISIS in different regions. These deals also extended to the ISIS' sale of electricity to Syria, Exhibit 1 at 69, and their sale of wheat to Syria. Exhibit 2 at 14.

### iii.   Military Cooperation Between Syria and ISIS

As Secretary of State John Kerry observed, if Syria and ISIS were actual enemies why did Syria not bomb ISIS' headquarters despite knowing its position? Exhibit 1 at 63. In June 2015 the U.S. Embassy in Damascus stated the obvious regarding the Syrian policy of refusal to target important ISIS assets, "[w]e have long seen that the #Asad regime avoids #ISIL lines, in complete contradiction to the regime's claims to be fighting ISIL. #Syria." Exhibit 22; Exhibit 2 at 11. The U.S. Embassy also publicized instances where Syria made air strikes in support of ISIS' attacks against other Syrian opposition groups: "[r]eports indicate that the regime is making air-strikes in support of #ISIL's advance on #Aleppo, aiding extremists against Syrian population." Exhibit 23; Exhibit 2 at 11. Syrian military cooperation with ISIS extended to allowing its fighters to transmit through Syrian government territory in order to allow them to attack the moderate opposition groups. Exhibit 2 at 11. Dr. Levitt concludes that such cooperation allowed ISIS to take and hold Aleppo and Raqqa, without possession of which it never would have kidnapped Foley and Sotloff. *Id.* at 10-11.

### iv.   Syria Permitted its Banks to Provide Financial Services to ISIS

According to a report by the Financial Action Task Force (FATF), an inter-governmental body of which the United States is a member, as of February 2015 Syria permitted more than 20 financial institutions to operate in ISIS-controlled territory. Trans-national trade is unlikely as the Central Bank of Syria, Commercial Bank of Syria, and Syria International Islamic Bank have all been designated by the United States Treasury, but the presence of these banks allowed ISIS to make transfers to sister branches around Syria. Exhibit 8 at 28. The existence of these commercial ties make other forms of commercial exchange between Syria and ISIS more likely than not.

**C.** **ISIS's Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff**

It is the official position of the United States that ISIS "is responsible for the violent murders of American citizens in the Middle East, including the beheadings of James Foley, Steven Sotloff, and Peter Abdul-Rahman Kassig, as well as the death of Kayla Mueller." Exhibit 9; Exhibit 10. This is corroborated by ISIS's own propaganda videos depicting the beheading of James Foley and Steven Sotloff, verified by Daveed Gartenstein-Ross through several different techniques including analysis and authentication of various ISIS media releases, *see* Exhibit 1 at 23-29, 29-36, as well as the eye-witness testimony of fellow ISIS hostage Nicolas Henin, a French journalist captured and held hostage by ISIS,  who spent months in the same changing series of cells as Foley and Sotloff, which was in the same series of prisons as Mueller. Exhibit 11.

On November 22, 2012, James Foley, an American freelance journalist covering the war in Syria, and his British colleague John Cantlie rode back toward the Turkish border in a taxi. Exhibit 1 at 23. Their car was blocked by a group of militants who handcuffed them and forced them into the back of a van. *Id*. Over the next eighteen months that they were held in captivity, Foley and Cantlie were moved three times, ultimately ending up in an ISIS prison beneath the Aleppo Children's Hospital. *Id*. It was in Aleppo that Henin first saw Foley as they crossed paths in July 2013 on the way to the bathroom. Exhibit 11 at ¶¶ 3, 6, 9.

On August 4, 2013, Steven Sotloff, an American journalist covering the civil war in Syria, and his fixer, Yosef Abobaker, were kidnapped by ISIS militants shortly after they crossed the border from Turkey. Exhibit 1 at 29. Two days after his abduction he was placed in the same cell in the Aleppo prison as Henin. Exhibit 11 at ¶10.  In mid-October, Henin's captors placed Foley in the same cell. *Id.* at ¶11. For approximately the next six months, until Henin's release in April

21

2014, he, Foley, and Sotloff shared a series of changing cells. *Id.* at ¶12. In August and November 2013, Henin heard a female voice begging "please don't hurt me" in French and English. *Id.* at ¶26. Before his release in April, Henin's captors brought Mueller in to the cell he shared with Foley and Sotloff so that he could provide a proof of life for her upon his return; he saw her face and when she stated "I am Kayla Jean Mueller," Henin recognized the voice he had heard previously. *Id.* at ¶28-29.

