**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ARTHUR BARRY SOTLOFF *et al.*,

        *Plaintiffs*,

    v.

SYRIAN ARAB REPUBLIC,

        *Defendant*.

Civil Action No. 16-725 (TJK)
(Consolidated with 18-cv-1625)

## <u>MEMORANDUM OPINION</u>

James Foley and Steven Sotloff, American journalists covering the civil war and humanitarian crisis in Syria, were kidnapped, tortured, and beheaded by the Islamic State of Iraq and the Levant, also known as the "Islamic State," "ISIS," or "ISIL." As a result of the gruesome video of their deaths that ISIS distributed for propaganda purposes in 2014, their tragic deaths are well-known to many Americans. This case, brought by their families against the Syrian Arab Republic under the terrorism exception to the Foreign Sovereign Immunities Act, is largely about whether Syria provided material support to ISIS such that Syria may be held liable for what happened to them. After a two-day evidentiary hearing, the Court now finds Syria liable. Thus, for the below reasons, it will grant the pending motion for default judgment and enter judgment against Syria.

## I.    Background

### A.    Factual Background

#### 1.    Syria and the Rise of ISIS

Syria has provided safe haven and support to terrorist organizations within its borders for decades. *See* 45 Fed. Reg. 33956 (May 21, 1980); Ex. 15 (2000 State Department Overview of

State-Sponsored Terrorism) at 5.[1]  In the early 2000s, the Zarqawi organization, or network, operated from Syria and received funding and resources from Syria.  *See Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193–95 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 59–63 (D.D.C. 2008).[2]  ISIS is simply "the most recent iteration of 'the Zarqawi organization,' [which] has undergone several name changes since its emergence in the early 1990s."  Ex. 1 at 12;[3]

---

[1] The State Department Overview of State-Sponsored Terrorism is admissible as a public record under Federal Rule of Evidence 803(8).  This overview is from a "Patterns of Global Terrorism" report that the D.C. Circuit has previously found admissible because it "fit[s] squarely within the public records exception" provided in Federal Rule of Evidence 803(8)(A)(iii).  *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017).  Under Rule 803(8), "[a] record or statement of a public office" is admissible if "it sets out . . . factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(A)(iii), (B).  "Once proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable."  *Owens*, 864 F.3d at 792 (citation omitted).  In *Owens*, the court concluded that the report satisfied these elements because it "contain[ed] both factual findings and conclusions on [various states'] support for terrorism," was created pursuant to a statute that requires annual reports on terrorism, and was "therefore the product of a 'legally authorized investigation.'"  *Id.* at 792–93 (quoting Fed. R. Evid. 803(8)(A)(iii)).  And there are no indicators of untrustworthiness.

[2] The Court takes judicial notice of these facts found in these opinions, which it may do for any fact "not subject to reasonable dispute" if it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing cases).  "Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings."  *Id*.  And "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'"  *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (citation omitted).  That said, the Court, as it must, reaches its own, independent findings of these facts here.  *Rimkus*, 750 F. Supp. 2d at 172.

[3] Exhibits 1 and 2 are the written testimony and reports of Plaintiffs' expert witnesses Dr. Daveed Gartenstein-Ross and Dr. Matthew Levitt.

Gartenstein-Ross Hr'g Tr. 39:13–40:13; *see also* Ex. 2 at 1 ("Syrian government support for the terrorist network that morphed into ISIS goes back many years, to include support for foreign fighters traveling through Syria to join al Qaeda in Iraq (AQI, and specifically the terrorist network led by Abu Musab al Zarqawi) which later became ISIS.").

The United States' invasion of Iraq in March 2003 opened a new chapter in Syria's role supporting Zarqawi's organization.  Despite pressure from the United States,[4] Syria continued to support Zarqawi and his forces, motivated by twin desires to "tie down U.S. forces in Iraq" and "allow the Iraq conflict to serve as an outlet for its domestic jihadists in the hope that if they were fighting in the war in Iraq, they might not cause trouble at home."  Gartenstein-Ross Hr'g Tr. 50:20–25; Ex. 1 at 53.  Syria maintained direct ties to the Zarqawi organization and allowed key Zarqawi operatives to operate in Syria and across its borders into neighboring countries.  Ex. 1 at 53–55; Ex. 2 at 20–23.  Over the next few years, Syria became "a transit station for al-Qaeda foreign terrorists on their way to Iraq," as Zarqawi facilitated the flow of "money, of weapons, and terrorists intent on killing U.S. coalition forces and innocent Iraqis."  Levitt Hr'g Tr. 163:24–164:3.  The Treasury Department responded by designating members of the Zarqawi network in Syria under Executive Order 13224 for providing financial and material support for terrorism.[5]

---

[4] *See* Syria Accountability and Lebanese Sovereignty Restoration Act of 2003, Pub. L. No. 180-175 (calling on Syria to "immediately and unconditionally stop facilitating transit from Syria to Iraq of individuals, military equipment, and all lethal items . . . [and] cease its support for 'volunteers' and terrorists who are traveling from and through Syria into Iraq to launch attacks").

[5] Ex. 1 at 48; Ex. 16 (announcement of the designation of Sulayman Khalid Darwish, "one of the most prominent members of the Zarqawi Network in Syria," that also noted that Zarqawi and the Zarqawi network had been named Specially Designated Global Terrorists in 2003 and 2004, respectively); Ex. 17 (2008 announcement of the designation of Badran Turki Hishan al-Mazidih, for "obtain[ing] false passports for foreign terrorists, provid[ing] passports, weapons, guides, safe houses, and allowances to foreign terrorists in Syria and those preparing to cross the border into Iraq").

