## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**ARTHUR BARRY SOTLOFF, et al.**      )
                                    )
                *Plaintiffs*,     )     **CA NO.: 16-cv-725 (TJK)**
                                    )     **consolidated with CA 18-cv-1625**
                                    )     **(TJK)**
    -against-               )
                                    )
**SYRIAN ARAB REPUBLIC, et al.**     )
                                    )
              *Defendant.*    )
_____ )

## REPORT AND RECOMMENDATION OF SPECIAL
## MASTER REGARDING COMPENSATORY DAMAGES

      This case arises out of the kidnapping, torture, and extrajudicial killings of James Foley and Stephen Sotloff (individually, "Victim" and collectively, the "Victims") in 2014 at the hands of the Islamic State of Iraq and the Levant, also known as the "Islamic State", "ISIS" or "ISIL".

      The Court appointed the undersigned as Special Master for the administration of damages proceedings, to receive evidence, and to prepare proposed findings and recommendations for the disposition of Plaintiffs' claims for compensatory damages in this matter. ECF No. 48. Some months after the Court's Order, Plaintiffs submitted evidence and documentation in support of their claims for and evaluation of compensatory damages including video deposition and affidavit testimony of the Victims' family members, video evidence of the execution of the Victims, economic loss reports, and other expert reports regarding the pain and suffering of the Victims. I have reviewed the relevant pleadings, the sworn testimony provided by the family member Plaintiffs, expert reports regarding the treatment of and subsequent manner of death of both Victims, the video evidence of the executions of the Victims, the expert reports regarding economic loss to the estates of the Victims, the Court's March 15, 2021 Memorandum Opinion on

liability, ECF No. 45, *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121 (D.D.C. 2021) ("Liability Opinion"), and applicable case law. My Report and Recommendation is based on the above-described information, evidence, and case law.

## BRIEF BACKGROUND

Section 1605A(a) of the Foreign Sovereign Immunities Act ("FSIA") creates a private right of action for United States nationals, members of the U.S. armed forces, and United States government employees or contractors who are injured or killed by terrorist acts carried out by officials, employees, or agents of a foreign state. 28 U.S.C. § 1605A(a). Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages, and pain and suffering damages.[1]

The determination of the appropriate amount of compensatory damages depends on the specific facts and circumstances of the case and the evidence submitted. In evaluating the claims for damages, I am entitled to rely on uncontroverted factual allegations that are supported by sworn testimony – affidavit, declaration or deposition testimony – and expert reports. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

The first section of this Report sets forth factual findings with respect to each Plaintiff. Next, I set forth the applicable legal standards and apply those standards to the factual findings to provide recommended damages awards for each Plaintiff.

---

[1] All of the Plaintiffs are United States citizens, and the Victims were also United States citizens – and thus all are eligible to assert claims under the FSIA. *Sotloff*, 525 F. Supp. 3d. at 135.

## FACTUAL FINDINGS

### I.    THE VICTIMS

Both Victims were American journalists covering the humanitarian crisis and war in Syria. Both were kidnapped and held captive in multiple locations in Syria. During their captivity, both Victims were starved, severely beaten, and tortured. Both Victims were executed by beheading. The executioners (ISIS) disseminated videos of the beheadings as "messages" to the United States government.

James Foley was a freelance journalist who was in Syria in 2012 writing about the struggles in that country. He was kidnapped while riding in a taxi in Syria near the Turkish border on November 22, 2012. *Sotloff*, 525 F. Supp. 3d at 131. He was held captive in various locations for nearly 2 years – a total of 635 days – before he was killed on August 19, 2014.[2] *Id*. at 131-132; Expert Witness Report of Dr. Gartenstein-Ross, ECF No. 34-1, (July 12, 2019) ("Gartenstein-Ross Report"), at p.26.[3]

---

[2] The uncontroverted record confirms that Mr. Foley was kidnapped on November 22, 2012 (*see, e.g.*, Deposition Transcript of John Elliot Foley, dated April 14, 2021, at 14:9, attached hereto as Exhibit H; Gartenstein-Ross Rep., at p.26, and that he was murdered on August 19, 2014. John Foley Dep. Tr., at 23:10; Gartenstein-Ross Report, at p.26. It is undisputed that he was held captive during that entire period of time – which totals 635 days.

[3] Dr. Gartenstein-Ross is an expert in jihadist groups and other violent non-state actors ("VNSAs"). Gartenstein-Ross Rep., at p.1. He holds a Ph.D. and M.A. in World Politics from Catholic University of America, a J.D., *magna cum laude*, from New York University School of Law, and a B.A. with Honors, *magna cum laude*, from Wake Forest University. *Id.*, at p.3. He is the Chief Executive Officer of Valens Global, a private commercial firm focused on understanding and fashioning responses to VNSAs. *Id.*, at 1. He also holds appointments at think tanks in the United States and Europe. *Id.*, at 2. He is a Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies (FDD), a nonpartisan policy institute in Washington, D.C. He is an Associate Fellow at the International Centre for Counter-Terrorism – The Hague (ICCT). *Id.* He authored several studies for ICCT, some of which required international field research. *Id.* He also served as a Fellow at Google's think tank Jigsaw, for which he worked on several major projects responding to violent extremists' use of online platforms. *Id.* He worked on these issues for the U.S. government, including serving as a Senior Advisor to the Director of the U.S. Department for Homeland Security's Office for Community Partnerships (2016-17). *Id.* Dr. Gartenstein-Ross has

Stephen Sotloff was also an American journalist covering the war and humanitarian crisis in Syria. He was kidnapped nearly a year after Mr. Foley's capture – on August 4, 2013 – when crossing the border from Turkey to Syria. *Sotloff*, 525 F. Supp. 3d 121, 131. He was held in a series of prison cells and at times in the same location and cell as Mr. Foley. He was held captive for a period of 394 days before he was killed on September 2, 2014.[4] Gartenstein-Ross Report, at p.33; *Sotloff*, 525 F. Supp. 3d 121, 132.

The Court has determined that both Mr. Foley and Mr. Sotloff were subjected to torture during their captivity. Gartenstein-Ross Report, at pp.44-45; *Sotloff*, 525 F. Supp. 3d 121, 131. Their treatment during captivity is evidenced through eyewitness testimony and the reports of qualified experts. Both Mr. Foley and Mr. Sotloff were held prisoner in dark, cramped cells and subjected to various forms of physical abuse including severe beatings, "waterboarding" and starvation. Declaration of Nicolas Henin, ECF No. 34-11, 16-cv-00725-TKJ, July 12, 2019 ("Henin Decl."), at ¶¶13-21; *Sotloff*, 525 F. Supp. 3d 121, 131. Both were also subjected to psychological torture – being forced to watch videos of the execution of other prisoners, and being

---

been accepted as an expert by this Court and by other courts in this Circuit and accordingly I may consider his report in evaluating compensatory damages. *See Transcript of Evidentiary Hearing (Day 1)*, ECF No. 41, June 29, 2020, at 35:23; *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 n.4 (D.D.C. 2017) (accepting Dr. Gartenstein-Ross as an expert witness); *United States v. Young*, 260 F. Supp. 3d 530 (E.D. Va. 2017), *aff'd*, 916 F.3d 368 (4th Cir. 2019); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 n.2 (D.D.C. 2018) (accepting Dr. Gartenstein-Ross as an expert on, *inter alia*, violent non-state actors, including identifying and analyzing online content generated by violent non-state actors and Iran's use of proxy organizations in Iraq from the 1990s to 2012).

[4] The record confirms that Mr. Sotloff was kidnapped on August 4, 2013 (*see, e.g.*, Deposition Transcript of Arthur Barry Sotloff, at 29:1, attached hereto as Exhibit B; Gartenstein-Ross Report, at p.33) and that he was murdered on September 2, 2014. Deposition Transcript of Shirley Pulwer Sotloff, dated March 19, 2021, at 23:23, attached hereto as Exhibit C; Gartenstein-Ross Report, *id*. As with Mr. Foley, it is undisputed that he was held captive during that entire period of time – which totals 394 days.

told that they were about to be executed on multiple occasions – only to be returned to their cells. Henin Decl., at ¶15; Gartenstein-Ross Report, at p.38; *Sotloff*, 525 F. Supp. 3d 121, 131.

Although their remains were never recovered, the eyewitness declaration testimony of Mr. Nicolas Henin – a French journalist held captive in the same locations as Mr. Foley and Mr. Sotloff for a period of time – vividly depicts the torture and abuse that both Victims suffered. Henin Decl., at ¶¶13-21. Mr. Henin was held captive by ISIS during a portion of the period of time when the Victims were held captive. Mr. Henin was held in a cell with Mr. Sotloff for 9 months and Mr. Foley was held in the same cell with both Mr. Henin and Mr. Sotloff for nearly 6 months. Henin Decl. at ¶¶10-11. Mr. Henin states that the three of them were chained together for two and a half months and that they were always in "darkness." Henin Decl. at ¶¶13-14. The psychological abuse was even more significant than the physical abuse: they were threatened with execution and were shown photos of the corpse of a prisoner who was executed. Henin Decl. at ¶15. Mr. Henin states that Mr. Foley told him that he was subjected to beatings and waterboarding. Henin Decl. at ¶17. Mr. Henin personally observed Mr. Foley's injuries – including broken ribs that were never healed, ribs that were "pushed inside", and scars on his ankles indicating that he had been hung upside down by his feet. Henin Decl., at ¶¶16, 18. Mr. Henin further states that he saw the captors punch and kick Mr. Sotloff and observed that Mr. Sotloff experienced severe depression. *Id.*, at ¶¶21, 23. Mr. Henin states that the beatings increased in March of 2014. Henin Decl. at ¶21.

In addition to the eyewitness declaration, Plaintiffs have submitted two expert reports substantiating the brutal treatment of the victims while in captivity and the pain and suffering of the Victims at the time of their executions.

Plaintiff have submitted the Expert Witness Report of Dr. Daveed Gartenstein-Ross. Dr. Gartenstein-Ross's report details the typical treatment of prisoners of ISIS and provides evidence of the pain and suffering of both Victims during their captivity. *See* Gartenstein-Ross Report,

pp.41-42. Dr. Gartenstein-Ross's opinions generally describing the typical treatment meted out by ISIS are based on the International Center for the Study of Violent Extremism's (ICSVE) report entitled *The ISIS Prison System: Its Structure, Departmental Affiliations, Processes, Conditions, and Practices of Psychological and Physical Torture*[5]. *Id.*, at p.40. Dr. Gartenstein-Ross's opinions regarding Mr. Foley and Mr. Sotloff specifically are based on his own knowledge of ISIS's methods, evidence from other prisoners who have been released and were held by ISIS during the same time period as Mr. Foley and Mr. Sotloff, and statements of individuals who actually saw or heard Mr. Foley or Mr. Sotloff. *Id.*, at p.36. Dr. Gartenstein-Ross states that ISIS often held prisoners in dark, small places, employed multiple methods of torture including waterboarding, and subjected prisoners to severe beatings, and near starvation. *Id.*, at pp.38-40. Dr. Gartenstein-Ross explains that shortly after capture, ISIS would interrogate the prisoners, employing various torture techniques including physical beatings. *Id.*, at p. 39. ISIS typically would seek access to the prisoners' social media accounts. Dr. Gartenstein-Ross further described the psychological torture to which prisoners of ISIS were typically subjected. *Id.*, at pp.37-38. Prisoners were forced to watch executions and were subjected to mock executions. *Id.*, at p.38. These mock executions functioned in part to make the prisoners somewhat less resistant – because they were frequently taken to "executions" that were not carried out. *Id.*, at p.45.

Dr. Gartenstein-Ross opined that Mr. Foley and Mr. Sotloff were subjected to these methods over their lengthy period of captivity. *Id.*, at pp.41-42. Dr. Gartenstein-Ross provided additional details about the treatment of Mr. Foley. Based on reports from individuals who had seen Mr. Foley during his captivity, Dr. Gartenstein-Ross states that Mr. Foley was subjected to

[5] Asaad Almohammad, Anne Speckhard & Ahmet S. Yayla, *The ISIS Prison System: Its Structure, Departmental Affiliations, Processes, Conditions, and Practices of Psychological and Physical Torture* (International Center for the Study of Violent Extremism Research Report, August 2017).

even more brutal treatment than most prisoners including mock executions and repeated and prolonged waterboarding. *Id.*, at 23. Dr. Gartenstein-Ross opined that this brutality may have been due to the fact Mr. Foley had family members in the military. *Id.*, at p.41. Dr. Gartenstein-Ross viewed the videos of the executions of Mr. Foley and Mr. Sotloff.  In both videos, the Victims are forced to make a statement that blames the United States governments for certain actions and then after the ISIS captor makes a statement, the execution begins.  Dr. Gartenstein-Ross opines that the videos are authentic, and that the executions were carried out by ISIS, based on his knowledge of the ISIS methods and the markings on the videos.  Gartenstein-Ross Report, at pp.27-32.