During their captivity, Henin, Foley, and Sotloff were held in darkness without seeing daylight for months at a time, forced to use bottles and buckets to relieve themselves, starved, chained together for months at a time, and beaten. *Id.* at ¶¶13-14. The beatings did not occur on a regular schedule, but rather intensified before prisoner releases or proof of life contact so that the hostages would recount their horror and put more pressure on their home countries. *Id.* at ¶21. Henin vividly remembers an instance in the fall of 2013 in which Sotloff was beaten severely, punched and kicked dozens of times as the guards collected other prisoners for proof of life videos. *Id.* at ¶21. According to Henin, the physical torture was not as bad as the psychological torture, which included threats of execution, as well as forcing them to watch execution videos of other hostages. *Id.* at ¶¶13-14.

Foley told Henin that prior to their sharing a cell, he had been beaten intensely in a manner worse than that inflicted upon the group. *Id.* at ¶16. He also told Henin that he had been water-boarded and starved. *Id.* at ¶¶17-18. Henin could see that Foley's ribs had been caved in to his chest and not allowed to heal properly and noticed that their captors beat Foley more frequently because he was American and because his brother was in the U.S. Air Force. *Id.* at ¶16.

In late 2013/early 2014, Foley, Sotloff, and Henin were transferred to a prison in Raqqa, from where Henin was released and where Foley and Sotloff were beheaded. *Id.* at ¶27; Exhibit 1

at 42. It is highly likely that Foley's and Sotloff's torture continued until they were beheaded. After

Foley, Sotloff, and Henin's captors, who they nicknamed John, George, and Ringo (collectively

"the Beatles") for their British accents, were identified in the media by several governments, Henin

learned that learned that their real names were Mohammed Emwazi, El Shafee Elsheikh, and

Alexanda Kotey, respectively. Their infamous depravities earned them a U.S. State Department

designation as a Specially Designated Global Terrorist (SDGT):

> Alexanda Amon Kotey, a British national, is one of four members of an execution
> cell for the Foreign Terrorist Organization (FTO) and SDGT group, the Islamic
> State of Iraq and the Levant (ISIL). The notorious cell, dubbed "The Beatles" and
> once headed by now-deceased SDGT Mohamed Emwazi (also known as Jihadi
> John), is responsible for holding captive and beheading approximately two dozen
> hostages, including several Westerners. Among them: American journalists James
> Foley and Steven Sotloff, and American aid worker Peter Kassig. As a guard for
> the cell, Kotey likely engaged in the group's executions and exceptionally cruel
> torture methods, including electronic shock and waterboarding.

Exhibit 23. Their involvement certifies Foley's and Sotloff's status as victims of unusual, cruel,

and inhumane torture.

On August 19, 2014, after he had been held for over a year and a half, James Foley was

taken to Raqqa, where he was forced to kneel in front of a camera and recite a statement

denouncing the United States:

> I call on my friends, family, and loved to rise up against my real killers, the U.S.
> government, for what will happen to me is only a result of their complacency and
> criminality. My message to my beloved parents: Save me some dignity and don't
> accept any meager compensation for my death from the same people who

effectively hit the last nail in my coffin with the recent aerial campaign in Iraq. I call on my brother John who is a member of the U.S. Air Force: Think about what you are doing. Think about the lives you destroy, including those of your own family. I call on you, John, think about who made the decision to bomb Iraq recently and kill those people, whoever they may have been. Think John, who did they really kill? Did they think about me, your and our family when they made that decision? I died that day, John. When your colleagues dropped that bomb on those people they signed my death certificate.