But the Zarqawi organization could not have operated in Syria without the "knowledge and permission" of the Syrian regime. Levitt Hr'g Tr. 162:3. Thus, the Treasury Department also moved to designate members of the Syrian government itself, including its Director of Military Intelligence, as Specially Designated Nationals under Executive Order 13338, for furthering Syria's support for terrorism.[6] Indeed, Syria's policy toward the Zarqawi organization from 2002 to 2010 was for Syrian intelligence officers to "not investigate, surveil, assist, or arrest such militants unless the top (officials) of the government wish[ed] it," according to a former high-ranking member of Syria's intelligence service. ECF No. 37-1 ¶ 13.[7]

In March 2011, "Syria began to experience the effects of the 'Arab Spring'—a wave of protests sweeping through the Middle East and North Africa against authoritarian governments. The Arab Spring prompted both a non-violent movement as well as an armed insurrection, calling for government change and an end to corruption . . ." *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 147 (D.D.C. 2019) (citations omitted). This movement made Syria's support for the terrorists within its borders a matter of survival for the Syrian regime. In the months that followed, fearing Western military intervention of the sort that toppled Muammar al-Qaddafi in Libya, Syria's President Bashar al-Assad began supporting the latest iteration of the Zarqawi organization "in an effort to paint all of the Syrian opposition as terrorists," and thus make similar action to dislodge his regime harder. Ex. 2 at 1, 6, 9; Ex. 1 at 53; ECF No. 37-1

---

[6] Ex. 18 (2006 announcement of the designation of Assef Shawkat, the then-"Director of Syrian Military Intelligence" and "close confidant of President Assad and an important member of his inner circle of advisors," "for directly furthering the Government of Syria's support for terrorism" by "working with terrorist organizations resident in Syria").

[7] Plaintiffs may prove their claims through use of affidavits in an FSIA default proceeding. *See Owens*, 864 F.3d at 785–86 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048–51 (D.C. Cir. 2014)); *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 147 n.4, 152 (D.D.C. 2019).

¶¶ 35–39.  Syrian national security and intelligence forces coordinated the effort to help create and support what became ISIS.  Ex. 2 at 6–8.  Syria did so in several ways.

First, between May and October 2011, Syria began unconditionally releasing battle-hardened Syrian jihadists, including those that became senior ISIS leaders and key operatives. Gartenstein-Ross Hr'g Tr. 56–58; Ex. 1 at 55 ("In 2015, Secretary of State John Kerry described ISIS as, at least in part, 'created by Assad releasing 1,500 prisoners from jail.'"); Ex. 2 at 1, 9–10; ECF No. 37-1 ¶¶ 35–36.  Many of the released jihadist prisoners had been held at "one of Syria's most notorious and brutal jails," "known for gross human rights violations and . . . mass executions" and described by former guards and prisoners as "an incubator for jihadism." Gartenstein-Ross Hr'g Tr. 56:1–16; Ex. 1 at 54–55.  The Syrian regime selected prisoners for release that would undermine more moderate forces opposing it.  Ex. 2 at 9–10.

One released prisoner, Abu Luqman, became "one of the most notorious members of ISIS's leadership" and governor of Raqqa; he recruited hundreds of fighters, contributing to the Islamic State's ability to control territory.  Ex. 1 at 56–58; Ex. 2 at 9.  In 2015, the Treasury Department designated Luqman under Executive Order 13224 for providing financial and material support for terrorism, noting that he had been "in charge of ISIL's detention of foreign hostages," "supervised security matters, including executions, interrogations, and transfers of ISIL prisoners, at an al-Raqqah detention facility used to hold foreign hostages," and had "ordered the beheadings of two ISIL hostages" in 2014.  Ex. 1 at 58.  Another prisoner that Syria released, Amr al-Absi, became governor of Aleppo and ran an ISIS prison there, below a children's hospital.  Gartenstein-Ross Hr'g Tr. 68:18-24.  Al-Absi also led ISIS's media efforts and was responsible for the distribution of propaganda videos depicting the beheadings of prisoners.  *Id.*; Ex. 1 at 61.

Second, Syria also developed a "direct financial relationship" with ISIS that helped it raise revenue.  Gartenstein-Ross Hr'g Tr. 82:14–19.  In 2014, ISIS captured strategic oil fields in Northeastern Syria and Northern Iraq.  Gartenstein-Ross Tr. 78:20–25.  The Assad regime bought oil (and wheat) from ISIS, helping to fill its coffers.  Ex. 2 at 11–13; Ex. 1 at 63–73; ECF No. 37-1 ¶ 47.  In 2014, the year ISIS executed Foley and Sotloff, its oil revenues were as high as $3 million per day.  *Id.* at 79:6–7; Ex. 1 at 65; Ex. 2 at 12.  Moreover, "[a]ccording to numerous accounts, including documents intercepted from ISIS's oil minister, Syria was the biggest customer of ISIS's oil."  Gartenstein-Ross Tr. 54:12–15; *see* Ex. 1 at 66–70.  The Treasury Department recognized the significance of these oil sales by sanctioning several Syrian businessmen under Executive Order 13582 for facilitating them.  Ex. 7; Ex. 27.