Plaintiffs have submitted an expert report prepared by Dr. Craig Mallak. Medical Consultation Report *Deaths of James Wright Foley and Stephen Sotloff*, Dr. Craig Mallak, dated June 26, 2021, attached to this Report as Exhibit A. Dr. Mallak's report further explicates the pain and suffering of the Victims during their captivity and their executions.

Dr. Mallak is the Chief of the Broward County, Florida Office of Medical Examiner and Trauma Services and has served in that capacity since 2012. Mallak Report at p.2.  He received a Bachelor of Science in Criminalistics from Michigan State University in 1982, a Juris Doctor degree from Creighton University in 1985, and M.D. degree from Creighton University in 1989. *Id.* Post-graduation, he spent one year in an internship at Naval Hospital Oakland and then was assigned overseas for a year as the regimental surgeon for the 4th Marines. *Id.* He completed the first two years of residency in anatomic and clinical pathology at the Naval Hospital Oakland, Oakland, California, and the second two years at the National Naval Medical Center in Bethesda, Maryland. *Id.* Subsequently he completed a year-long Forensic Pathology Fellowship at the Armed Forces Institute of Pathology in Washington, D.C. *Id.* From 2002 until 2012 he served as the Armed Forces Medical Examiner, directing the Armed Forces Medical Examiner System at Dover Air Force Base, Dover, DE (formerly a division of the Armed Forces Institute of Pathology (AFIP),

7

Washington, D.C.). *Id.*, at p.3. He has been involved in the investigation of more than 100 torture and deaths cases of both military and civilian individuals. He has been accepted as an expert in FSIA cases. *Id* at pp.3, 18; *Foley*, 249 F. Supp. 3d, 195, n.5 (qualifying Dr. Mallak as an expert witness).

Dr. Mallak, in my view, is qualified as an expert to opine on: (1) the nature of the injuries (physical and psychological) suffered by Mr. Foley and Mr. Sotloff while in captivity, (2) the pain and suffering associated with those injuries and with the circumstances in which they were held captive and (3) the pain and suffering that both Mr. Foley and Mr. Sotloff experienced during their execution.

Dr. Mallak's opinions are based on a review of the testimony and expert reports in this case, the video evidence of the executions, a comparison of these executions with other executions carried out in similar fashion, and extensive personal experience with victims of torture as the Armed Forces Medical Examiner investigating cases of torture. *Id.*, at p.4.

Dr. Mallak concludes that both Mr. Sotloff and Mr. Foley were subjected to physical and psychological torture before their brutal executions. *Id.*, at pp.4-6. Dr. Mallak concludes that Mr. Sotloff was subjected to repeated mock executions which exacerbated the physical and psychological torture he had already endured. *Id.*, at p.6. Dr. Mallak states that the typical pattern of treatment of captives is to subject the individual to periodic and systematic beatings so that the victim never heals and lives in a constant state of fear. *Id.* Dr. Mallak's report further describes the type of psychological torture employed by ISIS: including threats of death and witnessing the execution of others. *Id.*, at p.6. Dr. Mallak states that this type of psychological terror is multiplied when survivors were returned to captivity knowing that they would again be sent to an execution not knowing whether it would be their own execution. *Id.*, at 6. Dr. Mallak's report and explanation of the forms of abuse and torture are consistent with the statements of Dr. Gartenstein-Ross.

Dr. Mallak's report addresses the nature of the executions of Mr. Foley and Mr. Sotloff:

> James Foley was executed on August 19, 2014. Steven Sotloff was executed on September 2, 2014. Both were broadcast on video. As was the custom going back to the beheading of Daniel Pearl in Pakistan on February 1, 2002, the actual beheading is not shown on the video. Rather the time leading up to the execution and the aftermath are shown confirming the death of the victim.



> While we do not know how long the process lasted, it was not quick and painless. Moreover, there was no evidence that either Steven Sotloff or James Foley was anesthetized.
>
> ….
>
> Mr. Foley's and Mr. Sotloff's remains have never been recovered for examination. While the data from the examinations would be helpful, it is not necessary in this case with the numerous other cases that have been examined and documented. Based on the available facts and to a degree of medical certainty, it is without a doubt that both suffered continual physical pain and psychological terror throughout their captivity. Then they both suffered prolonged and brutal executions.  Mallak Report at p. 7.

As noted above, Dr. Mallak's conclusions are based both on his observation of the videos, his comparison of the video evidence of the beheadings of Mr. Foley and Mr. Sotloff to the beheading of other prisoners of ISIS or its precursor, and his own experience with numerous other executions and cases of torture. *Id.*, at pp.4, 7. He states that the video evidence in other beheading

executions demonstrates the extreme suffering inflicted on the victim. *Id.* In previous beheading videos, there is video and physical evidence of the use of a sword or large knife, and the death was fairly quick with powerful strikes to the neck. *Id.* Dr. Mallak opines that the execution of the Victims here would have produced a greater degree of pain and suffering for a longer period of time ██████████████████████████████████████████████████████████. *Id.* Dr. Mallak has compared the execution of Mr. Sotloff and Mr. Foley to the executions of previous victims – Jack Armstrong and Jack Hensley – whose claims for compensation under the FSIA were addressed in. *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 58 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir.), *cert. denied* 565 U.S. 945 (2011), and *disapproved of on other grounds by Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144 (D.D.C. 2014). Dr. Mallak's expert opinion is that Mr. Foley and Mr. Sotloff experienced pain and suffering similar to that of the victims in the *Gates* case because the executions were carried out in similar fashion. *Id.*

The declaration testimony of Nicholas Henin and the expert reports of Dr. Gartenstein-Ross and Dr. Mallak support the conclusion that both Mr. Foley and Mr. Sotloff were subjected to barbaric physical and psychological torture while held captive. The evidence shows that while held captive for nearly two years, Mr. Foley was starved, beaten, subjected to the infamous form of torture known as "waterboarding", suffered broken bones that were not healed, was hung from his ankles, and chained to other prisoners in small dark spaces with no facilities. Henin Decl., ¶¶16-17; Gartenstein-Ross Report, at p.44. The evidence shows that while held captive for over a year, Mr. Sotloff was also beaten, and that both Victims were interrogated, and subjected to the forms of psychological torture described in the expert reports. Gartenstein-Ross Report, at pp.40, 45; Henin Decl. at ¶¶13-21. The evidence further demonstrates that Mr. Foley and Mr. Sotloff were subjected to extreme fear and stress, forced to denounce their families and country on video, and then subjected to unconscionable terror, and horrific pain and extreme suffering during their

execution – which in each case was carried out in a barbaric fashion intended to cause the maximum pain and suffering.

## II.    FAMILY MEMBERS OF DIRECT VICTIMS

The adult family members of the Victims have provided deposition testimony about their experience, their relationship with the Victims, their injuries, and the effect of the death or injury of the Victims on their daily lives.

### FAMILY OF STEPHEN JOEL SOTLOFF

#### 1.    Arthur Barry Sotloff – Father of Stephen Sotloff

Arthur Sotloff is Stephen Sotloff's father. *See generally* Arthur Barry Sotloff, Deposition Transcript, dated March 19, 2021. He is a United States citizen. *Id.*, at 5:3. He provided deposition testimony in support of the claims in this case.

He testified about Stephen's childhood and high school years – noting in particular that Stephen loved to write and in fact resurrected a school newspaper at his high school. *Id.*, at 5:17-7:24. Stephen played a number of sports and was very close to his sister Lauren. *Id.*, at 7:1-5; 8:1-6. He testified that since Stephen went to a private high school, he opted to go to a public college. *Id.*, at 11:25-12:5. But near the end of his college tenure – he moved to Israel and completed college there. *Id.*, at 12:15-13:10. After graduation, Stephen became a freelance journalist. *Id.*, at 15:8-13. He was able to publish his work in major media outlets. *Id.*, at 15:14-19. He had an offer from the *Los Angeles Times. Id.*, at 16:21-22. Arthur testified that Stephen was planning to quit the freelance journalism career and move back to the United States. *Id.*, at 17:16-18:8. (This was based on a meeting Stephen had shortly before he was kidnapped). *Id.* Stephen ventured to Syria a number of times and had set up a code system to assure his travel. *Id.*, at 24:14-20. Just before he entered Syria the last time in August of 2013, Stephen called his father and gave him the contact information for an individual in Turkey. *Id.*, at 25:22-26:3. Stephen told his father to call that

contact if he did not hear from Stephen in 3 days. *Id*. But 12 or so hours later, the contact called Arthur to tell him that Stephen had been kidnapped. *Id*., at 26:8-12. A few days later he heard from the FBI that Stephen had been taken. *Id*., at 27:4-10. Arthur testified that the family was told by the FBI not to speak about the kidnapping. *Id*., at 27:11-17.  In December, the family received an email from the terrorists with a ransom letter. *Id*., at 28:18-29:8. They were told that they could either secure the release of various prisoners held by the United States or pay 100 million euros. *Id*., at 29:5-8. Arthur testified that they were in a hopeless situation:  they could not talk about the kidnapping, and even if they could raise the ransom money, they could not pay it without violating the law. *Id*., at 30:7-14. Arthur testified that "by day" he went to work as normal, and at night he worked to obtain information about his son and advocated for his release. *Id*., at 30:18-25. He made 12 or 13 trips to Washington trying to get someone to help. *Id*., at 39:13-19. The family received some information about Stephen from a contact who was able to talk to other prisoners who were released. *Id*., at 34:9-16.  From that contact, they learned that Stephen was being held in a 20 by 20 room with 26 prisoners. *Id*. They received two letters from Stephen that were smuggled out and Arthur described them as heart wrenching – because in his view, Stephen knew that he was not coming home. *Id*., at 37:5-7. Shortly before Stephen was murdered, the family received an audio recording from him. *Id*., at 42:9-10. The recording was made in response to a video that Stephen's mother made appealing to the kidnappers. *See* Shirley Pulwer Sotloff, Dep. Tr., at 24:16-25.9.  Arthur testified that the voice sounded like Stephen but also sounded like Stephen was reading a prepared statement. *Id*., at 42:16-43:3.  After 13 months of wondering where his son was, he saw Stephen being held by the neck in the James Foley execution video. *Id*., at 42:10-16. Then a short time later, Arthur was in his car and heard news that a second American had been beheaded. *Id*., at 44:12-16. And he knew that it was Stephen. *Id*. He expressed how hard it was to see someone you loved so much be murdered and he cannot understand why Stephen could not get out like

many others. *Id.*, at 45:16-25. It's very hard for Arthur to be positive, but he is trying to lead his life as Stephen wanted. *Id.*, at 48:23-49:5. Arthur stated that Stephen's death has been particularly hard on Lauren, Stephen's sister and that she has really distanced herself from the family, she has lost all her friends. *Id.*, at 53:7-17. Her life has been ripped from her. *Id.* Arthur testified that he thinks about Stephen every day. *Id.*, at 50:3-7. He is grateful that they started a foundation in Stephen's memory because it gives him something positive to do. *Id.*, at 49:20-50:2. But it hurts him to see friends with their grandchildren knowing that he probably won't have any grandchildren himself. *Id.*, at 50:8-16.