*Id.* at 26-27. After finishing his statement, an individual later identified by the U.S. government, counterterrorism experts, and media outlets as ISIS member and "Beatle" Mohammad Emwazi stated the following:

This is James Wright Foley, an American citizen of your country. As a government, you have been at the forefront of aggression towards the Islamic State. You have plotted against us and gone far out of your way to find reasons to interfere in our affairs. Today, your military airforce is attacking us daily in Iraq. Your strikes have caused casualties amongst Muslims. You're no longer fighting an insurgency, we are an Islamic army and a State that has been accepted by a large number of Muslims worldwide, so effectively, any aggression towards the Islamic State is an aggression towards Muslims from all walks of life who have accepted the Islamic Caliphate as their leadership. So any attempt by you, Obama, to deny the Muslims their rights of living in safety under the Islamic Caliphate will result in the bloodshed of your people.

*Id*. After finishing his statement, Emwazi begins beheading Foley. Exhibit 26. The video does not show the full beheading but does show Foley being mortally wounded before concluding with an image of Foley's beheaded corpse. *Id*. Emwazi then reappears holding Sotloff, in the same position and orange jumpsuit as Foley, before stating "[t]he life of this American citizen, Obama, depends on your next decision." *Id*.

Daveed Gartenstein-Ross has authenticated this video through its method of distribution, language, watermarks, flags, and logos, the identification of Emwazi, as well as subsequent public responsibility for the execution on the Part of ISIS. Exhibit 1 at 25-29. The National Security Council has publicly confirmed the authenticity of the video. *Id.* at 28.

On September 2, 2014, ISIS executed Sotloff in another publicly released video. *Id.* at 30.

Sotloff appears kneeling in an orange jumpsuit, and makes the following statement:

> I am Steven Joel Sotloff. I'm sure you know exactly who I am by now and why I am appearing before you. And now this time for my message: Obama, your foreign policy of intervention in Iraq was supposed to be for the preservation of American lives and interests, so why is it that I am paying the price of your interference with my life? Am I not an American citizen? You've spent billions of U.S. taxpayers' dollars and we've lost thousands of our troops in our previous fighting against the Islamic State, so where is the people's interest in reigniting this war? From what little I know about foreign policy, I remember a time you could not win an election without promising to bring our troops back home from Iraq and Afghanistan and to close down Guantánamo. Here you are now, Obama, nearing the end of your term, and having achieving none of the above, and deceivingly marching us the American people in the blazing fire.

*Id.* at 31-32. As with Foley, Sotloff's executioner, identified by U.S. government sources as

Emwazi, directs a threat at President Obama:

> I'm back, Obama, and I'm back because of your arrogant foreign policy towards the Islamic State, because of your insistence on continuing your bombings and [unclear] on Mosul Dam, despite our serious warnings. You, Obama, have but to gain from your actions but another American citizen. So just as your missiles continue to strike our people, our knife will continue to strike the necks of your people... We take this opportunity to warn those governments that enter this evil alliance of America against the Islamic State to back off and leave our people alone.

*Id.* at 32. As in the Foley video, after finishing his statement Emwazi is shown cutting Sotloff's

throat and inflicting a mortal wound, does not show the full beheading. *Id.*; Exhibit 25. The video

concludes with an image of Sotloff's beheaded corpse before Emwazi appears with British hostage

David Cawthorne Haines (who was later executed by ISIS). *Id.*

As with the Foley video, Daveed Gartenstein-Ross has authenticated the Sotloff video

through its method of distribution, language, watermarks, flags, and logos, the identification of

Emwazi, as well as subsequent public responsibility for the execution on the Part of ISIS. Exhibit

1 at 33-35. The National Security Council has publicly confirmed the authenticity of the video. *Id.*

at 35.