Another example of Syria's financial assistance to ISIS concerned access to the international banking system.  The Financial Action Task Force (FATF), an inter-governmental policymaking body of which the United States is a member, issued a report that found that as of February 2015, Syria permitted more than 20 Syrian financial institutions to operate in ISIS-controlled territory.[8]  Ex. 8 at 28.  By allowing ISIS to use its banks, Syria provided vital access

---

[8] This report is admissible under Federal Rule of Evidence 803(8).  "A record or statement of a public office" is admissible under this Rule in a civil case if it "sets out . . . factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(A)(iii), (B).  The report lays out factual findings by the FATF after an investigation "to identify a wide variety of [terrorist financing] methods terrorists use to raise, move and use funds," Ex. 8 at 5, in accordance with FATF's mandate "to address the funding of terrorist acts and terrorist organizations," *id.*; *see also* ECF No. 40 at 8 (citing *Terrorist Financing*, FATF, http://www.fatf-gafi.org/publications/fatfgeneral/documents/terroristfinancing.html (last visited Mar. 8, 2021)).  And there is no reason to believe the FATF report is untrustworthy.  The D.C. Circuit has found a report by an inter-governmental policy-making body admissible, *see In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1481–83 (D.C. Cir. 1991) (upholding admission of investigative report by International Civil Aviation Organization regarding plane crash under Rule 803(8)).

to the international financial system to ISIS, Levitt Hr'g Tr. 269:10–15, that allowed it to "function as a local economy," *i.e.*, to "send [money] abroad for purchasing power," to buy weapons, resources needed to keep the oil industry functioning, and "things [needed] to run society, the schools and garbage collection and everything else that a militant organization has to take care of when they take over control of territory," *id.* at 273:23–274:5.

Third, Syria cooperated militarily with ISIS by often refraining from targeting ISIS positions and encouraging it to attack more moderate forces that opposed Assad's regime. Ex. 2 at 10; *see* ECF No. 37-1 ¶¶ 40–45; Levitt Hr'g Tr. 276:17–277:11. For example, according to a former high-ranking member of Syria's intelligence service, several times Syria used military helicopters to transport ISIS fighters to areas that would benefit the regime, and supplied ISIS fighters with weapons by ordering its troops to retreat from positions near ISIS-controlled territory and to leave their weapons behind. ECF No. 37-1 ¶¶ 40–41. This military cooperation allowed ISIS to conquer and hold cities such as Aleppo and Raqqa, without which it would not have been able to kidnap and hold hostages there. Ex. 2 at 10–11.[9]

Consistent with all the above, from 2014—when the State Department began identifying ISIS in its annual Country Reports on Terrorism (CRT)[10]—through 2017, the CRT consistently

---

[9] Syrian and Islamic State forces sometimes engaged each other on the battlefield. Levitt Hrg. Tr. 282:3–17; Ex. 2 at 10. But that does not undermine the fact that Syria cooperated with ISIS in important ways that assisted it militarily. As Secretary of State John Kerry observed, Syria refused to attack ISIS's headquarters, despite full knowledge of its whereabouts. Ex. 1 at 63. And according to a former high-ranking member of Syria's intelligence service, Assad murdered his own officers to hide evidence of Syrian-ISIS cooperation, and never seriously targeted ISIS's forces, its leaders, or headquarters. ECF No. 37-1 ¶¶ 43–45. Syria only sometimes killed low-level ISIS fighters for "show," and deliberately sacrificed both Syrian military forces and Syrian civilians to allow ISIS to flourish. *Id.* ¶ 45; Levitt Hr'g Tr. 281:11–282:2.

[10] The reports are admissible under rule 803(8) because, like the "Patterns of Global Terrorism Reports" found admissible in *Owens*, they contain factual findings and conclusions regarding

recognized Syria's support for ISIS's rise.  *See* Ex. 3 ("2014 CRT") at 287–88 (noting that the terrorist networks in Syria, which grew from the permissive attitude the Assad regime took toward predecessor organizations, "were the seedbed for the violent extremist elements, including ISIL"); Ex. 4 ("2015 CRT") at 301–02 ("As part of a broader strategy during the year, the regime portrayed Syria itself as a victim of terrorism, characterizing all of the internal armed opponents as 'terrorists.'"); Ex. 5 ("2016 CRT") at 305–06 ("The Syrian regime has purchased oil from ISIS through various middlemen, adding to the terrorist group's revenue."); Ex. 6 ("2017 CRT") at 219–20.

## 2.    Foley's and Sotloff's Kidnapping, Torture, and Beheading

On November 22, 2012, Foley and another journalist in Syria, heading toward the Turkish border in a taxi, were stopped, handcuffed, and forced into the back of a van.  Ex. 1 at 23.  Though it is unclear which militant group initially captured them, shortly afterward ISIS took custody of them.  Ex. 1 at 23, n. 78; Gartenstein-Ross Hr'g Tr. 101:1–6.  Over the next eighteen months, ISIS moved the two several times, ultimately to the prison beneath the Aleppo Children's Hospital.  Ex. 1 at 23.  Almost a year later, on August 4, 2013, ISIS militants kidnapped Sotloff shortly after he crossed the border into Syria from Turkey.  Ex. 1 at 30.  They brought him to the same prison in Aleppo and held him in the same series of prison cells as French journalist Nicolas Henin.  *Id.*; Ex. 11 ("Henin Aff.") ¶ 10.  In mid-October, Foley joined them there.  *Id.* ¶ 11.  For the next six months, until Henin's release in April 2014, Henin, Foley, and Sotloff shared a series of prison cells.  *Id.* ¶ 12.

---

terrorism in various countries compiled pursuant to 22 U.S.C. § 2656f, which requires annual reports on terrorism.  *Owens*, 864 F.3d at 792.

During that time, Henin, Foley, and Sotloff were kept in complete darkness for months on end, chained to one another and other prisoners in extremely narrow, cramped rooms, and forced to use bottles and buckets to go to the bathroom. *Id.* ¶¶ 13–19. They were beaten, starved, forced to watch videos of other hostages being executed, and regularly threatened with execution. *Id.* The beatings appear to have been timed to encourage hostages to recount their treatment after being released to pressure their home countries to negotiate with ISIS. *Id.* ¶ 21. The men constantly feared torture and execution. *Id.* ¶¶ 15, 21.