**2.      Shirley Pulwer – Mother of Stephen Sotloff**

Shirley Pulwer is Stephen Sotloff's mother. *See generally*, Shirley Pulwer Sotloff, Dep. Tr. She is a United States citizen. *Id.*, at 4:6-7. She provided deposition testimony in support of the claims in this case.  She described Stephen's childhood and his close relationship with his sister Lauren. *Id.*, at 4:12-8:19. She explained that Stephen decided to go to Israel to finish college and eventually became a dual U.S. and Israeli citizen. *Id.*, at 11:19-12:10; 13:8-11. Shirley explained that her parents were Holocaust survivors and Stephen was very close to her mother – his grandmother and that this relationship helped shape Stephen's strength, courage, and desire to write about people facing extreme hardship. *Id.*, at 12:11-13:1; 14:12-15. After college Stephen traveled in the Middle East and wrote stories about people in distress. *Id.*, at 15:25-16:2. Shirley testified that Stephen's writings opened her eyes to life in other countries. *Id.*, at 16:18-19. Stephen traveled to Syria several times and always made it back. *Id.*, at 17:20-18:5. He traveled with a gentleman named Barak – who ultimately became the source of any information the family obtained about Stephen after he was kidnapped. *Id.*, at 18:8-12. When she first heard Stephen had been taken, she thought it could not be true. *Id.*, at 18:15-18. But after that point, she focused wholly on trying to get information and helping him to come home. *Id.*, at 18:19-22. For months

they did not know where Stephen was or whether he was alive. *Id.*, at 20:6-7. They finally received a communication with proof of life – in December – approximately 5 months after Stephen was taken. *Id.*, at 20:17-22. They received two letters from Stephen, that were smuggled out. *Id.*, at 21:4-9. One was essentially his "will":  he wanted the family to be happy together and take care of each other. *Id.*, at 12-18. Stephen was telling his family that he did not expect to make it back. *Id.*, at 22:18-23. They also received an audio recording shortly before Stephen was killed. *Id.*, at 23:17-19. When she saw Stephen on the video of James Foley's execution, she "lost it". *Id.*, at 26:20-23. She felt that ISIS could not go back – and that they had promised that Stephen would be executed. *Id.*, at 26:23-24. She watched the video of Stephen's murder – because she had to see it to believe it. *Id.*, at 27:10-13. There is no way to explain it. *Id.*, at 27:19. It was a horror to see her son's head on top of his body. *Id.*, at 27:21-22. She recently learned that the videos are still around – and they are being used to recruit new members to ISIS. *Id.*, at 28:3-14. She testified that she and her husband are sad – and that the family misses Stephen. *Id.*, at 32:14-25. Her daughter Lauren has been most affected. *Id.*, at 32:11-14. They try to make the best of it. *Id.*, at 32:15-16. She is very proud of her son and his accomplishments. *Id.*, at 33-1:10.

### 3.    Lauren Sotloff – Sister of Stephen Sotloff

Lauren Sotloff is Stephen Sotloff's younger sister. *See generally* Affidavit of Lauren Sotloff, dated March 29, 2021, attached hereto as Exhibit D. She is a United States citizen. *Id.*, at ¶1. She provided testimony in the form of a sworn affidavit.  Her affidavit, coupled with the testimony of her parents, demonstrate that Lauren has been and continues to be severely affected by the loss of her brother.  She was too distraught to provide deposition testimony – even seven years after the death of her brother.  Lauren Sotloff Aff., at ¶6. Lauren was extremely close to Stephen and his death shattered her life. *Id.*, at ¶¶5, 19-20.

she was working full time and was engaged to be married. *Id.*, at ¶7. After the kidnapping, her life changed. *Id.*, at ¶9. ███████████████████████████████████████████████

███████████████████████████████████████████████████ Her physical symptoms continue to this day. *Id.* After Stephen was murdered, her condition worsened. *Id.*, at ¶12. ████

████████████████████████████████████████████████ She was angry and her relationship broke up. *Id.*, at ¶13-14. She has not been able to have a normal relationship since Stephen's death. *Id.*, at ¶14. ████████████████████████████████

██████████████████████████████████ She states that she would have had a career in medicine had Stephen not been kidnapped and murdered. *Id.*, at ¶17. She sees the image of Stephen's execution over and over in her head and continues to "re-live" that day. *Id.*, at ¶18. She feels she died the day he died. *Id.*, at ¶19. Her career, health, and relationships with others including her family have been destroyed. *Id.*, at ¶20.

## FAMILY OF JAMES WRIGHT FOLEY

### 1.    Diane Maria Wright Foley – Mother of James Foley

Diane Foley is the mother of James Foley. She is a United States citizen. She submitted video deposition testimony in support of her claim for solatium damages. *See generally* Deposition Transcript of Diane Maria Wright Foley, dated March 17, 2021, attached hereto as Exhibit F. James Foley ("Jim") was the first-born child. *Id.*, at 5:22. He was always an engaged and friendly child. *Id.*, at 6:23-7:6. In college, he majored in History and Spanish. *Id.*, at 13:3-4. The college he attended was located in an area that bordered on a poor community and the college encouraged students to help others. *Id.*, at 13:11-15. The college had a motto – "Be the Difference." *Id.*, at 13:15-16. Diane Foley believes Jim was influenced by this emphasis on helping others. *Id.*, at 13:17. Jim started volunteering and throughout his college years he taught reading and writing at the local schools. *Id.*, at 13:18-19. After college Jim spent approximately five years with Teach for

America. *Id.*, at 14:16-21. He then went back to school for a Masters of Fine Arts in writing. *Id.*, at 16:13-20. After that he continued to teach writing and continued working to help those in need. *Id.*, at 17:18-23. He got a Master's degree in journalism from Northwestern. *Id.*, at 17:24-18:5. After receiving his degree, he traveled to Iraq with the Indiana National Guard. *Id.*, at 19:10-13. He became a freelance journalist and was committed to giving a voice to those in more remote parts of the world. *Id.*, at 23:12-16. In 2011 he went to Libya to write about events surrounding the "Arab spring" and was kidnapped along with another journalist. *Id.*, at 24:25-25:9; 26:1-4. He was eventually released as a result of efforts of his brother Michael and some friends. *Id.*, at 27:13-18. He came back to the United States for a time and spent the holidays with his extended family. *Id.*, at 27:19-21. But he returned to freelance journalism, this time traveling to Syria. *Id.*, at 28:24-25. He returned to the United States in the spring of 2012 and sought to help families of other reporters who had been kidnapped in Syria. *Id.*, at 31:10-32:7. He returned to Syria that summer and came back to the United States for what would be the last time in September 2012. *Id.*, at 32:14-33:8. He went back to Syria in October of 2012. *Id.*, at 33:14-15.

Diane Foley first felt that something was wrong when Jim did not call home at Thanksgiving because he always contacted his family during holidays. *Id.*, at 34:14-22. The day after Thanksgiving, the family learned from friends of Jim's that Jim had been kidnapped. *Id.*, at 34:25-35:6. The family heard from representatives of the United States government a few days later. *Id.*, at 37:11-13.

Diane Foley testified that she was frantic, and that she felt helpless and powerless. *Id.*, at 40:14-24. They had no information about where Jim was or even whether he was alive. *Id.*, at 38:14-19. Diane Foley testified that they could not obtain any helpful information or guidance from the government or the FBI. *Id.*, at 45:9-18. The family was devastated by the kidnapping and lack of information – but because they were told not to tell anyone of the kidnapping, they could

not even express their grief and worry. *Id.*, at 40:2-41:2. Eventually they decided to "go public" –
thinking that perhaps the journalist community could help locate Jim. *Id.*, at 44:14-18. Diane quit
her job so that she could devote her time to helping Jim. *Id.*, at 45:1-5. She made numerous trips
to Washington D.C. seeking help and information. *Id.*, at 45:5-8. She testified that no one seemed
interested. *Id.*, at 45:12-13. Then in September 2013, nearly 10 months after Jim was kidnapped,
Diane received some information from a Syrian source and from a man in Belgium whose son had
seen Jim. *Id.*, at 46:3-47:14. Finally, the family had some information, and they became hopeful
that Jim might eventually be released. *Id.*, at 47:8. In November of 2013, the captors contacted the
family and made a ransom demand that sought either release of prisoners held by the United States
or payment of a large sum.[6] *Id.*, at 48:25-49:2. Through that process, the family learned the identity
of the captors and received proof that Jim was still alive. *Id.*, at 48:10-17. Diane worked tirelessly
searching for help in her quest to bring Jim home. She continued to travel to Washington, D.C.
and overseas. *Id.*, at 51:13-54:15. She met with numerous officials and FBI agents. *Id.* Nothing
ever came of those meetings. She finally met with one official who told her not only that the
government was not going to bargain for Jim's life but that if the family attempted to pay the
ransom on their own, they would be prosecuted. *Id.*, at 52:2-14. The family nevertheless tried to
raise money and attempted to contact the captors. These efforts were fruitless. *Id.*, at 53:5-10.

Diane Foley learned of her son's murder when President Obama announced it in a
television statement. *Id.*, at 61:21-24. (That same day, she had seen the video of Jim's beheading
on Twitter but did not know whether it was real.) *Id.*, at 61:10-14. She was angry and appalled at

---

[6] The transcript of Diane Foley's deposition states that the ransom demand was 100,000 euros but
it appears that the ransom demand likely was actually multiples of that amount. John William
Foley (the father of James Foley) states in his deposition that the demand was 100 million euros.
Deposition Transcript of John William Foley, dated March 17, 2021, at 29:3, attached hereto as
Exhibit G. This is consistent with the amount demanded in the ransom note sent to Stephen
Sotloff's family. *See* Ransom Email dated December 4, 2013, attached hereto as Exhibit E.

the government's actions: they lied to her and the family and failed to provide any help to Jim or the family. *Id.*, at 61:25-62:12. Diane felt that it was important to create some good out of this horror and so she spearheaded an effort to create the James Foley Legacy Foundation. *Id.*, at 63:21-64:9. She was heartened by the outpouring of love from people who had known Jim. *Id.*, at 63:16-21. She learned that he had made a difference in many peoples' lives. *Id.*, at 65:4-11. For Diane, the Foundation provided some form of healing. *Id.*, at 67:6-11. She wants to make a difference and raise awareness about international hostage taking. *Id.*, at 67:12-17.

Jim's death had a profound effect on the family dynamic. *Id.*, at 69:3-9. Diane testified that her husband John was somewhat angry that she started the Foundation and resented the time she spent away from home. *Id.* Jim's siblings were indifferent to the Foundation. *Id.*, at 66:19-23. Diane testified that Jim's death caused two of his brothers to get divorced. *Id.*, at 69:14-16. The family has suffered a great deal of stress and anxiety and Diane testified that she takes medication for anxiety and suffers from other health effects as a result of Jim's murder. *Id.*, at 69:2-6.

### 2.    John William Foley – Father of James Foley

John William Foley is the father of James Foley. He is a United States citizen. John William Foley submitted deposition testimony in support of the claims in this case. *See generally* John William Foley Dep. Tr. John William Foley described James Foley's childhood and education and the time James was kidnapped and held captive in Libya – echoing the testimony of James' mother Diane. *Id.*, at 5:20-20:15. John William Foley recalled learning of James' disappearance and abduction in Syria from a friend of James the day after Thanksgiving of 2012. *Id.*, at 20:19-23. He could not believe that James had been kidnapped a second time. *Id.*, at 20:25-21:2. He described the feeling as dark – as if the lights had been turned off. *Id.*, at 21:5-7. He could not believe that there would be a good outcome this time. He testified that it was a year before the

family actually learned that James was alive from a young Belgian freedom fighter. *Id.*, 22:14-20.
After that, the family received a ransom note offering to exchange James for ISIS prisoners being
held by the United States or a substantial payment. *Id.*, at 24:5-12. The captors demanded 100
million euros. *Id.*, at 29:2-3. The captors offered a "proof of life" and through that process the
family confirmed that James was alive and began to have hope. *Id.*, at 24:23-24; 25:17-19. The
family met with representatives of the United States government – who really could not offer any
information or hope. *Id.*, at 25:24-26:10. The family was told that the government would not "go
after" the prisoners. *Id.*, at 26:11-20. He stated that the government lied to the family and the family
concluded that they were on their own and they would have to make the attempt to secure James'
release. *Id.*, at 26:21-27:10. They received another ransom note and at first had some hope because
at least the captors were communicating with them.  But they could not raise the money, the
government was not helping, and of course they could not arrange the release of the ISIS prisoners.
*Id.*, at 27:11-21. At that point, things went downhill.  *Id.*, at 28:4-13; 29:1-6. The day that James
was killed, the FBI came to the family's home asking for DNA samples. *Id.*, at 29:8-17. They
could not figure out why they were being asked for this two years after the kidnapping. *Id.* Later
that day, they learned that James had been killed. *Id.*, at 29-18-20. James William Foley saw the
video of the execution of his son on the internet.  *Id.*, at 29:25-30:3. And he kept thinking, could
this really be Jim?  *Id.* They heard nothing from the government until that evening when President
Obama appeared on television and announced that Jim Foley had been beheaded.  *Id.*, at 30:4-10.
John William Foley described watching the video:  he said it was like being stabbed or suffocated
or strangled. *Id.*, at 30:22-24. It was the worst moment, the worst experience of his life. *Id.*, at
31:3-4. He described it as total sadness. *Id.*, at 31:5-6. After Jim's death, they learned about Jim's
treatment while he was a captive. *Id.*, at 31:16-32:1. John experienced significant medical and
emotional issues that required treatment.  *Id.*, at 32:11-18. He is envious of families that have been

able to move on but because of the Foundation that Diane created, they cannot do so. *Id.*, at 32:24-33:3. He says he was robbed of his retirement and while he believes Diane has done a tremendous job with the Foundation, it consumes her time. *Id.*, at 32:19-24; 33:5-8. The family dynamic has been devastated: the family needs Diane but she is occupied with the Foundation. *Id.*, at 33:15-19. He describes the situation as a disaster. *Id.*, at 33:16. He testified that Jim's death has affected all of Jim's siblings detrimentally. *Id.*, at 35:22-38:18.