### D.  Procedural History

On April 18, 2016 Plaintiffs in *Sotloff v. Syrian Arab Republic*, Ca. No. 16-cv-725 commenced this action seeking monetary damages for the abduction, torture, and extrajudicial killing of Steven Sotloff under 28 U.S.C. § 1605A. *Sotloff* Pls.' Compl., ECF No. 1. On July 10, 2018 Plaintiffs in *Foley v. Syrian Arab Republic*, Ca. No. 18-cv-1625 commenced this action seeking monetary damages for the abduction, torture, and extrajudicial killing of James Foley under 28 U.S.C. § 1605A. Pls.' *Foley* Pls.' Compl., *Foley* ECF No. 1. Service of process was effected on Syria by diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4) on February 6, 2017 in *Sotloff*, Clerk's Entry of Default, ECF No. 17, and on November 12, 2018 in *Foley*, ECF No. 31. The two matters were consolidated on September 24, 2018, Order, ECF No. 25, and the Clerk of the Court entered a default as to Syria in both consolidated matters as of January 28, 2019, Clerk's Entry of Amended Default, ECF No. 33.

### IV.  ARGUMENT

Under the FSIA, this Court may enter default judgment against Syria if it deems that Plaintiffs have established their claim "by evidence satisfactory to the court," see 28 U.S.C. § 1608(e), a standard that may be met "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (emphasis added and internal quotation marks omitted).  "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)" and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citations omitted).

A full hearing on liability is not required to award Plaintiffs relief, "the FSIA requires only that a plaintiff 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting 28 U.S.C. § 1608(e)). This standard which may be met "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (emphasis added) (internal quotation marks omitted). Chief Judge Beryl Howell recently ruled that affidavits alone could supply ample and sufficient evidence to satisfy the requirements of 28 U.S.C. § 1608(e). *See Braun v. Islamic Republic of Iran*, CA No. 15-1136 (BAH) Minute Order (D.D.C. filed November 9, 2016). In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit relyied on affidavits by two experts to reverse and remand to the District Court to enter a default judgment without an evidentiary hearing. 774 F.3d 1044, 1050-51 (D.C. Cir. 2014).

The "'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)" and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citations omitted). "In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). The D.C. Circuit recently affirmed this decision and emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases.  Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

27

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citations and quotations omitted).

In assessing whether a plaintiff has established a claim under the FSIA, the court "must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim[ ] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.'" *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 56 (D.D.C. 2018) (quoting Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1047–48 (D.C. Cir. 2014)).  Thus, the U.S. Court of the Appeals for the D.C. Circuit in Owens v. Republic of Sudan, 864 F.3d 751, 785-86 (D.C. Cir. 2017), recently observed that a "district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism":

> For example, we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial. See Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1048-51, 413 U.S. App. D.C. 356 (D.C. Cir. 2014) (noting "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding) (internal alterations and quotation marks removed). This broad discretion extends to the admission of expert testimony, which, even in the ordinary case, "does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 567 (D.C. Cir. 1993).  <u>Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion</u>. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems. Cf. Bell Helicopter Textron, 734 F.3d at 1181.

*Id*. (emphasis added). In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Id.* (internal citations and quotations omitted). The Court of Appeals in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence

and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id*.

The combination of evidence produced by Plaintiffs allow this Court to find the Syrian Arab Republic liable for the injuries caused to Plaintiffs under 28 U.S.C. § 1608(e).

### A.  Jurisdiction and Standing Exist in this Matter

**i.  Federal Subject Matter Jurisdiction Exists, as Syria Is Not Entitled to Immunity for Its Material Support of ISIS and the Resultant Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff.**

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 ("FSIA"), provides the sole basis for obtaining jurisdiction over a foreign state in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Although the FSIA provides that foreign states are generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions in which a federal district court can obtain personal and subject matter jurisdiction over a foreign state. *See e.g.*, *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011), *aff'd, Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017). Under the FSIA, a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b). Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity.  *See* 28 U.S.C. §§ 1330(a), 1604.

The "terrorism exception" to the FSIA, first enacted as part of the Mandatory Victim's Restitution Act of 1996 and substantially expanded by section 1083 of the National Defense Authorization Act for Fiscal Year 2008, authorizes causes of action against foreign state sponsors of terrorism for "personal injury or death" arising from acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support. 28 U.S.C. § 1605A(a)(1).