Foley told Henin that before the two were held together, he had been beaten even more severely, repeatedly waterboarded, and starved. *Id.* ¶¶ 16–18.[11] Foley's physical appearance reflected the torture he endured: his ribs had been broken but had not been allowed to heal properly and were "pushed inside this chest," *id.* ¶ 16, and his ankles were scarred because his captors had "chained his feet to a bar and then hung the bar so that he was upside down from the ceiling," Ex. 1 at 41–42. Henin also witnessed Sotloff's severe suffering at the hands of his ISIS captors. On one instance, two men punched and kicked Sotloff dozens of times. Henin Aff. ¶ 20. Sotloff's captors' death threats also brought him severe "bouts of crippling depression," about whether he would ever see his parents again. *Id.* ¶ 23. After months in the Aleppo prison, Henin, Foley, and Sotloff were moved to a prison in Raqqa. *Id.* ¶ 27; Ex. 1 at 43.

---

[11] Henin's statement about what Foley told him about Foley's prior treatment is admissible under Federal Rule of Evidence 807. Under this rule, hearsay is admissible if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(1)–(2). Here, the statement is supported by strong indicia of trustworthiness, as Henin observed the physical effects of the torture Foley said he had endured, Henin himself was tortured and witnessed ISIS's torture of Foley and other prisoners, and an expert testified that ISIS routinely tortures its hostages. Gartenstein-Ross Hrg. Tr. 93:12–13. And Foley's statement is more probative as to his treatment during this time than any other evidence available through reasonable efforts.

On August 19, 2014, ISIS released a propaganda video depicting Foley's beheading.  Ex. 1 at 29.  On it, he was forced to kneel in front of a camera and recite a statement denouncing the United States.  Ex. 1 at 25.  Standing beside him, Mohammad Emwazi, a member of the notorious ISIS execution cell known as "the Beatles" for their British accents, warned that further American military aggression would lead to "the bloodshed of [American] people."  *Id.* at 27; Ex. 26.  After the beheading, Emwazi reappeared on the video with Sotloff, still alive, warning that "[t]he life of this American citizen, Obama, depends on your next decision."  Ex. 1 at 27.  A few weeks later, on September 2, 2014, ISIS released another propaganda video, this one depicting Sotloff's execution.  Ex. 1 at 30.  In the video, Sotloff knelt in an orange jumpsuit and recited a statement blaming the United States and President Obama's foreign policy for his death.  *Id.* at 32; Ex. 25.  As in the Foley video, Emwazi then directed a threat to President Obama that "[ISIS's] knife will continue to strike the necks of your people," unless the United States "leaves [them] alone."  Ex. 1 at 32–33; Ex. 25.

### B.    Procedural Background

In March 2016, Sotloff's father Arthur—as representative of Sotloff's estate and on his own behalf—and his mother, Shirley, and sister Lauren ("the Sotloffs"), sued Syria for Sotloff's hostage taking, torture, and extrajudicial killing under the terrorism exception to the Foreign Sovereign Immunities Act (FSIA).  *See* Compl.  The Clerk of Court mailed a copy of the Sotloffs' summons and complaint, along with a translation of each, to the head of the Syrian Foreign Ministry through an international courier under 28 U.S.C. § 1608(a)(3).  ECF No. 8.  After the summons was returned unexecuted, the Clerk sent the same materials to the State Department to carry out diplomatic service under 28 U.S.C. § 1608(a)(4).  ECF No. 11.  Service

was effectuated on Syria through the Embassy of the Czech Republic in Damascus in February 2017.  ECF No. 15.

In July 2018, Foley's mother—as representative of Foley's estate and on her own behalf—along with Foley's father, John, and siblings, John, Mark, and Kathryn ("the Foleys," and, with the Sotloffs, "Plaintiffs"), sued Syria for Foley's hostage taking, torture, and extrajudicial killing under the terrorist exception to the FSIA.  Pls. Compl., *Foley v. Syrian Arab Republic*, No. 18-cv-1625 (D.D.C. July 10, 2018).  The Clerk of Court mailed a copy of the summons and complaint, along with a translation of each, to the head of the Syrian Foreign Ministry through an international courier under 28 U.S.C. § 1608(a)(3).  ECF No. 9, *Foley*, No. 18-cv-1625 (D.D.C. July 31, 2018).  After the summons was returned unexecuted, the Clerk sent the same materials to the State Department to carry out diplomatic service under 28 U.S.C. § 1608(a)(4).  ECF No. 13, *Foley*, No. 18-cv-1625 (D.D.C. Aug. 14, 2018).  Service was effectuated on Syria through the Embassy of the Czech Republic in Damascas in November 2018.  ECF No. 15, *Foley*, No. 18-cv-1625 (D.D.C. Jan. 15, 2019).

The Court consolidated the two matters in September 2018.  ECF No. 25.  Syria did not respond to either complaint or otherwise appear.  In January 2019, the Clerk of the Court entered default against Syria in both cases.  ECF No. 33.  Later that year, Plaintiffs moved for default judgment.  ECF No. 34.  In June 2020, the Court held a two-day evidentiary hearing on the motion for default judgment and heard from two witnesses.  The first expert, Dr. Daveed Gartenstein-Ross, is an anti-terrorism scholar and author who has worked, in various capacities, on issues related to violent non-state actors for over a decade.  Gartenstein-Ross Hr'g Tr. 13:1– 12.  He has testified as an expert on terrorism and jihadist groups in many courts, including in this District.  *See, e.g.*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186 (D.D.C. 2017).  The

Court qualified him as an expert on violent non-state actors generally, ISIS's evolution from its predecessor organizations, and ISIS's material supporters.  Gartenstein-Ross Hr'g Tr. 35:17–23. The second, Dr. Matthew Levitt, is director of the counterterrorism and intelligence program at the Washington Institute, a think tank dedicated to U.S. policy in the Middle East.  Levitt Hr'g Tr. 116:11–118:5.  He has also testified as an expert witness in many court proceedings, and has been cited by the United States Court of Appeals for the Sixth Circuit and the U.S. Supreme Court.  *See United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30–31 (2010).  The Court qualified him as an expert on the Syrian government's relationship with ISIS's predecessor organizations and ISIS itself between 2010 and 2015.  Levitt Hr'g Tr. 141:9–18.