### 3.    Lt. Col. John Elliot Foley – Brother of James Foley

John Elliott Foley is a younger brother of James Foley. He is a United States citizen. *See generally* John Elliott Foley Dep.Tr. He was four years younger than James. *Id.*, at 7:21. At the time of his deposition, John was serving in the United States Air Force. *Id.*, at 4:23-24. He joined the military when he was 23 and has served in many overseas locations including Iraq and Afghanistan. *Id.*, at 6:6; 6:10-7:2. John testified that he always looked up to James (Jim) as an older brother. *Id.*, at 8:24-9:1. Jim was a lovable guy and protective of John. *Id.*, at 8:2, 17. He testified about the close family relationships – the family always gathered together for holidays – even when they were living in distant places. *Id.*, at 8:21-9:6. John testified about the first time Jim was abducted (in Libya). *Id.*, at 9:7-20. His first concern was whether Jim was alright – but John clearly thought that Jim should have stayed away from such a risky area. *Id.*, at 10:17-24. Jim was traveling in some of the same areas of the world where John was stationed, and John testified that those "shared" experiences strengthened their sibling bond. *Id.*, at 11:23-12:16. John testified that they became closer as adults. *Id.*, at 12:19-13:1. Jim stayed with John for months while he was working and arranging his travel and the two communicated by Skype when Jim was in Syria. *Id.*, at 13:2-23; 14:2-11. John tried to convince Jim not to go to Syria and he feels intense guilt that he did not do more. *Id.*, at 16:3-14. John assisted his mother in the efforts to locate Jim. *Id.*, at 17:6-15. Most significantly, John feels guilt not only because he was not able to dissuade Jim from

traveling to Syria but because he assisted with his travels and because Jim was subjected to more extreme torture because John was a military officer. *Id.*, at 17:20-18:11. While Jim was captive, John felt hopeless. *Id.*, at 21:13-16. He felt that the U.S. Government had underestimated ISIS. *Id.*, at 20:7-22. He learned of Jim's death when he received a telephone call at around 3 or 4 in the morning. *Id.*, at 21:19-23. He testified that he saw the video of Jim's execution and that the statement Jim made – invoking John – was a "double whammy." *Id.*, at 21:23-22:9. John testified that he still thinks about the video and seeing Jim's decapitated head looking at him. *Id.*, at 22:13-18. He and his family were the targets of ISIS communications. *Id.*, at 22:23-23:7. He testified that his "psychosis" broke down and he was diagnosed with PTSD. *Id.*, at 22:21-22. He had to explain to his 7-year-old daughter why "Uncle Jim's" photo was on magazines. *Id.*, at 23:8-18. He still has nightmares. *Id.*, at 23:23-24:2. He testified that he has suffered a terrible toll and carries a heavy weight as a result of his brother's abduction and execution. *Id.*, at 24:3-6. ███████████

███████████████████████████████████████████████

███████████████████████ He testified that while the family is "close" each person is dealing with their grief in their own way and he described this as being in "silos of suffering." *Id.*, at 26:5-27:10. He believes that had Jim not died, he would still be married and would still be pursuing his military career. *Id.*, at 27:14-19. Although he and Jim were very different in many respects, he is extremely proud of his brother. *Id.*, at 28:4-19.

### 4.    Mark Foley – Brother of James Foley

Mark Foley is a younger brother of James Foley.  He is a United States citizen.  *See generally*, Deposition Transcript of Mark Foley, dated April 22, 2021, attached hereto as Exhibit I.  James (Jim) was about 11 years older than Mark.  *Id.*, at 5:11. Mark remembers playing with Jim when Jim was in high school. *Id.*, at 5:19-24. He described Jim as the goofball older brother and the life of the party. *Id.*, at 6:5-14. He described large family gatherings and Jim always

bringing everyone together. *Id.*, at 6:15-25. Jim was a father figure to Mark and helped Mark develop into a good person. *Id.*, at 7:6-9. He testified about taking family trips with Jim. *Id.*, at 8:6-14. One of the last trips he took with Jim was a trip to Spain. *Id.*, at 8:15-24. Mark had his first alcoholic drink with Jim. *Id.*, at 9:4-5. They shared a love of music. *Id.*, at 10:15-16. They remained close after Jim went to college. *Id.*, at 10:23-11:3. When Jim returned home after his release from Libya, Mark and Jim spent the summer together. *Id.*, at 11:5-13. After Mark joined the Army he and Jim continued to communicate and became even closer. *Id.*, at 11:4-5. Mark testified that growing up with Jim made him a better person. *Id.*, at 13:13-21. Jim taught him the importance of family and friendship. *Id.*, at 14:2-17. Mark clearly looked up to Jim and still strives to be like him. *Id.*, at 14:18-22. He admired Jim's worldliness and focus on others. *Id.*, at 14:23-15:8. Mark testified that Jim and the rest of the family placed great importance on family holidays and that they all traveled home to be together for major holidays. *Id.*, at 18:4-13. Mark last spoke to Jim about two weeks before Jim's abduction. They spoke about being together for Thanksgiving. *Id.*, at 20:10-21:18. When he learned Jim had been killed, he was in shock. *Id.*, at 23:5-9. He watched the video of the execution and he wanted to get revenge on the perpetrators. *Id.*, at 33:2-5. He testified that he has suppressed his feelings – and that he has changed as a person. *Id.*, at 34:16-35:2. He has no patience and gets frustrated easily. *Id.* Jim's death has changed the way the family observes holidays and the family's focus on Jim and his legacy has exacerbated a rift between Mark's wife and Mark's family. *Id.*, at 38:16-39:5. Mark testified that something is "missing" in their family gatherings, and he no longer feels safe traveling outside the United States. *Id.*, at 43:17; 45:21-22. He is very proud of Jim and the Foundation helps to honor Jim's memory. *Id.*, at 47:8-48:13.

### 5.    Kathryn Foley Simpson – Sister of James Foley

Kathryn Foley is the youngest sibling of James Foley (Jim). She is a United States citizen. *See generally* Deposition Transcript of Kathryn Foley Simpson, dated May 10, 2021, attached hereto as Exhibit J. Jim was 15 years older than Kathryn. *Id.*, at 6:20. Kathryn and Jim grew up in the same household until Jim went off to college. *Id.*, at 7:1-3. Kathryn has a degree in nursing and joined the Navy after college. *Id.*, at 5:20-21; 7:9-11. She left her position in the Navy earlier than planned as a result of Jim's death. *Id.*, at 7:14-17. Jim was a mentor and father figure to Kathryn. *Id.*, at 7:21-25. They spent time running and working out together – often when Jim was home for holidays. *Id.*, at 8:2-8. They went shopping together and Jim visited Kathryn at college. *Id.*, at 8:10-20. She describes their relationship as a close brother sister relationship. *Id.*, at 8:23. She was terrified when Jim was first kidnapped in Libya. *Id.*, at 10:13-18. While Jim was in Syria, they communicated by Skype. *Id.*, at 12:20-23. Kathryn was the last person to communicate with Jim before his capture. *Id.*, at 12:25-13:1. It was Thanksgiving morning in the United States and they were joking together and he wished her a happy Thanksgiving. *Id.*, at 13:1-7. When she learned Jim had been kidnapped in Syria, she felt fear and sadness. *Id.*, at 13:17-18. But for a long time, she felt that there was hope that he would be released. *Id.*, at 13:20-23. She helped her mother arrange trips in her quest to locate Jim and secure his release. *Id.*, at 14:7-15. She was devastated when she learned of Jim's death. *Id.*, at 17:1-8. She watched the video of Jim's execution. *Id.*, at 17:14-15. She could not escape the photos and stories about Jim's death. *Id.*, at 17:22-18:1. Everywhere she went she saw her brother's face and his orange jumpsuit. *Id.*, at 18:1-4. Week after week, Jim's image would stimulate discussion about the geopolitical climate or another killing. *Id.*, at 18:5-11. Seeing the images of her brother next to his murderer over and over was painful. *Id.*, at 18:19-23. The image continues to affect her: she cannot stand seeing the color orange. *Id.*, at 19:1-7. Her brother's death has affected her physically and she suffers from insomnia. *Id.*, at

19:16-22. She testified that Jim's death has forever changed the family. *Id.*, at 20:4-6. After Jim's death she traveled with one of her brothers to Europe and met some of Jim's friends. *Id.*, at 20:10-13. That is when she learned about the horrific torture to which Jim had been subjected. *Id.*, at 20:21-24; 21:1-7. Many things remind her of Jim and the torture he experienced. *Id.*, at 21:21-22:12. She testified about the effect of Jim's death on the family. *Id.*, at 22:15-24:10. Her mother had to quit work to try to find Jim. *Id.*, at 22:23-24. Her father had to become the sole provider and Jim's capture and death exacerbated his anxiety and depression. *Id.*, at 22:15-22. Her brother John was affected tremendously – he lost his family and his career and he was "called out" in the statement Jim made before his execution. *Id.*, at 25:11-18. And Kathryn left the military as a result of Jim's death. *Id.*, at 24:2-6. In her view, the entire family has been changed monetarily and emotionally. *Id.*, at 24:7-8.

## DETERMINATION OF COMPENSATORY DAMAGES

### III.    DAMAGES CLAIMS OF ESTATES OF THE VICTIMS.

The Estates of Mr. Foley and Mr. Sotloff assert claims for both economic loss damages and non-economic pain and suffering damages.

#### A.  ECONOMIC LOSS DAMAGES UNDER THE FSIA:  APPLICABLE LAW

"Section 1605A of the FSIA explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (Syrian Arab Republic was liable to citizens' estates and families, under FSIA, for economic losses) (citing 28 U.S.C. § 1605A(c)).  *See also Roth*, 78 F. Supp. 3d at 402; *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Economic loss damages must be supported by credible evidence, and may be proven by the submission of a forensic economist's expert report that is based on reasonable data and assumptions. *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328, at *10 (D.D.C. Mar. 31, 2022) ("The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case") (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009)). "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed, supra*, 845 F. Supp. 2d 204, 214); *see also Thuneibat*, 167 F. Supp. 3d at 48-49 (finding satisfactory evidence to support economic loss award in expert reports from forensic economists that were based on data provided by the National Center for Health Statistics, information submitted by the immediate family members of the two victims, and the expert's own expertise where loss wages and benefits were calculated and offset with estimates of personal consumption, based on data from the U.S. Department of Labor, Bureau of Labor Statistics, and where the resulting value was discounted "based on the rate of return on U.S. Treasury Bills based on Historical H.15 data from the Board of Governors of the Federal Reserve System"); *Belkin*, 667 F. Supp. 2d at 24 (awarding economic damages based on conclusion that expert testimony was based on reasonable assumptions about plaintiff's likely earnings if she had survived, including the length of time she would have worked and received retirement benefits).

The estates of both Victims have submitted an expert report in support of their claims for economic loss damages. Both reports were prepared by Stephen M. Dripps, Senior Economist and Statistician at the Center for Forensic Economic Studies ("CFES") and by Chad Staller, President and Senior Economist at CFES. Both Mr. Dripps and Mr. Staller are "Certified Valuation

Analysts". Mr. Dripps has a Bachelor's degree in Statistics and a Masters in Finance from Pennsylvania State University. CFES Economic Loss Report for Stephen Sotloff, dated June 22, 2021 ("Sotloff CFES Report"), at p.16, attached hereto as Exhibit K; CFES Economic Loss Report for James Wright Foley, dated June 22, 2021 ("Foley CFES Report"), at p.18, attached hereto as Exhibit L. He has conducted multiple valuation analyses, including computation of lost future wages, in personal injury cases, commercial disputes, and employment matters. He lists deposition and/or trial testimony in four separate cases over a four-year period. Sotloff CFES Report, at Appendix A; Foley CFES Report, at Appendix A. Mr. Staller has a Master's of Business Administration and a Juris Doctor from Temple University. Sotloff CFES Report, *id*.; Foley CFES Report, *id*. He is on the faculty of the Temple University trial advocacy LLM program. Sotloff CFES Report, *id*.; Foley CFES Report, *id*. He has calculated economic loss in multiple personal injury cases and has been an expert in over 22 federal and state courts and 297 cases. Sotloff CFES Report, *id*.; Foley CFES Report, *id*. Based on their experience and credentials, I believe that both Mr. Dripps and Mr. Staller are qualified as experts in the area of economic loss computations.