This exception applies here for the reasons set forth in section IV.B below, and because the additional pre-requisites for a case to be heard under § 1605A(a)(2) are met:

(i)     Syria was designated a state sponsor of terrorism at the time of Foley and Sotloff's killing, *see supra*, Section II.B.ii;

(ii)    Plaintiffs, James Foley, and Steven Sotloff were nationals of the United States at the time Foley and Sotloff were killed, *see supra*, Section II.B.i; and

(iii)   Plaintiffs afforded Syria a reasonable opportunity to arbitrate, *see* Exhibit 14; *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233–34 (D.C. Cir. 2003) (holding FSIA "does not require any particular form of offer" and that offer made after service of complaint afforded a reasonable opportunity to arbitrate); 28 U.S.C. § 1605A(a)(2).

Accordingly, since Syria is not entitled to immunity under the FSIA, this Court has "original jurisdiction" over this matter. 28 U.S.C. § 1330(a).

> ## ii. Syria Is Subject to the Personal Jurisdiction of this Court Since Subject Matter Jurisdiction Exists and Syria Has Been Properly Served

This Court has personal jurisdiction over Syria because, as set forth in Plaintiffs' Affidavit for Default and Motion for Entry of Default, ECF Nos. 17, 30, service was effected in accordance with the FSIA's requirements. *See 2*8 U.S.C §§ 1330(a), 1608(a); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) ("[p]ersonal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C. § 1330(a) and service of process meets the standards set forth by 28 U.S.C. § 1608").

### iii. Plaintiffs Have Standing to Bring Their 28 U.S.C. § 1605A Claims Against Syria.

Under the FSIA terrorism exception, nationals of the United States may seek an award of economic damages, solatium, and punitive damages against non-immune foreign states. 28 U.S.C. § 1605A(c). Both victims and Plaintiffs were and are U.S. nationals at all times relevant to this case. *See supra* Section II.B.i. Plaintiffs Arthur Barry Sotloff and Diane Maria Foley may therefore recover the all damages arising from Foley's and Sotloff's captivity, tortures, and deaths as personal representatives of their estates. Additionally, all Plaintiff have standing to seek solatium for the emotional pain they suffered from being deprived of the society and comfort of their sons and brothers. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010). Finally, all Plaintiffs have standing to sue for punitive damages. *Id.* at 83.

### B. Syria Is Liable for the Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff Under 28 U.S.C. § 1605A

Under 28 U.S.C. § 1605A(c), a designated state sponsor of terrorism is liable for damages to a national of the United States for personal injury or death caused by an act of "torture, extrajudicial killing, . . . hostage taking, or the provision of material support or resources for such an act . . . ." 28 U.S.C. § 1605A(a)(1), (c). The record presented by Plaintiffs proves Syria's liability for the hostage taking, torture, and extrajudicial killing of James Foley and Steven Sotloff.

### i. The Abduction, Torture, and Murder of James Foley and Steven Sotloff constitute Hostage Taking, Torture, and Extrajudicial Killing under 28 U.S.C. § 1605A

#### 1. *Hostage Taking*

Section 1605A(h)(2)'s "definition of 'hostage taking' incorporates the definition from Article 1 of the International Convention Against the Taking of Hostages . . . and that definition applies to a person who 'seizes or detains and threatens to kill, to injure or to continue to detain

31

another person.'" *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 16 (D.C. Cir. 2015); 28

U.S.C. § 1605A(h)(2).  ISIS's abduction of both Foley and Sotloff are archetypical hostage takings.

They were forcibly detained and threatened with further detention, injury, and death unless the

United States provided certain concessions to ISIS. *See supra* Section III.C.

2.  *Torture*

Under the FSIA, "torture" is defined as: "[1] any act, [2] directed against an individual in

the offender's custody or physical control, [3] by which severe pain or suffering (other than pain

or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical

or mental [4] is intentionally inflicted on that individual [5] for such purposes as obtaining from

that individual or a third person information or a confession, punishing that individual for an act

that individual or a third person has committed or is suspected of having committed, intimidating

or coercing that individual or a third person, or for any reason based on discrimination of any

kind."  Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C.

§ 1605A(h)(7).