## II.     Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," and so "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Still, "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  A court retains its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action.  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.  And "plaintiffs retain 'the burden of proving personal jurisdiction, [and] they can

12

satisfy that burden with a *prima facie* showing.'" *Id.* at 7 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)).  And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).

As a result, the D.C. Circuit has instructed that "courts have the authority—indeed . . . the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  But uncontroverted factual allegations supported by admissible evidence may be taken as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).  And § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens*, 864 F.3d at 785.

In a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have

prevailed in a contested proceeding." *Id.* (citations omitted).  "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* Thus, courts are given "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Id.*  And this discretion extends to the admission of expert testimony, often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citations omitted).  Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate" and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Id.*  For these reasons, the D.C. Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

## III.   Analysis

### A.   Subject-Matter Jurisdiction

The FSIA terrorism exception provides federal courts with subject-matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" an enumerated terrorist act.  28 U.S.C. § 1605A(a)(1); *see also* 28 U.S.C. § 1330.  As relevant here, Plaintiffs must prove four elements to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimant or victim was a national of the United States at the time of the act; (3) the claimant afforded the

foreign state a reasonable chance to arbitrate the claim; and (4) the damages sought are for personal injury or death caused by the act of terrorism.  *See Akins*, 332 F. Supp. 3d at 32; 28 U.S.C. § 1605A.  Plaintiffs have proven all of these elements.

### 1. The United States Designated Syria a State Sponsor of Terrorism

The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since.  *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980).

### 2. Plaintiffs Are U.S. Nationals

Foley, Sotloff, and their family members are and were at all relevant times United States citizens.  Ex. 12; Ex. 13.  And United States citizens are nationals for FSIA purposes.  28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### 3. Plaintiffs Offered to Arbitrate Their Claims

"The FSIA 'does not require any particular form of offer to arbitrate, simply the extension of a "reasonable opportunity."'"  *Warmbier*, 356 F. Supp. 3d at 45 (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya* (*Simpson I*), 326 F.3d 230, 234 (D.C. Cir. 2003)).  Plaintiffs included an Offer to Arbitrate, as well as a translation of that letter into Arabic, with their summons and complaint.  Ex. 14 ¶ 4.  Syria did not respond.  As a result, this element is satisfied.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 66 (D.D.C. 2015); *Simpson I*, 236 F.3d at 233.

### 4. Syria's Actions Qualify for the Terrorism Exception

The fourth element of subject-matter jurisdiction under the FSIA terrorism exception is that the plaintiffs seek damages for personal injury or death caused by the foreign state's

commission of at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Plaintiffs allege that ISIS took Foley and Sotloff hostage, tortured, and killed them, and that Syria's provision of material support to ISIS caused such acts.  *See* ECF No. 34 at 33–36.  On all counts, they have met their burden.

### a.    Hostage Taking, Torture, and Extrajudicial Killing

### i.    Hostage Taking

Hostage taking under the FSIA is defined by Article 1 of the International Convention against the Taking of Hostages, which states:

> Any person who seizes or detains and threatens to kill, to injure, or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages.

28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205.  Hostage taking thus has two elements: the abduction or detention and the purpose of accomplishing "the sort of third-party compulsion described in the [C]onvention."  *Simpson v. Socialist People's Libyan Arab Jamahiriya* (*Simpson II*), 470 F.3d 356, 359 (D.C. Cir. 2006) (quoting *Price*, 294 F.3d at 94).  Even so, purported hostage-takers need not have communicated their purpose to the third party whose behavior they intend to compel.  *Id.* at 360–61.

Plaintiffs have satisfied the first element of hostage taking based on the evidence submitted with their motion and presented to the Court at the hearing.  Dr. Gartenstein-Ross concluded, based on the available evidence and his knowledge and expertise, that ISIS abducted

Sotloff and detained Foley until his execution.[12]   Gartenstein-Ross Hr'g Tr. 100–01; Ex. 1 at 23,

30.   Moreover, ISIS's responsibility for the abductions of Foley and Sotloff is supported by

Henin's account of fellow hostages detained in the same ISIS prison beneath the Aleppo

Children's Hospital.   *See* Henin Aff. ¶¶ 3, 6, 9–12.

      The Court also finds that the second element of hostage taking is satisfied, because

Plaintiffs have shown that ISIS "threaten[ed] to kill, injure, or continue to detain" Foley and

Sotloff "to compel" the United States to make concessions and refrain from military action.   Ex.

1 at 27, 40; *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 46 (D.D.C. 2019)

("Political leverage in the context of a country's relationship with the United States is a

sufficiently coercive purpose to establish hostage taking.").   This is so for several reasons.