1.    **Economic Loss Damages For Estate Of Victim Stephen Joel Sotloff.**

The economic loss computation for the estate of Mr. Sotloff is based on the Complaint in this case, biographical information about Mr. Sotloff, and publicly available governmental and professional publications. Sotloff CFES Report, at p.2. Mr. Sotloff was employed as a freelance journalist at the time of his death. *Id*. He had a 30-month contract with the *Los Angeles Times* as a Middle East correspondent. *Id*. He had worked for multiple well-known publications in the past. *Id*. He had indicated that he was planning to transition to the role of editor. *Id*. At the time of his death, Mr. Sotloff was 31.3 years old. *Id*.

The CFES computation of economic loss for the estate of Stephen Sotloff is based on a well-accepted methodology and applies credible and reliable data. First, the experts have

computed Mr. Sotloff's remaining work life.  The experts have identified two different work life estimates: statistical work life of 32.3 years and continuous work life of 35.7 years. *Id.* Both assumptions are reasonable and based on reliable data sources.  Next, the experts determine the appropriate wages to apply.  The computation assumes a starting annual salary of $66,000 based on the average earnings for News Analysts, Reporters, Journalists and Editors – as reported by the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics. *Id.*, at p.3. The computation applies this annual salary from the date of Mr. Sotloff's kidnapping in 2013 until January 1, 2014. *Id.* At that point, the computation assumes that Mr. Sotloff would have transitioned to the position of Editor with a somewhat higher annual salary of $73,910.  The salary for the Editor position is based on data from the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics.  *Id.* The computation then assumes that Mr. Sotloff's earnings would increase linearly over a nine-year period to the 75th percentile of Editors' earnings – so that by January 1, 2023, he would be earning $89,530.  *Id.* The computation applies a modest earnings growth rate: from 2013 until June 2021 (which is the date on which the report was prepared)[7], the computation assumes a growth rate of equal to the average annual change in hourly wages in the non-farm sector based on data from the Bureau of Labor Statistics.[8]  *Id.* The future growth rate (i.e., growth after June 2021) is set at an annual rate of 2.87% based on the documented growth rate in non-farm hourly wages from 2000 to 2020 – again using Bureau of Labor Statistics data.  *Id.* Once the wage loss is thus computed for each year of assumed work life,

---

[7] The report mistakenly states that past growth was estimated from "2012 to the present". Sotloff CFES Report, at p.3 (emphasis added). This is clearly a typographical error, as the actual computation and summary shows that Mr. Sotloff's earnings are estimated from August 4, 2013, the date of his kidnapping. *Id.* at pp. 3, 7.

[8] *Employment, Hours, and Earnings from the Current Employment Statistics survey, (National)*, Series ID: CEU0500000008, available here https://data.bls.gov/timeseries/CEU0500000008 (last accessed April 25, 2022).

the computation deducts amounts attributable to taxes and to personal maintenance or consumption. The deduction for taxes includes both state and federal taxes and the deduction for personal maintenance is based on data regarding the personal maintenance of a single individual as compiled in the Bureau of Labor Statistics, Consumer Expenditure Survey.[9] The computation results in a deduction of between 58.5% and 66.6%. *Id.*, at p.4. After computing the total aggregate amount of loss using the above assumptions, the experts reduce the total to a present value amount. The calculation of present value applies an interest rate of 1.88% on the principal amount (based on the yield on high grade municipal bonds in 2020 and 2021) and applies a higher interest rate of 4.04 % on the reinvested interest. *Id.* The 4.04 % rate is based on the bond yield from 2000 to 2020. *Id.* The above methodology yields economic loss between $775,236 and $860,355. *Id.*

As noted, the methodology employed is consistent with generally accepted procedures for determining lost future wages and the data applied to conduct the computations are all derived from reliable and appropriate sources. Indeed, the computation may be viewed as conservative: in some cases, future loss computations incorporate assumptions about marital status changes and household size adjustments which would result in a lower deduction for personal maintenance. Additionally, it would not be unreasonable to assume a longer work life as well as more significant wage growth given current economic conditions and the work ethic exhibited by Mr. Sotloff. I conclude that the economic loss computations are reasonable and well supported and recommend accepting the highest amount computed – $860,355 – in determining compensatory economic loss damages.

---

[9] http://www.bls.gov/cex/ (last accessed April 25, 2022).

**2.  Economic Loss Damages For The Estate Of Victim James Wright Foley.**

The economic loss computation for the estate of Mr. Foley is also based on the complaint filed in this case, biographical information about Mr. Foley, and pertinent government and other publications and data.   The experts applied essentially the same methodology, data and assumptions in computing economic loss for estate of Mr. Foley that were used to conduct the computation for the estate of Mr. Sotloff.

Mr. Foley was 40.8 years old at the time of his death on August 19, 2014. Foley CFES Report, at p.2. Mr. Foley was employed as a freelance journalist. *Id.* He had a Bachelor's degree in History and Spanish and two Master's degrees. *Id.* He had worked for various publications and also for Teach for America and USAID. *Id.* The lost earnings computation starts on the date of his kidnapping – November 22, 2012. *Id.*, at p.3. The experts have presented two computations based on different assumptions about Mr. Foley's future career path and have also calculated two different periods of "work life". *Id.* One work life scenario assumes continuous work through Mr. Foley's statistical work life expectancy for a person of Mr. Foley's age and education. *Id.* The second scenario assumes continuous work through the social security retirement age of 67. *Id.* The first scenario yields a remaining work life of 24.1 years and the second scenario assumes a remaining work life of 26.2 years.  *Id.* With respect to the future career path: the first scenario assumes the Mr. Foley would continue to work as a journalist and would progress to a higher salary over time.  *Id.*, at p.3. This scenario assumes a starting annual salary of $66,000 based on the average earnings for News Analysts, Reporters, Journalists and Editors – as reported by the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics. *Id.* Next, the calculation assumes that this salary would have progressed linearly to the 75th percentile of earnings in this occupational group – up to a salary of $80,950 – over a 10-year period.  *Id.* The second scenario assumes that Mr. Foley would have attained the position of Editor by January 1,

2015. *Id.* In this scenario, the calculation assumes that in the position of Editor, Mr. Foley would have received the average annual salary for Editors as reported in the same Bureau of Labor Statistics publication. *Id.* Thereafter, the calculation assumes that Mr. Foley's earnings would have progressed linearly up to the 75th percentile (a salary of $89,530) over a 9-year period. *Id.* In both scenarios the calculations apply earnings growth rates: from 2012 until June 2021 (when the loss report was prepared), the computation assumes a growth rate of equal to the average annual change in hourly wages in the non-farm sector based on data from the Bureau of Labor Statistics. *Id.* The future growth rate (i.e., the period after June 2021) is set at 2.87% a year based on the growth rate in non-farm hourly wages from 2000 to 2020 – again using Bureau of Labor Statistics data. *Id.*

After computing the wage loss in this manner, the calculation applies certain deductions: first, the computed earnings are reduced to account for state and federal taxes. Second, the earnings are reduced to account for the personal maintenance or consumption factor – i.e., the amount that Mr. Foley would have consumed for his own living expenses. *Id.*, at p.4. The factors applied as deductions are slightly different in the two scenarios. *Id.* The tax rates applied are based on a standard tax calculation formula. The percentage deductions for personal maintenance are based on the U.S. Department of Labor, Bureau of Labor Statistics, Consumer Expenditure Survey 2017 and 2018. *Id.*

Finally, after the deductions are applied on an annual basis, for each work life scenario, the total aggregate amount computed is reduced to present value. The calculation of present value applies an interest rate of 1.88% on the principal amount (based on the yield on high grade municipal bonds in 2020 and 2021) and applies a higher interest rate of 4.04 % on the reinvested interest. *Id.* The 4.04 % rate is based on the bond yield from 2000 to 2020. *Id.*

The methodology yields a projected economic loss of between $526,721 and $642,433 on a present value basis. *Id.*, at p.5.

30

As noted, the methodology and data sources used in the computations are the same as those applied in the computations conducted for the estate of Mr. Sotloff. As noted above, the methodology employed is consistent with generally accepted procedures for determining lost future wages and the data applied to conduct the computations are all derived from reliable and appropriate sources. The computations are, in my view, credible and reliable – and conservative. Mr. Foley exhibited a strong passion for his work and certainly could reasonably be expected to continue to work past the "standard" retirement age. In addition, given his education and experience, he could have engaged in multiple different occupations. Accordingly, I recommend that the computations of loss be accepted as reasonable, and I further recommend awarding the highest loss amount calculated – $642,433.

## B. NON-ECONOMIC PAIN AND SUFFERING DAMAGES CLAIMS FOR ESTATES OF STEPHEN SOTLOFF AND JAMES FOLEY.

The estates of both Victims seek non-economic damages for both the period of captivity and for the pain and suffering endured while captive and at the time of their executions.

In evaluating the recommended amount of "pain and suffering" damages for the estates of Victims killed in the attack, I take into consideration and am guided by prior decisions in this Circuit awarding damages to victims of terrorism. The case law in this Circuit reveals a wide range of pain and suffering awards for victims killed by terrorists – with differences based primarily on the severity of the injuries leading to death, the duration of infliction of harm/torture, the fear and terror endured by the victim, and the circumstances of the killing. Pain and suffering damages are not limited to physical pain, but also take into account mental anguish based on the conscious knowledge of imminent death and courts have consistently recognized that the fear and distress a decedent experienced knowing that death is imminent in the context of a terrorist attack is a reasonable component of damages. *See Baker v. Socialist People's Libyan Arab Jamahirya*,

31

775 F. Supp. 2d 48, 81-82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 221, 266-73 (D.D.C. 2008) ($18 million in pain and suffering damages to each of seven victims who survived just a few minutes after a plane bombing).

In general, many courts evaluating pain and suffering damages for victims in FSIA cases have articulated a basic principle that such damage awards should be generally consistent to the extent the circumstances appropriately can be characterized as similar. *See, e.g.*, *Wamai v. Republic of Sudan,* 60 F. Supp. 3d 84, 91 (D.D.C. 2014) (quoting *Peterson v. Islamic Republic of Iran ("Peterson II")*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007); *Winternitz*, No. CV 17-2104 (TJK), 2022 WL 971328, at *9 ("In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries.") (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *Peterson v. Islamic Republic of Iran ("Peterson II")*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) ("In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards.") But each case must be assessed on its own merits and with reference to its specific facts. And I note that there are few cases that could be deemed "similar" to the circumstances presented here.

Courts have applied varied approaches in assessing pain and suffering damages where a victim has been held captive for a significant period of time. In some cases, courts have awarded amounts based on the number of days in captivity. *See, e.g.*, *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 136 (D.D.C. 2019) (Courts typically apply "a per-diem formula—awarding $10,000 per day of captivity—to compensate for injuries sustained while imprisoned."); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145,163-64 (D.D.C 2017) (awarding $16.02 million in pain and suffering damages for plaintiff's 1,602 days of

imprisonment).[10] Where the victim was held captive for very substantial periods of time, the formula yields awards of multiple millions. *Levinson v. Islamic Republic of Iran*, No. 1:17-CV-00511 (TJK), 2020 WL 7130164, at *12 (D.D.C. July 16, 2020), report and recommendation adopted, No. CV 17-511 (TJK), 2020 WL 5834839 (D.D.C. Oct. 1, 2020) (awarding $47,500,000 in damages for pain and suffering to a plaintiff who had endured 4,750 calendar days in captivity).

In other cases, courts have opted instead to base the award on the brutality of torture and severity of damage inflicted rather than a formulaic *per diem* amount.  *See, e.g.*, *W.A. v. Islamic Republic of Iran*, No. 18-CV-1883(CKK/GMH), 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020), *report and recommendation adopted*, No. CV 18-1883 (CKK), 2020 WL 7869211 (D.D.C. Apr. 11, 2020) (awarding $10,000,000 to the estate of a man who suffered severe physical and psychological torture over 5 days, had holes drilled into his body, was burned, and had bruising and broken bones from beatings, was used to extort money from his family and was then murdered, concluding that the *per diem* amount of $50,000 would be a "perverse application" of the formula).