ISIS tortured both Sotloff and Foley in that while both were in ISIS custody, they were

starved, beaten, chained in darkness for months at a time in unhealthy conditions, waterboarded,

and subjected to threats of death and mock executions,  for the purpose of punishing them for their

national identity, and the national identity and public service of their relatives, to coerce them into

reciting ISIS propaganda, and to intimidate and coerce the U.S. population and government. *See*

*supra* Section III.C.

3.  *Extrajudicial Killing*

The definition of "extrajudicial killing," at Section 1605A(h) follows the definition set

forth in the Torture Victims Protection Act of 1991.  See 28 U.S.C. § 1605A(h)(7).  "Extrajudicial

32

killing" is defined as: [1] "a deliberated killing [2] not authorized by a previous judgment pronounced by a regularly constituted court [3] affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and [4] that, "under international law," is not "lawfully carried out under the authority of a foreign nation." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C. § 1605A(h)(7).

The executions of James Foley and Steven Sotloff while they were held hostage by ISIS were not sanctioned by any court, *see supra* Section III.C, and plainly constitute "extrajudicial killings" within the meaning of the FSIA. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1050 (D.C. Cir. 2014) ("With respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

### ii. Syria Provided Material Support to ISIS, Without Which that Terrorist Organization Would Have Been Unable to Carry Out the Hostage Taking, Torture, and Extrajudicial Killing of James Foley and Steven Sotloff.

Plaintiffs have satisfied their burden under 28 U.S.C. § 1608(e) to show that Syria provided material support and resources in furtherance of ISIS' acts of terrorism, including the hostage taking, torture, and murder of James Foley and Steven Sotloff. The definition of "material support or resources" in Section 1605A is drawn from the Anti-Terrorism Act, 18 U.S.C. § 2339A, and is defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

The FSIA requires that the extrajudicial killings, torture, and hostage taking be "caused by" the provision of material support. In the FSIA context, the causation requirement is satisfied by a showing of proximate cause. *See e.g.*, *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d

138, 177 (D.D.C. 2016) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-28 (D.C. Cir. 2004)). "Proximate causation normally requires only that there be 'some *reasonable connection* between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Flanagan*, 190 F. Supp. 3d at 177 (citing *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984); *accord Kilburn,* 376 F.3d at 1128 (citing same) (emphasis added). Neither specific intent nor advanced knowledge by the foreign state of a terrorist act is not required for a finding that a state sponsor of terrorism provided "material support" under the FSIA's terrorist exception. In *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), the D.C. Circuit explicitly rejected the argument that the FSIA requires a "greater showing of intent than proximate cause." *Owens*, 864 F.3d at 798.

As set forth above, *see supra,* Section III.A-B, Syria provided ISIS and its predecessor organizations with massive payments for oil, electricity, agricultural products, access to banking services, a supply of trained, networked and radicalized jihadis released from prison, as well as military coordination and support, such as air strikes against ISIS opponents. This certainly qualifies generally as "any property, tangible or intangible, or service," and qualifies specifically as "currency," "financial services," "lodging," "training," "expert advice and assistance," "safehouses," "weapons," and "personnel" under 18 U.S.C. § 2339A.; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150-51 (D.D.C. 2011) *aff'd by Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safehouse' under 18 U.S.C. § 2339A(b). . . .") (internal citation omitted).

Syria intentionally released Abu Luqman, the director of the Islamic State's security and intelligence service and governor of Raqqa, who oversaw ISIS's detention and execution of foreign

hostages, Fiwaz Muhammad al-Kurdi al-Hiju, ISIS' first judge in mid-2013 who thereafter played

a leading role in the execution of prisoners in Raqqa, and Amr al-Absi, the infamous head of ISIS'

media wing and an official who certainly came into direct contact with Foley during his captivity

and torture, and who in view of the fact that Foley and Sotloff were imprisoned and tortured

together very likely came into contact with Sotloff as well. *See infra* at pp. 14-17.  These are only

three of the "hundreds of Sednaya's extremist prisoners" who were released as part of the Syrian

government's general amnesty to hardened jihadists, Exhibit 1 at 54, as a reaction to the Arab

Spring. These three contributed materially to the success of ISIS in Syria, and were all highly likely

to have been involved in Foley and Sotloff's torture and murder. *Id.*

ISIS would not have been able to carry out the hostage taking, torture, and execution of