      First, Foley's and Sotloff's executioner made explicit threats to the United States in both

propaganda videos, warning President Obama to cease military action in the region and linking

ISIS's treatment of prisoners to the United States' failure to heed that warning.   *See, e.g.*, Ex. 1 at

27, 32–33.   Second, Dr. Gartenstein-Ross offered his credible and well-reasoned opinion that

ISIS took hostages and treated them so brutally for the broader purpose of "send[ing] [a]

message and . . . giv[ing] it complete control over populations and prisoners who fell under its

control."   Gartenstein-Ross Hr'g Tr. 92:22–93:2.   And third, according to Henin, ISIS guards

appeared to time the beatings of its hostages "to increase the pressure on the Western powers to

negotiate."   Henin Aff. ¶¶ 15, 21.   For these reasons, the Court finds that ISIS's kidnapping of

Sotloff, and detention of both Sotloff and Foley, qualifies as a hostage taking.

---

[12] Dr. Gartenstein Ross testified that it was not clear whether Foley was first seized by ISIS, but he concluded that at a minimum, shortly after Foley's abduction, ISIS took control of him and held him until his execution.   Gartenstein-Ross Hr'g Tr. 100:23–101:6.

### ii.     Torture

The FSIA's definition of torture is imported from the Torture Victim Protection Act

("TVPA").  28 U.S.C. § 1605A(h)(7).  Under that statute,

> (1) The term "torture" means any act, directed against an individual in the
> offender's custody or physical control, by which severe pain or suffering
> (other than pain or suffering arising only from or inherent in, or incidental to,
> lawful sanctions), whether physical or mental, is intentionally inflicted on that
> individual for such purposes as obtaining from that individual or a third
> person information or a confession, punishing that individual for an act that
> individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or for
> any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or
> resulting from—
>
> > (A) the intentional infliction or threatened infliction of severe physical pain or
> > suffering;
> > (B) the administration or application, or threatened administration or
> > application, of mind altering substances or other procedures calculated to
> > disrupt profoundly the senses or the personality;
> > (C) the threat of imminent death; or
> > (D) the threat that another individual will imminently be subjected to death,
> > severe physical pain or suffering, or the administration or application of
> > mind altering substances or other procedures calculated to disrupt
> > profoundly the senses or personality.

Torture Victim Protection Act of 1991, Pub. L.No. 102-256, 106 Stat. 73 (1992), *codified at* 28

U.S.C. § 1350 (note).  To establish torture, the plaintiffs must also show that the conduct was

sufficiently severe and purposeful.  *Warmbier*, 356 F. Supp. 3d at 46.

The Court has no trouble concluding that ISIS tortured Foley and Sotloff.  Dr.

Gartenstein-Ross testified that "[n]obody who escaped from ISIS's imprisonment has ever

reported not being tortured."  Gartenstein-Ross Hr'g Tr. 93:12–13.  He outlined ISIS's brutal

methods of physical and mental torture, including the abysmal and unsanitary living conditions.

Ex. 1 at 36–43.  And he persuasively concluded that he has no doubt that ISIS tortured Foley and

Sotloff, as described in his report.  Gartenstein-Ross Hr'g Tr. 101:8–11.  Moreover, according to

Henin, Foley and Sotloff were starved, beaten, waterboarded, confined in cramped cells and in complete darkness for months, and forced to use buckets and bottles to go to the bathroom. Henin Aff. ¶¶ 13–19.  And their ISIS captors regularly threatened their lives.  *Id.* ¶¶ 15, 21.

These acts—infliction of starvation, unsanitary conditions, severe pain, and threats of execution—are severe enough to qualify as torture under the TVPA.  *See, e.g.*, *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (hostage experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Moradi*, 77 F. Supp. 3d at 68–69 (detainee in Iranian prison experienced torture when subjected to "severe physical and mental pain, including threatening him with death and dismemberment, physically beating him, . . . and keeping him in excruciatingly painful positions for hours at a time during the interrogations"); *Foley*, 249 F. Supp. 3d at 203 (D.D.C. 2017) (hostage subjected to threats of imminent death was tortured in the form of "mental pain and suffering").

The Court also finds that ISIS's treatment of Sotloff and Foley satisfies the "purpose" requirement under the TVPA.  Again, Dr. Gartenstein-Ross testified how "torture was an intimate part of ISIS's standard operating procedures for its hostages" to obtain information, pressure the hostages' countries into negotiations, and coerce hostages into making statements ISIS could use for propaganda purposes.  Ex. 1 at 39–42; *see also* Henin Aff. ¶¶ 15, 21. Moreover, ISIS used torture to punish Americans in particular for acts of the United States government.  Ex. 1 at 36–43.  Sure enough, according to Henin, ISIS inflicted severe physical and mental pain on Foley in part because he was an American and had a brother in the U.S. Air Force.  Henin Aff. ¶ 16.  And it seems obvious that torture—the threat of execution—was used to coerce both Foley and Sotloff into making statements denouncing the United States right before

they were killed.  Ex. 1 at 25–27, 31–33, 35; Ex. 25; Ex. 26.  For these reasons, the Court finds

that ISIS's treatment of Sotloff and Foley qualifies as torture.

### iii.        Extrajudicial Killing

The state-sponsored terrorism exception to the FSIA also defines "extrajudicial killing"

through reference to the TVPA.  28 U.S.C. § 1605A(h)(7).  Under the TVPA, an "extrajudicial

killing" is:

> a deliberated killing not authorized by a previous judgment pronounced by a
> regularly constituted court affording all the judicial guarantees which are
> recognized as indispensable by civilized peoples.  Such term, however, does not
> include any such killing that, under international law, is lawfully carried out under
> the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L.No. 102-256, 106 Stat. 73 (1992), *codified at* 28

U.S.C. § 1350 (note).  This definition "contains three elements: (1) a killing; (2) that is

deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly

constituted court."  *Owens*, 864 F.3d at 770.

Given the testimony and other evidence already described, the Court need not take long

to explain its conclusion that Foley's and Sotloff's deaths were "extrajudicial killings" under the

statute.  In Dr. Gartenstein-Ross's view, ISIS was plainly responsible for their deaths.