---

[10] *See also, e.g.*, *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 6 (D.D.C. 2019) ($1,920,000 for hostage held on 192 days); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) ($1.68 million for 168 days); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135-136 (D.D.C. 2005) ($1.05 million for 105 days of captivity); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 153 (D.D.C. 2010) ($5.03 million for 503 days); *Massie v. Government of the Democratic People's Republic of Korea* 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) ($3,350,000 for 335 days); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 100 (D.D.C. 2003), *Cicippio, Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004) ($650,000 for 65 days); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d. 27, 37 (D.D.C. 2001) ($5,640,000 for 564 days); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51 (D.D.C. 2001) ($23 million for 2,354 days); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 26 (D.D.C. 2001) (awarding $2,050,000 for victim held 205 days; $1,260,000 for 126 days; and $50,000 for 5 days); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) ($24,540,000 for 2,454 days); *Frost v. Islamic Republic of Iran*, Case No. 17-cv-603 (TJK), 2019 WL 5110604, at *24 (D.D.C. Aug. 26, 2019), *report and recommendation adopted in part and rejected in part on other grounds*, 419 F. Supp. 3d 112 (D.D.C 2020) (awarding $310,000 for 310-day period of captivity); *Azadeh v. Islamic Republic of Iran*, No. 16-1467 (KBJ), 2018 WL 4232913, at *18 (D.D.C. Sept. 5, 2018) ($1,140,000 for 114 days of captivity); and *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 61 (D.D.C. 2018) ("*Fritz I*") ($10,740,000 for 1,074 days held in captivity).

In fact, the court in *W.A.* characterized the $10 million pain and suffering amount as conservative – but determined that this was the maximum amount that could be awarded because it was the plaintiff's demand. *W.A.*, No. CV 18-1883 (CKK), 2020 WL 7869211, at *14. (Federal Rule of Civil Procedure 54(c) prohibits an award of damages that exceeds the amount set forth in the pleadings in a default case.)

In the instant case, while the Victims were held captive for an extended period of time, the *per diem* approach is not appropriate in my view:  that formula would not yield a sufficient pain and suffering award under the circumstances here.[11]

While all deaths resulting from terrorism are barbarous, there are some cases – such as this one – that present extreme circumstances. As exemplified by the cases noted below, courts have awarded substantial pain and suffering damages to victims who were held captive and subjected to particularly brutal torture before death, or particularly painful and savage treatment, or where the killing was performed in a manner that assured egregious suffering. *See, e.g.*, *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 346 (D.D.C. 2016) (awarding a lump sum of $25,000,000 to each former hostage, in addition to a *per diem* amount of $19,670,000 for each day of their captivity, based on their "extreme suffering" which included a plane crash, being subjected to long marches, weighed down by chains, denied medical treatment, starved, and exposed to and forced to suffer from serious illnesses coupled with constant fear of death – for total pain and suffering awards of $44,670,000 for each surviving victim); *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017) (awarding $30 million to the estate of victim who was held captive for a short period of time – three days – but was subjected to blunt force trauma, strangulation and

---

[11] Under the *per diem* approach, Mr. Sotloff's estate would be awarded $3.45 million and Mr. Foley's estate would be awarded $6.35 million. These numbers are substantially lower than the amounts awarded for victims who were held captive and tortured for even shorter periods of time before being murdered.

bodily mutilation before death, including the removal of his eyes and tongue); *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30 (D.D.C. 2018) ($15 million in compensatory damages for pain and suffering where deceased was detained for over 17 months, returned to his family in a vegetative state, subjected to a publicized coerced "confession" and trial, and endured severe torture); *W.A.*, No. CV 18-1883 (CKK), 2020 WL 7869211, at *1 ($10 million for victim who suffered severe physical and psychological torture over a five day period); *Higgins v. The Islamic Republic of Iran*, No. 1:99CV00377, 2000 WL 33674311, at *8 (D.D.C. Sept. 21, 2000) ($30 million awarded for a victim held hostage for 529 days, brutally tortured and killed); *Est. of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40, 46 (D.D.C. 2007) ($22,331,500 awarded to estate of victim who was held captive for slightly over two years, tortured, and hung).

All of these cases are instructive and relevant to determining an appropriate award of pain and suffering damages for the estates of the Victims who underwent severe torture and extended periods of captivity.  But, in addition, the Victims were subjected to a particularly egregious and shocking form of execution that was intended to inflict the maximum possible pain and fear.  The case that presents facts most similar to those here with respect to the manner of execution is *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 58 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011), *cert. denied* 565 U.S. 945 (2011) and *disapproved of on other grounds by Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144 (D.D.C. 2014). In that case, two American contractors were kidnapped and beheaded by the Zarqawi Terrorist Organization, a predecessor of ISIS. *Id.*, at 58; Gartenstein-Ross Rep., at p.15. The victims were held for a period of only a few weeks, but the manner of their executions was strikingly similar to the executions of Mr. Foley and Mr. Sotloff.  As the *Gates* court found, the execution videos of the victims

> depict each American man blindfolded, gagged, and kneeling on the ground. As becomes evident, their hands and feet are tied. The terrorists stand immediately behind, faces concealed by black hoods. Several brandish assault rifles. One of them reads a polemic statement in Arabic. When the reading is finished, one terrorist produces a knife. He knocks over the American and begins sawing at his neck. The victims attempt to move away, to no avail. The video footage records awful sounds: kicking and efforts to escape, muffled cries, and labored breathing by the man wielding the knife. Copious amounts of blood are shown.

*Gates*, 580 F.Supp.2d, at 58. In *Gates*, the court awarded $50 million in pain and suffering damages for the estates of each victim.

### 1.    Pain and Suffering Damages – Stephen Joel Sotloff

The Plaintiffs have advised the Special Master that the Estate of Stephen Sotloff seeks a pain and suffering award in the amount of $50 million for the abuse and torture Mr. Sotloff endured while captive and in the period just prior to his death. The Complaint filed sets forth a prayer for damages for the estate of Mr. Sotloff in the aggregate amount of $80 million. Complaint, ECF No. 1, April 18, 2016 ("Sotloff Complaint"), at ¶¶47, 50, 53, 56, 59, 61, 64, 67. The submission on behalf of the Estate of Mr. Sotloff further notes that under the case law addressing damages for the duration of captivity, the estate could be entitled to an additional $3.94 million, beyond the suggested amount of $50 million.

The uncontroverted evidence presented here demonstrates that Mr. Sotloff suffered from prolonged physical and mental abuse and torture during over a year of captivity – a much longer period of captivity than that endured by the victims in *Gates*. Additionally, the uncontroverted evidence demonstrates that Mr. Sotloff would have experienced fear of death throughout the period of captivity, exacerbated by mock executions and observing the execution of other prisoners. The execution video shows that Mr. Sotloff was forced under extreme duress – while kneeling next to his captor and likely aware of his impending death – to make a statement denouncing his country and blaming the United States for his fate. As the expert report of Dr. Mallak demonstrates, Mr.

Sotloff was clearly conscious during his execution and suffered perhaps the most excruciating death imaginable. The evidence shows that Mr. Sotloff was executed in this vicious manner solely because he was American and that the execution was conducted as a warning to the United States government. The extreme brutality of the execution as deliberate and clearly intended to engender maximum fear and terror. This is in all respects an extraordinary case that warrants an extraordinary pain and suffering award. Based on the evidence and the extreme circumstances, I conclude that an award of $54 million is appropriate. This amount is fundamentally based on the award in *Gates* and further accounts for the prolonged period of captivity and torture – as compared to the *Gates* case and consistent with other cases involving significant periods of captivity.

## 2. Pain and Suffering Damages – James Wright Foley

The Plaintiffs have advised the Special Master that the Estate of James Foley seeks a pain and suffering award in the amount of $50 million for the abuse and torture Mr. Foley endured while captive and in the period just prior to his death. The Complaint filed in this case sets forth a prayer for $80 million in damages in the aggregate for the Estate of Mr. Foley. *Foley v. Syrian Arab Republic*, 18-cv-01625-TJK, ECF No.1 July 10, 2018 ("Foley Complaint"), at ¶¶52, 55, 58, 61, 64, 66, 69, 72. The Plaintiffs further note in their submission to the Special Master that under the case law addressing damages based on the duration of captivity, the Estate could be entitled to additional damages of $6.35 million beyond the suggested amount of $50 million.

The analysis regarding pain and suffering damages for Mr. Foley is essentially the same as the analysis for Mr. Sotloff. The uncontroverted evidence demonstrates that Mr. Foley also suffered from prolonged physical and mental abuse and torture during nearly two years of captivity. Indeed, the evidence shows that Mr. Foley was subjected to particularly brutal treatment. The evidence submitted by the experts Drs. Mallak and Gartenstein-Ross establish that Mr. Foley too would have experienced fear of death resulting from the deliberate actions of the captors

throughout that period of captivity, suffered from physical abuse and torture, and experienced extreme fear and anxiety. The execution video shows clearly and graphically that Mr. Foley was forced, under extreme stress, to denounce his family and country. The expert report of Dr. Mallak demonstrates that Mr. Foley was conscious during his execution and suffered an excruciating and terrible death. The extreme brutality of Mr. Foley's execution was deliberate and was clearly intended to create fear and terror both in Mr. Foley and in observers and it was carried out solely because Mr. Foley was an American as a "warning" to the United States. Again, this is in all respects an extraordinary case that warrants an extraordinary pain and suffering award. In making a recommendation, I am again guided by the cases cited above and in particular by the award in *Gates*. As noted above, the circumstances in this case are even more egregious than those in the *Gates* case and would justify an award greater than that in *Gates*. Accordingly, I recommend a pain and suffering award for the estate of James Foley in the amount of $56.5 million – which accounts for the extended period of captivity and torture beyond that experienced by the victims in *Gates*.

III.    **NON-ECONOMIC/SOLATIUM DAMAGES CLAIMS OF FAMILIES OF JAMES FOLEY AND STEPHEN SOTLOFF.**

A. **SOLATIUM DAMAGES UNDER THE FSIA**

Section 1605A(c) of the FSIA expressly provides for solatium damages to immediate family members of the victims. Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort. *See Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim. Solatium is awarded to compensate the the [*sic*] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations

omitted). *See also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30-31 (D.D.C. 1998) (factors that the court may consider in determining solatium damages include "obvious distress during testimony", "claimant's inability to testify due to intense anguish", "testimony which describes a general feeling of permanent loss or change caused by decedent's absence" and "medical treatment for depression and related affective disorders").

Generally, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. (The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003))). The immediate family members need only demonstrate a close personal relationship with the victim to be entitled to an award of solatium damages. *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth*, 78 F. Supp. 3d at 403 ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted). *See also Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 272 (D.D.C. 2020), citing *Kaplan*, *supra*, for "presumption of emotional injury" with respect to solatium damages.

Immediate family members need not be present at the attack in order to be eligible for solatium damages. *See Winternitz*, 2022 WL 971328, at *10 ("'[I]mmediate family members of

terrorism victims may state a claim for IIED even if they were not present at the site of the attack.'") (quoting *Pennington v. Islamic Republic of Iran*, 2022 WL 168261, at *4 (D.D.C. Jan. 19, 2022)); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) (*Cohen I*) ("Solatium claims are typically brought by family members who were not present or injured themselves"); *id.* at 85 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)).

Accordingly, an immediate family member who provides credible testimony about the effect on him or her of the attack may receive an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (declaration that victim's detention and torture caused wife significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

The case law in this Circuit outlines considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks. Solatium damage awards are determined based on numerous factors including "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*"). In *Heiser I*, the court

conducted a survey of decisions of the district courts in the District of Columbia Circuit and found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Heiser I*, 466 F. Supp. 2d at 269 (footnotes omitted). These amounts are guideposts that may be considered in evaluating damages and are neither mandatory nor applicable in all cases. *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018).[12]

The amount of solatium damages tends to be greater – enhanced over the *Heiser* values – where there are more extreme circumstances, such as where a family member is under medical care for emotional or psychological injury; or the testimony demonstrates that the family member continues to experience and feel the loss as if it had just occurred, or where the family member is aware of the victim's extreme suffering while captive. A review of relevant cases indicates that upward enhancements (over the *Heiser* "baseline" awards) have generally ranged from approximately 20% to 50% but in several cases, the damages awarded far exceed these percentages. In cases awarding greater enhancements, courts have placed particular emphasis on circumstances such as the lack of knowledge of the fate of the victim and the brutality of the treatment and death of the victim. *See, e.g.*, *Levinson v. Islamic Republic of Iran*, No. 1:17-CV-00511 (TJK), 2020 WL 5834839 (D.D.C. Oct. 1, 2020), at *3 (awarding $14,000,000 to the spouse and $6,500,000 to each of the children of a plaintiff who has been held in captivity for years), *Fritz I*, 324 F.Supp.3d, at 62-63 (adopting report and recommendation of special master and awarding, *inter alia*, 20% enhancement to parents where father suffered adverse health effects stemming from his grief); *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 11 (D.D.C. 2020)

_____

[12] I note that the *Heiser* guidepost values reflect awards compiled over ten years ago.