James Foley and Steven Sotloff without the material support of Syria. As Gartenstein-Ross

concludes, "[r]elying upon substantial evidence commonly used by experts in the relevant fields,

it is my expert opinion that:

> Following the onset of the "Arab Spring" revolutions that destabilized the region
> in 2011, the Syrian Arab Republic engaged in both explicit and also tacit support
> for ISIS, exemplified by prisoner releases that the regime undertook in 2011 and
> also the regime's oil trading relationship with ISIS. These activities should be
> understood in the context of the regime's support for ISIS's predecessor, al-Qaeda
> in Iraq (AQI), in the early 2000s. *It is unlikely that ISIS would have been able to
> amass as much power as it did, and hence kill Foley and Sotloff in the manner at
> issue in this case, but for these actions undertaken by the Syrian Arab Republic.*

*Id.* at 72-73 (emphasis added). Dr. Levitt[9] concurs:

> Based on my knowledge, experience, training and education, and drawing on my
> own extensive research, I make the following additional expert opinions. Over the
> course of many years, the Islamic State group (first as the Zarqawi network, then al
> Qaeda in Iraq, then the Islamic State of Syria and the Levant and finally as the

---

[9] This Court has previously relied on the expert testimony and reports of both Gartenstein-Ross
and Dr. Levitt in concluding that Syria's material support of ISIS' predecessors made it liable for
that group's hostage taking, torture, and extrajudicial killing of U.S. nationals. *See e.g. Foley*, 249
F. Supp. 3d 186; *Gates*, 580 F. Supp. 2d 53.

Islamic State group) benefited from a wide range of material and other support from the Assad regime. Without this support, the Islamic State group could not have evolved during 2012-2015 into the powerful terrorist group it became, controlling large swaths of territory and engaging in truly barbaric acts of terrorism such as beheadings, crucifixions, burning people alive, and more.

By targeting moderate Syrian rebel groups and often avoiding conflict with the Islamic State, Syria carved out a safe haven for the Islamic State, which at a minimum prevented any law enforcement or security agency supervision or interdiction of the group. Without effective law enforcement or security agencies, and *in light of Syrian government activates that helped the Islamic State group take and hold territories such as Aleppo and Raqqa, the Assad regime enabled ISIS to kidnap and kill hostages in these areas.*

Exhibit 2 at 23-24 (emphasis added). Specifically, Dr. Levitt concludes that Syria-ISIS military cooperation allowed ISIS to take and hold Aleppo and Raqqa, without possession of which ISIS would never would have kidnapped Foley and Sotloff. *Id.* at 10-11.

Syria deliberately released certain prisoners, as it began a massive incarceration of Arab Spring protestors, in order to resurrect the jihadist bogeyman group—formerly AQI/ISI—that had faded from the scene. Just the three prisoners described above became key members of ISIS and laid the foundation for its infamy and depraved successes. Syria instructed its officers to cooperate with ISIS, coordinated with ISIS in military efforts against the moderate opposition, and engaged in critical trade with ISIS which funded the group's ambitions. But for this assistance, ISIS would not have been able to take Aleppo and Raqqa, and would not have kidnapped, tortured, and executed James Foley and Steven Sotloff.

## V.  <u>CONCLUSION</u>

For the above-mentioned reasons, the Court should enter a default judgment as to liability against Defendant Syrian Arab Republic for the hostage taking, torture, and extrajudicial killings of James Foley and Steven Sotloff.

DATED                                        Respectfully Submitted,

July 12, 2019                                s/Steven R. Perles
                                             Steven R. Perles (Bar No. 326975)
                                             Edward B. MacAllister (Bar No. 494558)
                                             Joshua K. Perles (Bar No. 1031069)
                                             Emily J. Amick (Bar No. 242018)
                                             PERLES LAW FIRM, PC
                                             1050 Connecticut Ave, NW
                                             Suite 500
                                             Washington, DC 20036
                                             Telephone: 202-955-9055
                                             Email: sperles@perleslaw.com