Gartenstein-Ross Hr'g Tr. 36:22–25, 97:10–11.  In particular, ISIS's own propaganda videos

depicting the killings left him "no doubt that these were authentic ISIS productions associated

with that organization."  Gartenstein-Ross Hr'g Tr. 98–99.[13]  Second, the killings were

---

[13] Dr. Gartenstein-Ross reached this conclusion about the propaganda videos for several reasons, including the presence of the logos of ISIS and the Al-Furquan Foundation, an ISIS media production unit; the orange jumpsuits worn by Foley and Sotloff, which were typical of ISIS hostages; the identification of the executioner as Emwazi, a member of ISIS; the distribution of the video through ISIS's typical propaganda distribution channels; and ISIS's subsequent public statements taking responsibility.  *Id.* at 97–99; Ex. 1 at 24–36.

"deliberated" in that they involved "substantial preparation," as both Foley and Sotloff were forced to read coerced, prepared statements before being killed, and recordings of the beheadings were then widely distributed through ISIS's propaganda channels.  *See Owens*, 870 F.3d at 770 (quoting *Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011) (defining "deliberated" under the TVPA as "being undertaken with studied consideration and purpose")).  Finally, the beheadings were not authorized by any regularly constituted court or carried out under international law by a sovereign nation.  Thus, their deaths were "extrajudicial killings" under the state-sponsored terrorism exception to the FSIA.

      **b.**      **Syria's Material Support of ISIS Caused Foley's and Sotloff's Hostage Taking, Torture, and Extrajudicial Killing**

The final requirement under § 1605 is a showing that Sotloff and Foley's abduction, torture, and beheading were "caused by. . . the provision of material support or resources" to ISIS by "an official, employee, or agent" of Syria.  28 U.S.C. § 1605A(a)(1).

      **i.**      **Material Support**

The state-sponsored terrorism exception to the FSIA defines "material support" as having the meaning provided in 18 U.S.C. § 2339A:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Plaintiffs have shown that Syria provided material support to ISIS.  As explained at length above, the Court finds that Syria, consistent with its support of ISIS's predecessor organizations, provided ISIS support through the release of prisoners, financial assistance in the

form of oil purchases and access to the international financial system, and strategic military cooperation that served the needs of the Assad regime.  These actions constitute material support in the form of "personnel," "currency or monetary instruments or financial securities," "financial services," "training, expert advice or assistance," "weapons," and "transportation."  18 U.S.C. § 2339A(b)(1).

### ii.   Causation

A plaintiff need only show proximate cause under the statute.  *Kilburn*, 376 F.3d at 1128. Thus, she may establish proximate cause by showing "a reasonable connection between the material support provided and the ultimate act of terrorism."  *Foley*, 249 F. Supp. 3d at 204 (quoting *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011)) (cleaned up). More specifically, Plaintiffs must establish (1) that Syria's provision of material support was a "substantial factor in the sequence of events" that led to Foley's and Sotloff's hostage taking, torture, and extrajudicial killing, and (2) that what happened to them was "reasonably foreseeable or anticipated as a natural consequence of [Syria's] conduct."  *Owens*, 864 F.3d at 794 (cleaned up).  Again, Plaintiffs have met the relevant legal standard.

The Court finds that Syria's aid to ISIS was, at the very least, a substantial factor in the sequence of events that led to Foley's and Sotloff's hostage taking, torture, and extrajudicial killing.  Indeed, Dr. Gartenstein-Ross testified that "it is unlikely that ISIS would have been able to amass as much power as it did and thus kill Mr. Foley and Mr. Sotloff in the manner that it did in this case but for actions undertaken by the Syrian Arab Republic."  Gartenstein-Ross Hr'g Tr. 37:10–14.  As detailed above, both experts persuasively contended that Syria allowed ISIS's predecessor organizations to thrive for strategic reasons, including to help ensure the Assad regime's survival.  Gartenstein-Ross Hr'g Tr. 54:12–15; 56–58, 68:18–24; 78:20–25; 79:6–7;

82:14–19; Levitt Hr'g Tr. 269:10–15; 273:23, 276:17–277:11.  And "those very networks were the seedbed for the violent extremist elements, including ISIL."  2014 CRT at 287–88.  Then, Syria's material support to ISIS—its release of prisoners, financial relationship with ISIS, and military coordination with it—was a substantial factor in its development into a wealthy proto-state with sophisticated, battle-hardened leadership that controlled large swaths of territory. *See* Ex. 8 at 10, 13–14, 27–28; Ex. 2 at 6–15.  And it was only under those conditions that ISIS could hold Foley and Sotloff hostage in multiple locations, torture them for extended periods, behead them outdoors, and use their deaths for propaganda purposes.  Gartenstein-Ross Hr'g Tr. 103–107; Levitt Hr'g Tr. 290; Ex. 2 at 24.

Indeed, in a few cases, prisoners Syria released had a direct role in what happened to Foley and Sotloff.  Al-Absi, for example, "played a direct role in Mr. Foley's imprisonment," including his detention and interrogation, and likely Sotloff's as well.  Gartenstein-Ross Hr'g Tr. 69:8–18; 71:9–23; Ex. 1 at 61.  He held several leadership positions within ISIS, including governor of Aleppo, leader of ISIS's media efforts, *id.* 68:18-24, and ran the prison in Aleppo where Foley and Sotloff were held.  *Id.* 69:8–18.  Moreover, "there is a strong chance that Mr. Absi was involved in the distribution of Mr. Foley and Mr. Sotloff's beheading videos." Gartenstein-Ross Hr'g Tr. 72:2–4.