(awarding 20% enhancement where sibling spent months assisting injured brother and as a result lost his job and marriage); *Thuneibat*, 167 F. Supp. 3d 22 (upward enhancement of 25% where parents suffered ongoing depression requiring medication and siblings suffered emotional and behavioral effects; noting also that family members at the scene of the attack may be awarded an additional amount – characterized as a separate component of damages); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) (25% upward departure where relatives suffered from persistent complex bereavement-related disorder and PTSD following victim's death); *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012) (upward departure from $2 million to $3 million (30%) where sibling suffered nervous breakdown and was prescribed medication for approximately one year after the death of her brother); *Oveissi I* (awarding 50% enhancement where the child of the victim was uprooted and family was forced to go into hiding to avoid further attacks and therefore was unable to grieve in the normal manner); *Bayani*, 530 F. Supp. 2d 40, 46 (solatium award of $30 million to spouse of victim (an enhancement of 250% over *Heiser* value)); *W.A.*, No. 18-CV-1883(CKK/GMH), 2020 WL 7869218, at *20 (50% enhancement awarded to each child of victim); *Higgins*, 2000 WL 33674311, at *9 (award to child of victim of $12 million – a 240% enhancement over the *Heiser* values); *Warmbier*, 356 F. Supp. 3d 30, 59 (awarding $15 million to each parent of the victim (an enhancement of 300% as compared to the *Heiser* values) where parents had no knowledge of the fate of their son while he was in detention, the parents "constantly worried about their son, unsure of what was happening to him and had "first-hand observations and acute memories of [their] child's death.")

The solatium awards therefore must reflect the circumstances and while they may be determined with reference to the baseline framework values the facts can support a significant departure from the *Heiser* baseline values.

**B. Damages Recommendations for Family Members of Direct Victims.**

As discussed above, each of the family members of the Victims have provided competent, credible, and compelling deposition and affidavit testimony regarding their relationship with the Victim and the effects of the Victim's death and the nature of the death on their emotional and psychological health, and on their family relationships. Following are my recommendations regarding solatium damages and the basis for each proposed award.

   1.    **Solatium Damages for the Family of Stephen Sotloff.**

Stephen Sotloff's family (parents and sister) provided sworn testimony in support of their solatium claims in this case. Their collective testimony depicts a family that has been enormously affected by the death of Stephen. In a sense, the parents have lost both children because Stephen's sister has been so profoundly affected by his death. The Complaint seeks damages for the each of the family members in the aggregate amount of $70 million. Sotloff Complaint, at ¶¶ 46-67. (The Complaint sets forth 7 counts for which damages in the amount of $10 million is sought for each of the family members.) The Plaintiffs assert in a memorandum provided to the Special Master that this case presents the type of circumstances that warrant enhanced awards over the *Heiser* baseline. I agree that this case presents the type of circumstances that have been applied in other cases to support an "enhanced" award. The family did not know Stephen's fate for months and when they learned he had been kidnapped, they faced a hopeless situation. They had no ability to assist their son and brother. Although they worked to obtain information and sought ways to help Stephen, they were unable to do so. Stephen's mother made a heartfelt plea in a video – as a mother – to the kidnappers – to no avail. They eventually learned more about the conditions under which Stephen existed during his captivity and have had to live with the knowledge of the pain and torture to which he was subjected. And they saw his murder on video – and live with the knowledge that he was murdered in a manner that inflicted maximum pain and solely to send a

political message to the United States government. Unquestionably, the family members have established the basis for solatium awards and the evidence supports awards that are substantial.

### a.    Solatium Awards for the Parents of Stephen Sotloff:  Arthur Barry Sotloff and Shirley Pulwer.

Based on the uncontroverted evidence, the parents of Stephen Sotloff have demonstrated the close familial relationship that supports solatium awards in FSIA cases.  As noted, the evidence warrants an "enhancement" over the baseline *Heiser* award of $5 million. Stephen's parents suffered through their son's captivity for over a year and now know and must live with the fact that he was subjected to brutal conditions and torture during that time; they worked tirelessly to obtain his freedom with no success or help; and they saw their son murdered in the most heinous and painful manner for the sole purpose of sending a message to the United States.  The family has the added agony of knowing that the video of Stephen's murder is being used to recruit more ISIS members.  All families of victims of terrorism experience great loss and agony – but those families whose loved ones are held in captivity, are tortured, and then are killed slowly and painfully experience prolonged agony: "Families of torture and hostage-taking victims are typically awarded greater damages than are the families of victims of a single attack," because in the former cases, "the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event—was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." *Warmbier*, 356 F.Supp. 3d at 59 (citing *Oveissi I*, 768 F.Supp.2d at 27). In light of the evidence and circumstances, and a comparison of the pertinent case law, I recommend a solatium award for

each of Shirley Pulwer and Arthur Sotloff in the amount of $7,500,000 – a 50% enhancement over the *Heiser* baseline value. [13]

### b.    Solatium Award for the Sister of Stephen Sotloff:  Lauren Sotloff.

The uncontroverted evidence establishes that Lauren Sotloff had an extremely close relationship with her brother and that his death has affected her profoundly. She has suffered, and continues to suffer significant emotional injuries as a result of Stephen's death and it does not appear that she has yet been able to overcome her despair and grief. She has lost her job, her relationships, and her planned career. The evidence strongly supports an "enhanced" award of solatium damages for Lauren Sotloff.  Based on the uncontroverted evidence, and the extreme situation presented here, I recommend an award of $3,750,000 – which can be viewed as a 50% enhancement over the "*Heiser*" damages amount for siblings.

### 2.    Solatium Damages for the Family of James Foley

Five members of James Foley's family testified in support of the claims in this case.  Their testimony depicts a family that has been devastated and forever changed as a result of James' kidnapping and execution.

The Complaint seeks damages in the aggregate amount of $30 million for each of the family members of James Foley. Foley Complaint, at ¶¶ 64, 69, 72. (The Complaint seeks an award of $10 million for each of the family members for each of three counts.)  In a submission to the

---

[13] I note that the parents in the *Warmbier* case were awarded solatium damages that are twice the amount of this recommendation.  The facts in the *Warmbier* present certain relevant differences: the parents were faced with the shock and horror of seeing their son returned in a state of unawareness and exhibiting the effects of extensive trauma and injuries.  When the plane carrying their son landed, they went to meet him – expecting to see him peacefully resting in a coma based on what they were told.  Instead, they were confronted with an inhuman wail from their son who had been irreparably brain damaged, was in a vegetative state and was curled up in a fetal position. They then had to make the difficult decision to remove him from feeding tubes and other mechanisms that were prolonging life and watch him pass away.  As the court in that case noted, the parents observed their son's death first hand.

Special Master, Plaintiffs assert that this case presents the type of extreme circumstances that compel enhanced solatium awards. I agree with the Plaintiffs' contention that this case presents precisely the sort of extreme circumstances that warrant an upward enhancement in the award: the family spent an agonizing nine months not knowing whether James was alive or dead. Then, when they learned he was alive, they faced a hopeless situation. Diane quit her job and worked non-stop in an effort to bring her son home. Despite their extensive efforts, they could not secure his release. They knew that James likely was facing abuse and deprivation. His execution was intentionally brutal and horrific – solely for the purpose of creating maximum terror and issuing a warning to the United States. And the video makes clear that James was under extreme duress when he was forced to denounce his family and government. The family then faced the very public reaction to the death of their family member. The unspeakable agony to which the family members have been subjected – culminating in the horror of observing their son's and sibling's brutal death in a video and the ongoing effects – must be considered in assessing the appropriate award for solatium damages.

### a.    Solatium Award for the Parents of James Foley: Diane Maria Foley and John William Foley.

The uncontroverted testimony establishes the close familial relationship that justifies a solatium award in an FSIA case. The testimony provided by both parents demonstrates vividly the profound effect of James' kidnapping and execution on their own emotional state and on the relationships among the remaining members of the family. Diane and John Foley have reacted to their son's death in different ways. Diane has focused her energy on creating a foundation, which consumes much of her time, taking her away from home and family. She continues to suffer from and take medication for her anxiety. The testimony establishes that John suffered emotional devastation as a result of James' captivity and death and clearly John feels some loss of the

companionship of his wife because of her dedication to the Foundation. John continues to experience anxiety and depression.

As discussed above with respect to the solatium damages for the parents of Stephen Sotloff, this case warrants an award in excess of the baseline *Heiser* value. In making this recommendation, as noted above, I have taken into account pertinent cases discussed above.

Taking these factors into consideration, I recommend a solatium award for each of Diane Foley and John William Foley in the amount of $7,500,000 – a 50% enhancement over the *Heiser* baseline values.

### b.    Solatium Awards for the Siblings of James Foley: John Elliot Foley and Mark Foley (brothers) and Kathryn Foley Simpson (sister).

Each of the siblings of James Foley has testified to the devastation they felt when their brother was killed and the long-term ongoing effects of his death on their own wellbeing and on their family relationships. Each sibling has established the familial relationship that supports an award of solatium damages under the FSIA. Each of the siblings has testified to the ongoing and long terms effects of James' murder on their lives, their relationships, and their emotional health. The testimony further demonstrates that the very public nature of James' murder with the constant reminders in the media and the political discourse has contributed to the ongoing pain and suffering of the family members. The uncontroverted testimony makes clear that all the siblings have been profoundly affected and continue to suffer from the loss of their brother.

Based on the compelling testimony of the family members, the extraordinary circumstances, the ongoing pain and suffering, and the significant alteration of their lives resulting from James' death, I recommend the following awards for the siblings of James Foley.

For each of Mark Foley and Kathryn Foley I recommend an award of $3,125,000. (This can be viewed as a 25% enhancement over the *Heiser* baseline.) For John Elliot, who has testified

to the loss of career and family and to the pain he experienced and continues to experience because his brother's brutal treatment was attributed in part to John's service in the military – I recommend an award of $3,250,000 which is equivalent to a 30% enhancement over the *Heiser* value for siblings.

## IV.   PREJUDGMENT INTEREST

Plaintiffs seek prejudgment interest on all components of compensatory damages. *Sotloff* Complaint, ECF No. 1 at ¶¶13-19; *Foley* Complaint, Ca. No. 18-1625 (D.D.C.), ECF No. 1 at ¶¶14-20. "'The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations.'" *Fritz I*, 324 F.Supp.3d at 63 (*quoting Baker*, 775 F.Supp.2d at 86). There is considerable discussion and debate among the courts in this Circuit regarding the propriety of pre-judgment interest in FSIA cases and courts have differed not only on whether such awards are appropriate but also on the rationale for such awards and the types of damages to which such awards should apply. *See, e.g.*, *Barry v. Islamic Republic of Iran*, 437 F.Supp.3d 15, 60 (2020) ("Courts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits.") *See also Doe A-1 v. Democratic People's Republic of Korea*, 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) ("Courts in this district have taken varying approaches to requests for prejudgment interest").

"Where courts have made such an award, they have generally justified it based on a delay between the time of the attack giving rise to the injury and the time at which the claimants received relief." *Barry*, 437 F. Supp. 3d at 60 (citing *Reed*, 845 F. Supp. 2d at 214 (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263-65 (D.D.C. 2008)); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011)). "'The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation.'" *Fritz*

*I*, 324 F. Supp. 3d at 63 (*quoting Oldham v. Korean Air Lines Co*., 127 F.3d 43, 54 (D.C. Cir. 1997)). "Accordingly, '[p]rejudgment interest is an element of complete compensation.'" *Fritz I*, 324 F. Supp. 3d at 63 (*quoting Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 59 (D.D.C. 2012) (*quoting West v. United States*, 479 U.S. 305, 311-12, 107 S. Ct. 702, 93 L.Ed.2d 639 (1987))). *See Kinyua v. Republic of Sudan,* 466 F. Supp. 3d 1 (D.D.C. 2020), ("'A solatium award is therefore best viewed as fixed at the time of the loss,' … and plaintiffs are entitled to the full amount of their award as if they received it in 1998. Failing to do so would not only place the present plaintiffs at a disadvantage relative to their family members in earlier litigation, but would also allow the Iranian defendants 'to profit from the use of the money over the past [two] decades.'"). *Id.* at 12 (quoting *Fritz I*, 324 F. Supp. 3d at 64 and *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013)). *See also Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 274 (D.D.C. 2020) (stating, in an action arising from 1998 embassy bombings, that "this Court will follow its general practice. As the Court observed recently, 'plaintiffs are entitled to the full amount of their award as if they received it at the time of the injury,' and failure to award prejudgment interest would 'allow the Iranian defendants to profit from the use of the money over the last [two] decades.'") (quoting *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (addressing embassy bombing claims)); *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at *19-20 (D.D.C. July 2, 2020) (stating, in action arising out of 1996 bombing of Khobar Towers, that "[f]ailing to award prejudgment interest would place plaintiffs at a disadvantage relative to plaintiffs in earlier litigation"); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82-83, n.10-12 (Bates, J.) (awarding prejudgment interest to victims of embassy bombings); *Wamai*, 60 F. Supp. 3d at 98 (Bates, J.) (stating, in action brought by victims of embassy bombings, that "[p]rejudgment interest is appropriate on the whole award, including pain and suffering and solatium" and past economic loss, but not on present economic loss); *see also Fritz I*, 324 F. Supp.