The Court also finds that the second element of causation is satisfied, because Plaintiffs have shown that the hostage taking, torture, and extrajudicial killing of Foley and Sotloff were "reasonably foreseeable" consequences of Syria's prisoner release, financial support, and military aid.  Syria has a long history of providing material support for the Zarqawi organization, the predecessor to ISIS.  *See Foley*, 249 F. Supp. 3d at 193–95 (finding Syria liable for terrorist acts committed by the Zarqawi organization); *Thuneibat*, 167 F. Supp. 3d at 36 ("[P]laintiffs

have established these suicide bombers were trained, funded, and sent by Zarqawi and his

organization . . . which received material support and resources from [Syria].”); *Gates*, 580 F.

Supp. 2d at 59–63 (finding Syria provided material support to the Zarqawi organization through

serving as a “logistical hub” and facilitating transportation of terrorists into Iraq, providing

sanctuary to terrorists, and financing Zarqawi and his network).  And as Dr. Gartenstein-Ross

explained, the Zarqawi organization routinely kidnapped, tortured, and beheaded Americans and

journalists in strikingly similar fashion.  Gartenstein-Ross Hr’g Tr. at 107:19–25.  ISIS in Iraq

had even “captured Americans; put them in orange jumpsuits of a kind that Mr. Sotloff and Mr.

Foley were forced to wear; [] tortured them; and then [] beheaded them on camera.”  *Id.*  Thus,

“it was very foreseeable that it might happen again.”  Gartenstein-Ross Hr’g Tr. 107:25–108:1;

*see also Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 WL 5422844, at *12 (D.D.C.

Sept. 10, 2020) (finding bombing injuries a reasonably foreseeable result of Syria’s support for

ISIS because its prior support for a predecessor organization had led to increased violence).

    For his part, Dr. Levitt testified that what happened to Foley and Sotloff was reasonably

foreseeable because, as detailed above, Syria *wanted* to create an organization capable of such

depraved violence; that was the very reason it supported ISIS in the first place:

> There is no question—absolutely no question—that the Assad regime knew;
> expected; wanted the Islamic State to engage in abhorrent violence specifically so
> that it would become a worse boogeyman than the Syrian regime. . . . So did the
> Syrian Government know that these two men would be kidnapped and held and
> brutally murdered?  Probably not.  Did they expect that things like this would
> happen?  Yes.  Did they want for things like this to happen?  Yes.  Could they
> have foreseen; should they have foreseen and known that this type of action
> would have happened based on the actions that they took and the actions they
> chose not to take in both cases to support and sponsor the Islamic State?  Yes.

Levitt Hr’g Tr. 291:22–292:21.

*          *          *

For all these reasons, Plaintiffs have shown that Syria is not immune from suit for Sotloff and Foley's hostage taking, torture, and murder and that this Court has subject-matter jurisdiction over their claims under the FSIA's terrorism exception.

**B.     Personal Jurisdiction Over Syria**

To impose judgment on a foreign state under the FSIA, this Court must also have personal jurisdiction.  Personal jurisdiction over a foreign government turns on a showing of (1) subject-matter jurisdiction under the FSIA; and (2) proper service under the FSIA.  28 U.S.C. § 1330(b).  As Plaintiffs have already satisfied the first requirement, the Court turns to the second.

28 U.S.C. § 1608(a) lists four methods of serving a foreign government, in the order in which plaintiffs must attempt them:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a); *see also Fritz*, 320 F. Supp. 3d at 87 ("Section 1608(a) provides four methods of service in descending order of preference." (internal quotation marks omitted)). Because Syria does not have a special arrangement for service with Plaintiffs, nor is it a party to an international convention on service, Plaintiffs did not need to attempt service in accordance with § 1608(a)(1) or (a)(2).  *See Fritz*, 320 F. Supp. 3d at 88; *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008).  Plaintiffs tried to serve Syria under § 1608(a)(3) in March 2016 and July 2018, respectively.  ECF No. 8; ECF No. 9, *Foley*, No. 18-cv-1625 (D.D.C. July 31, 2018).  When that failed, they each started service through diplomatic channels under § 1608(a)(4) by diplomatic note forwarded by the State Department to the Foreign Interests Section of the Embassy of the Czech Republic.  ECF No. 15; ECF No. 13, *Foley*, No. 18-cv-1625 (D.D.C. Aug. 14, 2018).  Although Syria refused to accept delivery, service was still proper.  *See Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael*, 540 F. Supp. 2d at 52–53.

Because the Court has subject-matter jurisdiction over Plaintiffs' claims and Plaintiffs properly served Syria under 28 U.S.C. § 1608(a), the Court has personal jurisdiction over Syria under 28 U.S.C. § 1330(b).

### C.  Syria's Liability

Having already concluded that the Court possesses subject-matter jurisdiction, little else is needed to show that Plaintiffs are entitled to relief.  28 U.S.C. § 605A(c).  The private right of action in the FSIA terrorism exception provides that a foreign government is liable to a U.S. citizen "for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1), (c).  As a result, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief

as a matter of federal law" if the plaintiff is a citizen of the United States. *Fritz*, 320 F. Supp. 3d at 86-87; *see Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) ("Essentially, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met.").

As already mentioned, Plaintiffs are U.S. citizens. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22). As a result, they may rely on the cause of action in the terrorism exception to establish Syria's liability. *See Owens*, 864 F.3d at 809. And because they have proven that the state-sponsored terrorism exception abrogates Syria's sovereign immunity and that this Court has subject-matter and personal jurisdiction, they have also shown that Syria is liable to them for the hostage taking, torture, and extrajudicial killing of Foley and Sotloff.

## IV.    Conclusion

For all the above reasons, the Court will grant Plaintiffs' Motion for Default Judgment, ECF No. 34. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 15, 2021