3d. at 64 (Moss, J.) (awarding prejudgment interest on the past economic loss of the direct victims abducted and murdered in Iraq as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families); *Fritz v. Islamic Republic of Iran*, 466 F. Supp. 3d 13 (D.D.C. 2020) ("*Fritz II*") (Moss, J.) (finding additional family member entitled to damages and following *Fritz I* in awarding prejudgment interest); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (Friedman, J.) (awarding prejudgment interest in action arising from suicide bombing in Israel).

But numerous other courts differ, concluding that the "values set by" the *Heiser* framework "represent the appropriate level of compensation, regardless of the timing of the attack … These courts emphasize that 'pain and suffering and solatium damages are both designed to be fully compensatory.'" *Barry*, 437 F. Supp. 3d at 60 (citing *Oveissi I*, 768 F. Supp. 2d at 30 n.12.; *Wyatt*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *Schertzman Cohen v Islamic Rep. of Iran*, 2019 WL 3037868, at *10 (D.D.C. July 11, 2019); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 43 (D.D.C. 2012); *Thuneibat*, 167 F. Supp. 3d 22, 54; *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 45–46 (D.D.C. 2018) ("*Akins I*"); *Akins v. Islamic Republic of Iran*, 549 F.Supp.3d 104 (D.D.C. 2021) ("*Akins II*"), (denying motion to, *inter alia,* add prejudgment interest to baseline awards finding that the "majority of Judges confronted with this issue have concluded—as this Court did in *Akins*—that 'pain and suffering and solatium damages are both designed to be fully compensatory.'") *Id.* at 121-22 (quoting *Barry*, 437 F. Supp. 3d at 60).

This Court recently addressed the issue and concluded that prejudgment interest was not warranted where pain and suffering and solatium damages were already fully compensatory. *Winternitz*, No. CV 17-2104 (TJK), 2022 WL 971328, at *12.[14] Based on this Court's

---

[14] *See also Pennington v. Islamic Republic of Iran*, 2022 WL 168261, at *5 (D.D.C. Jan. 19, 2022) ("As have many courts before it, this Court calculates its direct-injury and solatium awards to be

determination and analysis in *Winternitz*, it is appropriate to address each component of damages separately and to consider whether the recommended damages are fully compensatory. Accordingly, I have set forth below an analysis with respect to each component of the compensatory damages recommendation in this Report:

- **Future Economic Loss**:  Prejudgment interest is not appropriate for the future economic loss damages.  This loss amount accounts for the future and is discounted to present value as of the date of judgment.   Application of prejudgment interest at a different rate would alter the present value computation and create an inconsistent loss calculation.[15]

- **Past Economic Loss**:  Past economic loss is a computation of loss as of the date of the abduction of the Victims and is a nominal dollar amount.  The expert reports submitted in support of the economic loss claims of the estates of the Victims specifically state that the

---

fully compensatory."); *Borochov v. Islamic Republic of Iran*, 2022 WL 656168, at *11 (D.D.C. Mar. 4, 2022) (citing *Akins* and denying prejudgment interest); *Selig v. Islamic Republic of Iran*, -- F. Supp. 3d -- , 2021 WL 5446870, at *25 (D.D.C. Nov. 22, 2021) (same); *Blank v. Islamic Republic of Iran*, 2021 WL 3021450 (D.D.C. July 17, 2021) (finding that "the majority of Judges on this Court to consider the issue of prejudgment interest for FSIA damages awards have held 'the 'values set by' the *Heiser* framework 'represent the appropriate level of compensation, regardless of the timing of the attack" and holding that, "[c]onsistent with this persuasive authority, the four family-member plaintiffs are not entitled to prejudgment interest on their solatium damages.") (citations omitted); *Barry*, 437 F. Supp. 2d at 60, *Doe A-1*, 2021 WL 723257, at *9; *Bathiard v. Islamic Republic of Iran*, 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (in addressing motion for leave to amend complaint to add demand for prejudgment interest and concluding, "[w]hile the Court is aware of well-reasoned decisions in this jurisdiction that have come out the other way, *see, e.g.*, *Fritz*, 324 F. Supp. 3d at 63–64, it continues to conclude that prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation. ... Here, the Special Master clearly accounted for the passage of time and the persistence of the plaintiffs' injuries in determining the appropriate compensatory damages awards. *See, e.g.*, R & R 35 (noting that "Mr. Moghrabi *continues to* experience emotional injuries as a result of his experience and injuries" (emphasis added)); *id.* at 44 (finding that Cesar Bathiard's wife "has suffered and *continues to suffer* significant emotional distress as a result of his death" (emphasis added)). Plaintiffs are therefore not entitled to prejudgment interest on their nonpecuniary damages.").

[15] In this case, the future loss is assumed to start after 2021 – the date of the economic loss report.

present value computation is applied only to the future values and the reports define future loss as 2022 forward. Accordingly, it would be appropriate to apply prejudgment interest to the past loss (which is not adjusted by any interest factor) to account for the time elapsed between the abduction of the plaintiffs and the date of judgment.

- **Pain And Suffering Damages For The Victims**: In *Winternitz*, this Court found that the injured victim's pain and suffering injuries including lasting and severe psychological harm and that accordingly, the damage value established covered ongoing injury and was fully compensatory. In light of this determination, this Court declined to add prejudgment interest to the award. *Winternitz*, No. CV 17-2104 (TJK), 2022 WL 971328, at *12 (citing *Doe v. Syrian Arab Republic*, No. 18-CV-0066 (KBJ), 2020 WL 5422844, at *18 (D.D.C. Sept. 10, 2020)). In this case, the pain and suffering damages recommended for the Victims do not have an "ongoing" component. Instead, the amount is fixed as of the date of the death of the Victims. This loss therefore is intended to account for the full pain and suffering of the Victims as of the time of their deaths in 2014. It would be reasonable, therefore, to apply prejudgment interest to the pain and suffering loss amount to account for the delay in compensation for a loss fixed in 2014.

- **Solatium damages.** Solatium damages present a somewhat more complex issue. Solatium damages are intended to compensate for grief and loss – not limited in time. The recommended amount of solatium damages accounts for the permanence of the loss and the ongoing grief. In that sense, the rationale for prejudgment interest as a necessary factor to make the plaintiff whole and bring the loss value to the present time does not inevitably apply. As many courts, including this Court, have found, solatium damages are by their nature fully compensatory and thus an award of prejudgment interest is not necessary to fully compensate the plaintiffs. *Winternitz*, No. CV 17-2104 (TJK), 2022 WL 971328, at

*12. Yet, I note and am mindful of the fact that in this case as in many others, the grief and loss commenced nearly a decade ago – and the plaintiffs have continued to suffer throughout that period – only now reaching an end to the only means they have to seek a form of justice.  On balance, however, this Court's recent decision counsels against an award of pre-judgment interest for solatium damages.

For the Court's consideration, I have provided a calculation of prejudgment interest from the date of abduction through April 30, 2022 at the applicable federal prime rate for the Victims' pain and suffering damages and past economic loss damages.  I have also included for the Court's information a computation of prejudgment interest on the recommended solatium damages.

Prejudgment interest is calculated at the prime rate for each year from the date of abduction for each Victim (November 22, 2012 for Mr. Foley and August 4, 2013 for Mr. Sotloff) using the methodology described in *Fritz I*, 324 F. Supp. 3d at 64, 67 n. 2. [16] A multiplier was calculated using the Federal Reserve's data for the average annual prime rate from the dates of abduction through April 2022.  *See* Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last accessed on April 25, 2022).[17]

---

[16] *See also Fritz v. Islamic Republic of Iran*, No. CV 15-456 (RDM), 2018 WL 5046229, at *26 (D.D.C. Aug. 13, 2018), (awarding prejudgment interest from the date of the respective abductions for each victim), *report and recommendation adopted as modified*, 324 F. Supp. 3d 54, 64 (D.D.C. 2018) ("Plaintiffs were theoretically entitled to the full amount of their solatium awards in 2006 (when Al-Taie was abducted) and 2007 (when Fritz, Chism, and Falter were abducted and killed), and thus prejudgment interest is appropriate to account for the time that they have not had access to that full amount.")

[17]  The rates applied are as follows:

      2012:  3.25 (applied from the date of abduction for Mr. Foley)
      2013:  3.25 (applied from the date of abduction for Mr. Sotloff)
      2014:  3.25
      2015:  3.26
      2016:  3.51
      2017:  4.10

To calculate the multiplier for each Victim, I multiplied $1.00 by the prime rate in 2012 (Foley) and 2013 (Sotloff), and then multiplied the resulting product by the percentage of the days of the year remaining as of the date of the attack. I then added that product to $1.00. Next, I multiplied that amount by the prime rate the following year and added that amount. Continuing this iterative process through April 2022 yields a multiplier of 1.422 for Mr. Foley and 1.390 for Sotloff. As the Court explained in *Wamai* and *Opati*, "[t]he product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award." *Wamai*, 60 F. Supp. 3d at 99 n. 16; *Opati*, 60 F. Supp. 3d at 83 n. 12.

---

2018: 4.91
2019: 5.28
2020: 3.54
2021: 3.25
2022: 3.50 (current rate)

54

## SUMMARY OF RECOMMENDATIONS

| VICTIMS | SECTION 1 - PAIN AND SUFFERING | | | SECTION 2A - PAST ECONOMIC LOSS | | | SECTION 2B - FUTURE ECONOMIC LOSS | TOTALS | |
|---|---|---|---|---|---|---|---|---|---|
| | PAIN AND SUFFERING | PREJUDGMENT INTEREST ON PAIN AND SUFFERING | PAIN AND SUFFERING WITH PREJUDGMENT INTEREST | PAST ECONOMIC LOSS | PREJUDGMENT INTEREST ON PAST ECONOMIC LOSS | PAST ECONOMIC LOSS WITH PREJUDGMENT INTEREST | FUTURE ECONOMIC LOSS (No Prejudgment Interest) | TOTAL WITHOUT PREJUDGMENT INTEREST | TOTAL WITH PREJUDGMENT INTEREST ON PAIN AND SUFFERING AND PAST ECONOMIC LOSS |
| Estate of Steven Sotloff | $54,000,000.00 | $21,076,279.55 | $75,076,279.55 | $176,328.00 | $68,821.08 | $245,149.08 | $684,027.00 | $54,860,355.00 | $76,005,455.63 |
| Estate of James Foley | $56,500,000.00 | $23,820,231.73 | $80,320,231.73 | $199,001.00 | $83,898.23 | $282,899.23 | $443,432.00 | $57,142,433.00 | $81,046,562.96 |

| FAMILY MEMBERS | SOLATIUM DAMAGES |
|---|---|
| Arthur Barry Sotloff | $7,500,000.00 |
| Shirley Goldie Pulwer | $7,500,000.00 |
| Lauren Sotloff | $3,750,000.00 |
| John William Foley | $7,500,000.00 |
| Diane Maria Foley | $7,500,000.00 |
| Lt. Col. John Elliot Foley | $3,250,000.00 |
| Mark Vincent Foley | $3,125,000.00 |
| Kathryn Foley Simpson | $3,125,000.00 |

### SOLATIUM DAMAGES WITH PREJUDGMENT INTEREST FOR THE COURT'S INFORMATION

| FAMILY MEMBERS | SOLATIUM DAMAGES | PREJUDGMENT INTEREST ON SOLATIUM DAMAGES | SOLATIUM WITH PREJUDGMENT INTEREST |
|---|---|---|---|
| Arthur Barry Sotloff | $7,500,000.00 | $2,927,261.05 | $10,427,261.05 |
| Shirley Goldie Pulwer | $7,500,000.00 | $2,927,261.05 | $10,427,261.05 |
| Lauren Sotloff | $3,750,000.00 | $1,463,630.52 | $5,213,630.52 |
| John William Foley | $7,500,000.00 | $3,161,977.66 | $10,661,977.66 |
| Diane Maria Foley | $7,500,000.00 | $3,161,977.66 | $10,661,977.66 |
| Lt. Col. John Elliot Foley | $3,250,000.00 | $1,370,190.32 | $4,620,190.32 |
| Mark Vincent Foley | $3,125,000.00 | $1,317,490.69 | $4,442,490.69 |
| Kathryn Foley Simpson | $3,125,000.00 | $1,317,490.69 | $4,442,490.69 |

Dated:  April 25, 2022

Respectfully submitted,

By: *Deborah E. Greenspan*
   Deborah E. Greenspan, Esq.
   Special Master